## CUNNINGHAM *vs.* BURDELL.

*In the matter of the Estate of* HARVEY BURDELL, *deceased.*

By the law of this State, marriage is treated merely as a civil contract, not requiring legal forms, religious solemnities, or any special mode of proof. Marriage is honorable ; and where its duties are voluntarily assumed by parties occupying an independent position, there must be some strong and controlling motive to induce a suppression of the relation.

The policy of the law is opposed to concealment of the marriage contract ; and when there has been no cohabitation, or acknowledgment, or mark of the relationship, but the parties lived as single persons, and the alleged contract was first announced after the alleged husband's death,—*Held,* that there was no presumption in favor of marriage, but against it. In such case, the allegation should be viewed with jealousy, and strict proof be demanded.

In a question of identification, where there is no recognition, it is unsafe to rely upon mere resemblance ; especially where the comparison is between a dead body and a living person, the powers of perception in the observer were not unusual, the opportunities for observation were slight, and a considerable interval had elapsed between the dates of comparison.

Where direct evidence of marriage is insufficient, it may be supplied by indirect and collateral proof of the conduct, treatment, and declarations of the.parties.

Sentence given against an alleged marriage, on the ground that the ceremony was clandestine, and accompanied by suspicious circumstances; there was no proof of cohabitation, of private or public acknowledgment, no sufficient evidence identifying the alleged husband, the marriage was first disclosed after the husband's death, and the declarations and acts of the parties were entirely repugnant to the marital relation.

HENRY L. CLINTON, *for Claimant.*

I. The testimony of all the eye-witnesses to the ceremony establishes most clearly the fact of the marriage between the claimant and the decedent.

All the witnesses who were present at the marriage ceremony in question (to wit, Rev. Mr. Marvin, who officiated professionally, his servant girl, Sarah Manahan, and Augusta Cunningham, daughter of the claimant), have identified,

with more or less positiveness, the corpse of the decedent, as that of the person who was married to the claimant, on the 28th of October, 1856. Mr. Marvin's testimony, taken alone, would be amply sufficient to establish the identity of the decedent. He (Mr. Marvin), is strongly corroborated by the servant girl. She states that there was a strong resemblance between the corpse of Dr. Burdell and the person whom she saw married; and is only restrained from giving a positive opinion by the consideration, that "death disfigures so much." Mr. Marvin states, with great positiveness, that he has no doubt whatever that the gentleman whom he married on the 28th of October was Dr. Harvey Burdell. The fact that Mr. Marvin did not, upon the Coroner's inquest, express a positive opinion as to the identity of Dr. Burdell, does not in any way militate against the force of his testimony before the Surrogate. The circumstances under which he testified before the Coroner were most extraordinary and peculiar. Before he arrived at No. 31 Bond street, he was made to believe that a gross fraud had been practiced upon him. Upon his arrival there, and before an opportunity to view the corpse was afforded him, the idea was "preached into him," by the throngs of people in the house, that it was Eckel, and not Burdell, whom he had married to the claimant. His mind, as he testifies, was preoccupied with that theory. He fully believed it. But when he saw the corpse, its resemblance to the person he married flashed upon his mind so strongly, that this theory was almost entirely over thrown. He would then have abandoned it altogether, had he not been told that Eckel and Burdell were so like each other in appearance, that one might readily be taken for the other by those not intimately acquainted with them. He, therefore, expressed no positive opinion before the Coroner as to the identity of Dr. Burdell; but contented himself with stating, that the corpse bore a strong resemblance to the man he married on the 28th of October. His opinion upon the subject of Dr. Burdell's identity was not asked when he gave his evidence. At this time, Mr. Marvin had not seen Eckel.

He did not see him until several days afterward. Why was not Mr. Marvin confronted with Eckel? especially as the latter was in custody at the time, on the charge of murder, and could have been brought before the Coroner upon five minutes' notice. Had this been done, Mr. Marvin would at once have testified that he had no doubt whatever that the body of Harvey Burdell was that of the man he married; and no question as to the genuineness of the marriage would ever have been raised; for, in that event, there never could have existed a reasonable doubt upon the subject. From that time to the present, the relatives of Dr. Burdell and their emissaries have dogged Mr. Marvin by day, and hunted him by night, in order to entrap him into loose conversations, so that they might afterwards give a garbled statement of it in evidence, and, by distorting his language, make him say something he never intended. They have continually waylaid him, and resorted to means with a view to overthrow his testimony, such as would mantle with shame the cheek of an honest man.

As soon as Mr. Marvin saw Eckel (who bore not the remotest resemblance to Dr. Burdell), he was positive in the opinion that he married Dr. Burdell to the claimant. And he so stated before the Grand Jury, within two weeks or thereabouts, subsequent to giving his testimony before the Coroner.

It is true, Mr. Marvin testified that he was not as accurate as some in his observation of countenances; but in this particular case, his observation of the man he married was minute and close, for the reason that, when he first called, Mr. Marvin thought the man's whiskers were false, and that he (Mr. Marvin) could see daylight through them. He, therefore, upon the occasion of the marriage, scrutinized the man closely, in order to test the accuracy of his suspicion; as he had determined, if his suspicion proved to be correct, that he would not perform the ceremony. His (Mr. Marvin's) positive and unequivocal opinion upon the point of identity should have controlling weight with the Surrogate. The

intensity of Mr. Marvin's observation of the man he married
is illustrated by the fact, that upon being confronted with the
the claimant and her daughter Augusta, when before the
Coroner, he did not identify either.   The reason is obvious.
At the time of the performance of the marriage ceremony,
there were no special circumstances (as in the case of the man)
calculated to rivet his attention upon them.   The idea has
been broached by the opposite counsel, that the fact of Mr.
Marvin's going to Goshen to supply Dr. Snodgrass' pulpit,
and there conversing with Dr. Snodgrass' family, on the sub-
ject of the marriage in question, was the cause of his arriving
at the conclusion that he had married Dr. Burdell.   This
idea is grossly absurd, not to say puerile; for Mr. Marvin
testifies that he had arrived at this positive opinion, and so
expressed himself, before he went to Goshen.

Mr. Marvin testifies to another circumstance, very strongly
corroborative of his opinion that he married Dr. Burdell.
He conversed with very many acquaintances of Dr. Burdell,
who described his manners and appearance to the witness.
Mr. Marvin testifies that after listening to such descriptions,
his invariable reply was: "You have described the man I
married."

Augusta Cunningham testifies positively and unequivocally,
that Harvey Burdell was the man whom Rev. Mr. Marvin
married to her mother, on the 28th of October.   The Surro-
gate must base his judgment upon the opinion of witnesses.
Is the united unimpeached and unimpeachable testimony of
all who were present at the ceremony to be ruthlessly over-
thrown?   Augusta Cunningham cannot, by human possibility,
be mistaken in her evidence upon this point.   Why should
not the positive opinion of the Rev. Mr. Marvin, whose
opportunities of judging were so ample, who so closely
scrutinized Dr. Burdell at the time of the marriage, set
this question forever at rest.   Cannot Mr. Marvin, who
saw Dr. Burdell under such peculiar circumstances, both
before and after he was murdered, better judge of his iden-
tity, than those who never saw Dr. Burdell, in life or in

death? This is not a case where there is a conflict of evidence upon the point of identity; on the contrary, the testimony is all one way. The three witnesses present all concur in establishing the identity of decedent. Most respectfully I ask, would it not be the height of madness to disregard the whole evidence on the subject of identity? Could a secret marriage ever be more strongly proven? All the circumstances established by the other side, with a view to disprove this marriage, are but the ordinary concomitants of a secret marriage. If idle rumors, vague suspicions, morbid delusions, and deplorable hallucinations are to take the place of positive proof, strong as adamant, and firm as the rock of Gibraltar, then, this marriage, duly solemnized, will be rendered null and void; otherwise, it will be established in this court.

II. The testimony of the Rev. Mr. Marvin is not overthrown, or at all impaired by the evidence of the contestants.

The contestants have called a host of witnesses who claim to have had conversations with Mr. Marvin, for the purpose of showing that he made statements, out of court, contradictory of his evidence. An illustration of the utter worthlessness of this evidence is found in the fact, that no two of these witnesses agree with each other, and very few of them agree with themselves in their statements.

I shall examine the testimony of the principal witnesses of the contestants upon this head.

Ex-Alderman Voorhies testified to one or two conversations between himself and Mr. Marvin, and one between himself, Mr. Tilden, and Mr. Harriott, after Mr. Marvin had testified before the Surrogate, which conversation, as he states, arose out of the fact that Mr. Marvin's testimony, before the Surrogate, differed from statements made to them by him.

The next witness, Mr. Harriott, testified, that this last conversation occurred before Mr. Marvin had given any testimony in this case; thus contradicting Alderman Voorhies, instead of Mr. Marvin. Mr. Harriott professed to give the

exact words used by Mr. Marvin in a conversation with himself. Mr. Harriott stated, that his memory was so good, that weeks and months after a conversation occurred, it was in his power to repeat the exact words used. He was asked if he could repeat the exact words he had used in response to a question put to him a few moments before.

He replied: "Most certainly I can." He attempted it, and left out almost his whole answer. He attempted it again, but essayed only to give the substance, and met with very poor success at that. He attempted it again, but found it impossible to be certain as to any of the words he had used, and could give only a vague idea of what he supposed he intended to say.

Dr. B. F. Maguire, a cousin of Dr. Burdell's, testified that Mr. Marvin told him that the man he married was thin and spare, and that his whiskers were from four to six inches long; he testified that Dr. Burdell's manner and speech were very quick. The extent to which this witness gave a loose rein to his prejudices and his feelings is illustrated by the fact, that he testified that the decedent " could not be otherwise than quick in speech;" a rank absurdity.

Dr. S. W. Parmley testified that Mr. Marvin told him, that the man he married " appeared to be about seventy years of age, except in his face." He also testified that Mr. Marvin told him that he did not examine the man he married, or note him particularly, until he called the next day for his certificate, when he thought he saw daylight through his whiskers. In these particulars, Dr. Parmley is contradicted by the entire evidence throughout the case, on both sides. This is a perfect illustration of the utter unreliability of all the evidence introduced by the contestants under this head; especially when it is remembered that the object of such evidence is·to impeach the integrity of the testimony of a clergyman whose character is above reproach.

·· John Connery, deputy of the Coroner, testified that when Mr. Marvin saw the corpse, he shook his head. This circum- stance is explained by Officer McCluskey, who was present

on this occasion. He testified that the claimant was brought into the room where the corpse lay, with a view to ascertain whether Mr. Marvin could recognize her, and that it was then, and not while Mr. Marvin was viewing the corpse, that he shook his head; which indicated that he did not recognize the claimant. This question was put to the witness:

*Q.* "Did he (Marvin) say that he (the corpse) was not the man?"

*A.* "No; he did not say that exactly. He said he could not swear positively. He expressed no opinion." Yet another witness present at this identical time, introduced by the .contestants, swears positively that Mr. Marvin said, that "that was not the man." Thus these two witnesses for the contestants, flatly contradict each other.

The next witness introduced by contestants on this point is, Mr. Charles Weldon, ·a Reporter for the *N. Y. Daily Times,* He testified to the accuracy of the report of Mr. Marvin's testimony before the Coroner. By this report, it appears that a daguerreotype of Dr. Burdell was shown to Mr. Marvin; and he testified that there was but little resemblance between that and the gentleman he married. Most of the witnesses for the contestants, who were shown this daguerreotype, testified that it bore little or no resemblance to Dr. Burdell, and that they could not recognize it as his likeness. The report of Mr. Weldon proves the fact, that Mr. Marvin was not asked his opinion as to whether the corpse was that of the person he married. The discrepancies in the testimony on this point are all accounted for, upon the ground that the question put to Mr. Marvin was with reference to the resemblance of the daguerreotype (not of the corpse) to the man he married.

Captain Dilks, of the Fifteenth Ward police, testified that Mr. Marvin was asked by the Coroner his opinion as to whether the corpse was that of the person he married. All the reports of the case ᵣ ⸱⸱ evidence by the contestants demonstrate the contrary. This witness is contradicted, in all the important details of his evidence, by the other testimony

of the contestants. His memory is vigorously and tenaciously blank, on many points important for the claimant. Robert Johnstone, a lawyer, called by contestants, testified that Mr. Marvin, when viewing the corpse, stated, he did not identify the body positively, and that he desired to see Eckel.

Johnstone stated, that Mr. Marvin remarked that he could see no difference between the features of the corpse and those of the man he married, at the same time, pointing out a similarity in the features, in several particulars. Mr. Johnstone testified that the whiskers of the corpse were about the length of his little finger, while many of the witnesses for contestants stated, that they were less than an inch in length. Mr. Johnstone also testified, that Mr. Marvin in that conversation stated, that the man he married was heavier than the corpse.

Next comes the testimony of Henry L. Bogardus, who was present at this particular conversation, and he swears exactly the reverse of Mr. Johnstone, to wit, that Mr. Marvin stated, that the corpse was heavier than the man he married. This shows the utter treachery of the memory of witnesses, who attempt to detail conversations months after they occur. Bogardus, who professed to have been a close observer, on this occasion, could not tell whether the corpse had moustache, goatee, side whiskers, whiskers under the chin, whether the face was covered with beard, or the whole face was smoothly shaven. Neither could he tell whether the complexion of the corpse was pale or florid. How utterly weak is the attempt to overthrow the solid evidence of Mr. Marvin, by testimony such as that introduced for that purpose by the contestants! Had the claimant attempted to bolster up the marriage by such " airy nothings," she would have been scouted out of court.

I will now hurriedly glance at the testimony sustaining. Mr. Marvin. Hector Moore, a witness called by contestants, on his cross-examination, testified, that on the same day that Mr. Marvin gave his evidence before the Coroner, he (Mr. Marvin) told the witness that when he (Marvin) came

to 31 Bond street, that day, he thought Burdell was not the man he married; but that, upon examining the corpse, he at once changed his opinion, and became convinced that the corpse was that of the person he married, that the Coroner tried to make him swear positively, either that Burdell was, or was not the man, which he refused to do, especially as he had not seen Eckel.

John McCluskey, a policeman, attached to the Coroner's office, introduced by claimant, testified, that on that day, Mr. Marvin, upon being asked as to the identity of Burdell, stated, that the corpse and the person he married, were one and identical.

Mr. Marvin added: " The more I look at the corpse, the more impressed I am that is the man I married." Mr. Ezra Bliss confirms the statement of these two witnesses.

Jeremiah B. Fellows, a merchant, introduced by claimant, testified, that he was present at the inquest on the day that Mr. Marvin testified, and he then asked Mr. Marvin whether it was Dr. Burdell he married? Mr. Marvin replied: " He was as positive as he could be that it was, but that if Eckel was so like Burdell that the two were scarcely distinguishable, it might be doubtful."

Dr. Uhl testified, that at or about the same time, he heard Mr. Marvin say, that the points of resemblance were strong. Upon a fair view of all the testimony on this point, *pro* and *con*, it is clear, that Mr. Marvin is overwhelmingly sustained. The attempt to impeach or shake his evidence is most lame and impotent.

Again, I maintain that the description Mr. Marvin gave of the man he married, was a correct description of Dr. Burdell. Mr. Marvin testified, that the man stooped, was slow of speech, walked, and (except in the face) appeared like one sixty or sixty-five years of age.

While the Herkimer witnesses, in their exuberant enthusiasm, make Burdell so straight as to bend backwards, Mr. Maguire (his cousin), and the other witnesses, on both sides, concede that he had an inclination of the head forward.

Samuel A. Beekman, a merchant of this city, testified that he had known decedent for twelve years, that he had "frequently seen him walking with his eyes down, and there was a stoop of the head, rather than the shoulders. His walk was shuffling and rocking."

Dr. Walter B. Roberts testified, that his relations with Dr. Burdell were very intimate, and he had known him for three years. He testified that a person, at first sight, would say that Dr. Burdell was round shouldered, from a habit he had of stooping; that when he walked his head bent forward, and he seemed to be looking at the pavement. Dr. Roberts also testified that Dr. Burdell's beard was very thick, under the chin, and about the mouth; and that at first view his entire whiskers appeared to be very heavy, but that on a near and closer examination, it was perceptible that they were rather thin on the sides of the face. It is not impossible, that Mr. Marvin might have supposed his whiskers to be thicker and longer than they actually were, for the reason, that his attention was directed to them, not to ascertain their size, but to determine whether or not they were false. The testimony of Dr. Uhl in regard to the manner of Dr. Burdell is important. Dr. Uhl testified, that Dr. Burdell had two different sets of manners: I will quote Dr. Uhl's language: "When he (Dr. Burdell) called on professional or delicate business, he would speak slowly, with a long interval between his sentences, hesitating, hanging his head a little, drawling out his words, &c.; at other times, his voice was quick and sharp." The testimony introduced by contestants to show the general habit of decedent, does not at all conflict with that of Dr. Uhl as to his manner on particular occasions.

One word on the subject of Dr. Burdell's whiskers, which have loomed up in this case with such terrible significance. Our learned opponents seem to have regarded these whiskers as the very bulwark of their defence. An army of witnesses have been introduced for the purpose of showing that Dr. Burdell never wore side whiskers; and that, probably, at the time of the marriage in question, he wore no beard. The

HARVARD LAW SCHOOL LIBRARY.

contestants, however, finally introduced Mr. Barr, Dr. Burdell's barber, who testified, that to his certain knowledge, Dr. Burdell let his entire beard grow from the first of September 1856 to the time of his death. Dr. Uhl testified, that on the 27th of October (the day before the marriage) he saw Dr. Burdell, and observed that his whiskers were full and black.

Dr. Daniel D. Smith testifies, that he saw Dr. Burdell on the morning of the 31st of October, that he wore his whiskers all over his face; and they were large and black, that his appearance was so much altered, the witness did not recognize him until he (Burdell) spoke to him. Thus, it appears most conclusively, that the description Mr. Marvin gave of the man he married, was a correct description of the decedent.

III. The testimony of Augusta Cunningham has not been impeached, directly or collaterally, nor in any degree weakened by any available evidence adduced in the case.

If Dr. Burdell was not married to the claimant, this witness is not only guilty of the most diabolical perjury, but of aiding and abetting her mother in the astounding crime of procuring another to personate Dr. Burdell in the marriage ceremony. If she be guilty of these two crimes, you can hardly stop short of the conclusion, that she has stained her soul with blood-guiltiness. What motive but that of murder could have prompted a simulated marriage? Crime is not to be assumed. The presumptions of law and humanity are in favor of innocence, until the contrary appear. Law, justice, and humanity forbid that you impute such crimes to this young girl, unless they be clearly proven against her by the evidence. I defy my learned opponents to point to any evidence in this case proving, or tending to prove, any of these most horrible crimes. Let them, if they can, point to any reliable evidence calculated even to raise a reasonable suspicion. This witness has, on three different occasions, testified on the subject matter of her evidence in this case; first, before the Coroner; second, on the trial of her mother

for murder; third, before the Surrogate. On each occasion, her evidence was given in great detail. Thrice has she been cross-examined with great dexterity and extraordinary severity. I shall not go into detail as to her testimony, before the Coroner, in the Court of Oyer and Terminer, and in this court, with a view of comparing part by part, for the purpose of showing the trivial inaccuracies and discrepancies that could not but occur under such circumstances. The testimony given on each of these three occasions is substantially the same. With a view to account for any discrepancies that may appear between her testimony before the Coroner and in this court, I will invoke your attention to the extraordinary and unparalleled circumstances under which she first testified. Her home for one long week had been converted into a prison. It was filled with the police and besieged by a mob. Her mother, her sister, and herself were confined there as prisoners, and treated as outlaws; for even the right to see and advise with counsel was denied them—a right guaranteed by the Constitution, and which, in practice, has always been accorded to even the most desperate and abandoned criminals. Every one who spoke to them in words of kindness was branded as with the mark of Cain. The fearful and appalling murder of her step-father was quite sufficient to overthrow and exhaust one of weak constitution, and who had suffered for years with broken health. Surrounded by scenes of tumult and brutality—worried, jaded, worn out with sufferings, indignities, and calamities; her strength gone, her nervous system, for the time, broken down, she went upon the stand to testify; the atmosphere of the room contaminated and fetid; her eyes compelled to meet the concentrated gaze of a gaping crowd —can you not excuse trepidation, nervousness, or confusion, under such circumstances? She might well be excused for any statements then made by her. But she has been remarkably accurate and consistent upon material points, thus showing the power of innocence and the force of truth. It is true Recorder Smith has testified that during her examina-

tion (which was conducted chiefly by himself) she was calm; but her calmness was nothing but the very excess of excitement. Her examination lasted many hours. With a view to show that he observed her manner, the Recorder testified that he did not think he took his eyes off from her for an instant during the whole examination. Here, then, you have the witness in a state of physical exhaustion—a densely packed crowd staring at her—and, in addition, the firmly-knit countenance, the compressed lips, and the prominent, fixed gaze of the Recorder directed towards her for hours. In order to show the merciless severity of the cross-examination to which she was subjected by the Recorder, I will cite a few specimens. [Mr. Clinton proceeded to cite at considerable length from a verbatim report of the examination of this witness.] Let me ask the counsel, with their ingenuity, with their perseverance, with the untiring spirit of persecution of Burdell's relatives to back them, why it was that, for four long months devoted to this case, during all of which time, according to the testimony, they have been quite ubiquitous—for the witnesses speak of them as being almost everywhere—they have been unable to produce any evidence to impeach the character of Augusta Cunningham? During all this time, multitudinous and vigilant inquiries in all directions have been made in relation to the claimant and her daughters. Everything in their previous history has been brought before the public. Augusta Cunningham is well known where she has lived. She has been in your schools and seminaries; she has not a small circle of acquaintances and friends, by whom she is respected and beloved. Yet no living person can be found to come into court and say aught derogatory of her character. Was it not enough that the mother of this lady should have been dragged through a criminal court—hunted and persecuted for a crime of which she was innocent as the babe unborn—had she not calamity enough in the loss of her lawful husband—was it not enough that the learned counsel should thus seek to blacken and destroy the character of the mother

of this young girl—was it not enough that the relatives of Burdell, in their attempts to get hold of his property, should seek to ride into possession over the dead body of my client —was not all this, enough, without seeking to blast for ever the reputation of a girl whose character is as pure and

> " Chaste as the icicle
> That's curdled by the frost from fountain,
> And hangs in Dian's temple ?"

How does the other side attempt to overthrow the testimony of Augusta Cunningham? Simply by contradicting her on collateral points. They seek to show, first, that the decedent was absent from the city of New York on the 25th, 26th, and 27th of October—(Augusta having stated that he was here on those days).

The contestants first endeavored to prove that the decedent was not in the city of New-York, on the 28th, the day of the marriage.

Dr. Allen T. Smith, a pretended partner of the decedent at this time, together with Fagg, swore that Burdell was absent from the city of New-York from the 27th of October, until a week or more thereafter. This testimony was placed in the foreground by our learned adversaries, thus showing that their original intention was, to prove that decedent was absent from this city during the entire week in which the marriage occurred. Failing in this, by reason of the rottenness of their testimony, their next effort is directed to proving that the decedent was in Herkimer on the 25th, 26th and 27th of October, 1856, which attempt was attended with no better success than the other, notwithstanding they had some three or four months within which to get up this *alibi;* while the testimony for the claimant, in answer to the great mass of evidence on behalf of the contestants, was crowded into almost as many days. Eli Taylor, the keeper of a hotel at Herkimer, testified that Dr. Burdell arrived there on Saturday the 25th of October, and remained there until three or four o'clock on the afternoon of the Monday following, when

he left for New-York. Mr. Laflin, a paper manufacturer, residing at Herkimer, left in that train which Burdell would have taken, according to the testimony of Eli Taylor. Laflin came immediately to New-York, and being well acquainted with the decedent, the probabilities are, that he would have seen him, had he come to New-York at that time, as represented. Eli Taylor testifies that a patent suit of *Taylor* vs. *Gray* was tried in the village of Herkimer on the 27th of October, and that Dr. Burdell was present on that occasion. He testifies to one circumstance, which shows conclusively that the visit at Herkimer, to which all the Herkimer witnesses' testify, did not occur in the latter part of October, but near the last of November. He says, that Dr. Burdell, when he arrived at Herkimer on the Saturday in question, stated, that he expected to meet Mrs. Wilson on board the boat that came from New-York. That fact speaks volumes in this case, for it was on the last Saturday in November that Mrs. Wilson left New-York for Herkimer, and the decedent expected to meet her on board the boat. This is a conceded fact in the case: Mrs. Wilson testifies to it herself. The other witnesses from Herkimer have all, if honest, made a mistake of a month in point of time. For all the testimony shows that Dr. Burdell arrived in Herkimer on Saturday, the 29th of November, and remained there until the ensuing Monday. This view harmonizes all the conflicting evidence on this point. At the precise time Eli Taylor testified that . Dr. Burdell was in Herkimer, he (Taylor) was in New-York visiting his brother, Elias Taylor. This fact is testified to by Elias, who recollects it distinctly. He fixes the date by reason of the death of his daughter, and a visit subsequently made to the cemetery by himself and brother, for the purpose of inspecting her grave. Another circumstance worthy of consideration is, that Eli Taylor did not produce the register of his hotel; although, for aught that appears, Dr. Burdell when there, was in the habit of registering his name. I contend, from the circumstances of the case, that Taylor's register was not forthcoming, for the reason that he was told

not to bring it.  It appears, by the evidence of Mr. Stephens and others, that Taylor kept a register, in which were entered the names of his guests.  It is a fair inference, to draw from the non-production of this register, that had it been produced, it would have appeared that the decedent, whenever he went to Herkimer, entered his name in it.

Next in order comes the testimony of Cephas Johnson, justice of the peace at Herkimer, who swore that the suit of *Taylor* vs. *Gray* (which I denominate the *alibi* suit) was actually tried on the 27th of October.  Our learned adversaries thought it a grievous offence, that Mr. Marvin's certificate of marriage was not in all respects in compliance with the requisition of the statute.  The docket of Justice Johnson, introduced here as proof of a date, lacks all the legal elements of a docket.  This the justice admits.  He swears that entries of trials are made in his docket in their chronological order, and at the time they occur.  The entry of the case of *Taylor* vs. *Gray* is made after that of cases tried in November, December, January, and one on the 3rd of February.  In order to extricate himself from this dilemma, he says, that there are plenty of blank leaves in his docket, and he enters cases without regard to chronological order.  Yet the docket, when produced, contained no blank leaves, or entries of cases, out of chronological order, except the one of *Taylor* vs. *Gray*.  The entry in this case was made several days after the death of Dr. Burdell.  The interpolation in the record is a controlling circumstance against the testimony of Justice Johnson.  I pronounce this a fictitious entry got up for the occasion.  The original minutes of evidence, which he produced, rendered " confusion worse confounded," the second page came before the first; they were written in pencil, and proved nothing, except that a sheet of letter paper, with pencil marks on it, was in the possession of the aforesaid justice.  I will not stop to allude to the different entries made in different ink, each one contradicting the others, and all of them contradicting the statements of the witness on direct examination ; but I

will ask the Surrogate to remember the flimsy and unsatisfactory excuses, which this Justice of the Peace made, when it was discovered, either that he or some one else had fabricated this entry. Next comes the testimony of Samuel Earle, a lawyer from Herkimer. He swears that Burdell was there on the 27th of October, and was present at the trial of the suit of *Taylor* vs. *Gray*, which did not occur at that time. The fact appears in all the Herkimer testimony, that Burdell did not transact any business there at the time, nor did he put his name to paper. At this time, Burdell was very busy in New York, in the Frazer matter, and in the Griffin suit, in which he had an interest, to say nothing of his own professional business. As he had no business at Herkimer at this time, it is not probable, that he would go there under such circumstances.

Next comes the testimony of Dolphus F. Payne; he seeks to fix the date of Burdell's visit at Herkimer by a political address made by him on the 25th of October. His testimony as to time is entitled to no weight. There was nothing in the fact of his seeing Dr. Burdell at Taylor's Hotel, in Herkimer, which would particularly attract his attention; he had frequently seen him there before. He did not pretend to have recollected the fact of having seen Dr. Burdell at Herkimer on the 26th of October, until some time in the month of April last. He only recollected the fact then, from having heard the matter talked over by the Earles. He also testified, that he supposed that Burdell was in Herkimer on the 28th of October, not only from his own recollection, but from the fact that Mr. Earle told him so. This, Mr. Earle positively denied. Whenever Burdell was in Herkimer, the witness Payne, always saw him, for the reason that they both put up at the same hotel. There is a significant circumstance to which Mr. Payne testified, which is, that when he saw Burdell in Herkimer, (which he erroneously supposed to have been on Sunday the 26th of October), he, Burdell, went to church; that this was the only occasion on which he ever knew Burdell attend church in Herkimer. Mrs. Wilson

swears that on Sunday, the 30th of November, at Herkimer, Dr. Burdell went to church with her, or some member of her family. This is another pregnant circumstance, showing that all the Herkimer witnesses mistook the supposed visit of Dr. Burdell in October, for the one made by him in November.

Next comes Christopher C. Wetherstein, who testified, that he saw Dr. Burdell in Herkimer on the afternoon or evening of the 25th of October. He professed to remember this from the fact, that the fire company to which he belonged had a parade on that afternoon, at which he wore a silver trumpet which had been won by the company at an agricultural fair in another county, some months previously. He testified that the fire company had a parade on the last Saturday of every month; down to, and including the month of November; that on such occasions, after the silver trumpet had been obtained, he wore it. It was undoubtedly on the last Saturday of November, instead of October, that he saw Burdell in Herkimer; there was no circumstance by which he could fix the date in October, which would not with equal force apply to November.

Next in order comes the testimony of Mrs. Mary Wilson, an own cousin of the decedent. She swears that she saw Burdell in Herkimer on the 26th and 27th of October. It is enough to say, in reference to her testimony in this connection, that she, repeatedly, in speaking of Dr. Burdell's visit in October, specifies conversations which did occur upon the November visit; in fact, almost, if not quite every conversation, that she alleged to have occurred with Dr. Burdell in October, she is forced to admit, actually took place on his visit to Herkimer, in the latter part of November. If she is honest, she is mistaken about the time; if she is not, her testimony is entitled to no weight.

The testimony of the Herkimer witnesses introduced by the contestants, when fairly construed, demonstrates beyond all doubt, that the decedent was not in Herkimer on the 25th, 26th, and 27th of October; and that the witnesses mistook his supposed visit at that place in October, for the one he

actually made in November, thus making a mistake of one entire month.

I will now invoke the Surrogate's attention to the testimony of the claimant, utterly overthrowing this pretended Herkimer *alibi*. First in order is the evidence of the clerks of the Lafarge House, where decedent took his meals, showing that he was there at that time. Dr. Burdell was a very penurious man. The Lafarge House clerks, Messrs. Hill and Stone, testify that whenever he left town, even for a day or two, it was his invariable habit to settle his bill, and when he returned commence a new account. The object of this was to avoid paying the price of his board when absent; as it was against the rules of the house to make any deduction in the bill for such temporary absence. To those acquainted with Burdell, the fact that his bill was running on at the Lafarge, is conclusive proof that he was not absent.

The directors of the Artizan's Bank have proved that Burdell attended meetings of the directors on the 24th and 28th of October.

Mr. Alexander Frazer testifies, that he saw Burdell every day from the 24th to the 28th day of October inclusive, conversed and advised with him in relation to his (Frazer's) affairs with the bank. The nature of his business with the bank was such, as to engrave upon his memory, almost in letters of fire, the events which transpired during that interval. Important action had to be taken by him. Dr. Burdell was his principal adviser. He consulted with him daily, and several times a day. Had Burdell been absent three days out of the four, comprising that interval, that circumstance would have so disconcerted Mr. Frazer as to have left an undying impression upon his memory. He and Burdell boarded together at the Lafarge Hotel. He recollects particularly that Burdell dined with him on Sunday, the 26th of October. In this particular, he is corroborated by his son Clarence, who recollects and swears to the fact, with great positiveness. Augustus Prime, the head waiter of the hotel, corroborates the statement.

Next in order is the testimony of George W. Douglass, a. person in the employ of Mr. Eckel, a young man of undoubted character, whom no one has attempted to impeach. He testifies, that on Sunday, the 26th of October, he called at 31 Bond street to see Mr. Eckel, for the purpose of getting a decided answer from him as to whether he would take the book-case bedstead from Mr. Smith; and while there, he saw Dr. Burdell. He knows this occurred on the Sunday before the delivery of the book-case bedstead, which took place on Tuesday, the 28th of October, according to the testimony of Douglass and Mr. Smith, fortified as they are by the bill and check received in payment, both of which bear date on that day.

In this connection, the testimony of Mr. Barlow and Walter B. Roberts is important. The latter testified that he saw Dr. Burdell on Saturday, the day after Mr. Frazer's resignation, when the affairs of the bank were discussed between them. On Sunday, the decedent was in the house of Dr. Roberts, while Mr. Barlow had a tooth fixed by Dr. Roberts, and the conversation ran upon the affairs of the bank; the decedent soliciting Dr. Roberts and Mr. Barlow to continue their connection with the bank, notwithstanding Mr. Frazer (Dr. Burdell's friend) was no longer Vice-President; and mentioning the fact, that he (Burdell) could now, as well as formerly, procure for them discounts. Dr. Roberts, in this statement, is corroborated by an entry in his book made at the time of the charge against Mr. Barlow for filling his tooth. There is an additional reason why Dr. Roberts should be accurate in his recollection in this matter. Dr. Burdell made it an invariable rule to make arrangements with Dr. Roberts to attend to his patients when away.

Dr. Uhl testifies, that during the forenoon on Monday, the 27th of October, he saw Dr. Burdell. He fixes the date by reason of his having visited a particular patient in Brooklyn on that day; he having met Dr. Burdell on his way to make that visit.

Abner Lane testified, that on the afternoon of Monday, the

27th of October, he subpœnaed Dr. Burdell in the case of *Warner* vs. *Griffin*. Mr. Lane is corroborated in this statement by Dr. Putnam. Dr. Putnam fixes the date, by means of a memorandum made at the time, and by reason of some things he had done in that case.

The testimony of the claimant, as well as that introduced by the contestants, demonstrates beyond all doubt that the decedent was in the city of New York on the 25th, 26th, and 27th of October. Thus it will be seen that the testimony of Augusta Cunningham on this point is most conclusively sustained. If she is mistaken, then are the witnesses Roberts, Barlow, Hill, Stone, Prime, Douglass, Lane, Alexander Frazer, Clarence Frazer, and Drs. Putnam and Uhl. If she be perjured, in this particular, then are they equally perjured. What becomes of this mammoth Herkimer *alibi*, which my learned friends have erected with such immense pains and cost, behind which they fancied themselves as safe as though " walled about with brass impregnable ?"

I will now take a hurried glance at some of the events of Tuesday, the 28th of October. The contestants sought to show, by the testimony of Dr. S. W. Parmley, that late in the afternoon of that day, a man, who was in the front room, third story, of 31 Bond-street, underwent a sudden and extraordinary metamorphosis. Dr. Parmley testified that he looked up at the window and saw a man there in his shirt-sleeves, and with little or no hair about his face; that a few moments afterwards he (Dr. Parmley) took another view, when he discovered a man different in appearance from the former, and with a considerable amount of whiskers. The object of this testimony was, to show, that some person was there arranging his toilet, for the purpose of personating Dr. Burdell. On behalf of the claimant, it was proved by Mr. Smith, the cabinet-maker, his foreman, and the servant girl, that at this precise time a book-case bedstead was being put up, and that the decedent was present assisting in the matter.

It will be recollected that Miss Sallenbach, the corset-

maker, testified, that on the evening of Tuesday, the 28th, the claimant, her daughter, and Eckel called at the store of the witness's mother. The object of this evidence is apparent. The witness was most unquestionably mistaken in regard to Eckel. First, Augusta Cunningham testified that the gentleman with her and her mother, on this occasion, was Dr. Burdell, and not Eckel. Second, Mr. Douglass proves (and is fortified by circumstances, which he detailed), that Eckel was in his company in another part of the city during that whole evening. Miss Sallenbach never having seen Eckel, as she alleges, before, might well be mistaken as to his identity; whereas Augusta Cunningham and Mr. Douglass could not innocently make a mistake on that point.

Our opponents have sought to show that Dr. Burdell was in Brooklyn on the evening of the 28th of October, at or about the time the marriage ceremony was performed, with a view to assail the testimony of Rev. Mr. Marvin and Augusta.

Phœbe Lipper, the servant girl in the employ of Mrs. Wilson, when asked if she recollected that any one in particular was at the house of Mrs. Williams, in Brooklyn (where the *alibi* is located), answered distinctly and emphatically that she did not; subsequently she was induced to retract her answer, and state that Dr. Burdell was there; she fixed the date because it was ironing-day, although it appeared that ironing-day not unfrequently came on other days of the week. This child stated that she had no recollection of this circumstance for months afterwards, until it was told her by Mrs. Williams and Mrs. Wilson. The testimony of Hannah Dennison (a child fourteen years of age, and related to Dr. Burdell) is the same in all its details—a circumstance of no little suspicion. Next follows the testimony of Mrs. Williams, who says, she expected her sister from Herkimer on the previous Saturday, but that on that day she received from her a letter stating that she would not arrive until the Tuesday in question; by this means she seeks to fix the date: she did not produce the

letter from her sister. She stated, however, that she then had a part of it in her possession, yet she did not produce even that part. This is a striking characteristic of the testimony for the contestants. Whenever letters or documents are wanted to fix dates, they are conveniently missing. Another circumstance of suspicion in regard to Mrs. Williams' testimony is contained in the fact, that although she was present at the coroner's inquest when the subject of Dr. Burdell's whereabouts was under investigation, she did not communicate the fact that he was at her house, to the Coroner or any one else; but kept it a profound secret, to be suddenly sprung upon the claimant at the close of this case. All these witnesses who swear to the Brooklyn *alibi* make Dr. Burdell speak of having just returned from Herkimer, when it has already been demonstrated that he did not go to Herkimer at the period alleged. All the circumstances combined show, beyond a peradventure, that the Brooklyn *alibi* is the purest fabrication that ever was attempted to be palmed off upon a court.

I will now direct your attention to the testimony of the claimant with reference to the evening of the 28th. Helen Cunningham, as pure and upright a girl as ever appeared upon the witness stand, proved that her mother, her sister Augusta, and Dr. Burdell, left the house 31 Bond-street together that evening. Her mother, at the time, asked her to recollect the fact, together with the date. On their way to Mr. Marvin's, the company were met, on the corner of Broadway and Bleecker-street, by Dr. Ware, who recognized Dr. Burdell, although he did not know the ladies. Dr. Ware fixes the date by reason of a letter, which he produced in court. He particularly noted the fact at the time, for the reason that it was an unusual circumstance for him to meet the decedent in the evening in company with ladies.

I have not only proved that the testimony of Augusta Cunningham is not impeached, directly or collaterally, but I have shown that she is corroborated in all important particulars. If the opposite counsel, with their microscopic

vision, shall discover discrepancies in the details of her evidence upon collateral points, I will ask the Surrogate to bear in mind the rank and voluminous contradictions which mar the evidence of nearly, if not all, the witnesses for the contestants.

IV. The conduct and declarations of the claimant and decedent, and their relations with each other, are not only consistent with the fact of marriage, but confirmatory of the direct evidence upon that subject.

1st. I will consider the relations of the claimant and decedent from the period of their first acquaintance down to the time of the marriage. 2d. From that time to the death of the decedent.

The first we hear from the testimony, of Dr. Burdell's visiting the claimant, is in Twenty-fourth street, some three years since. According to the testimony of Catharine Lamb, a servant girl in the house, his visits were daily. Miss Van Ness testifies that the intercourse between claimant and decedent at this time was that which ordinarily exists between people engaged to be married, and that their prospective matrimonial alliance was a subject of frequent conversation, even at this time. We next find these parties together at Saratoga in the summer of 1855. Dr. Burdell was at the cars, ready to receive the claimant and her daughters, having previously made arrangements for them at the hotel. He was their protector and devoted friend while there. He introduced them to his acquaintances; he tells them he is anxious to be attentive to her, and requests them to show her every attention, and does all in his power to make her visit agreeable. On this point I invoke your attention to the testimony of Dr. Roberts, Mr. Jennings, Mr. Frazer, and others. We next find him taking her to Elizabethport with him. He goes there to look after his property; speaks highly of her to his tenants; tells them she is a rich widow, and he is anxious she should invest some of her property there. The claimant, in the ensuing

autumn, goes to 31 Bond street to board, at the special instance of Dr. Burdell, he having made arrangements for her to board with Miss Jones, who then kept a boarding-house there. Dr. Burdell introduces her to Mrs. Williams, Mrs. Dennison, and what few other relatives he had, with whom he was not on unfriendly terms. He introduces her to Mr. and Mr. Frazer, and in fact to all the better portion of his acquaintances, gentlemen and ladies. She exchanges calls with Mrs. Frazer, and other ladies of rank, to whom she has been introduced by Dr. Burdell. Among others, he introduces her to the Directors of the Artizan's Bank. He speaks of her to Mrs. Williams, and to his Herkimer rela-tives, in terms of eulogy. Mr. Sanxay, the counsel of Dr. Burdell, Dr. E. A. L. Roberts, and others, testify that they never knew him (Dr. Burdell) speak in such exalted terms of any lady as he used with reference to her. Prior to June or July, 1856, the testimony in the case does not show that he ever spoke an unkind word of her. Some months prior to that period, Demist Hubbard, at the request of Dr. Burdell, came to reside at 31 Bond street. She was an own blood cousin of the decedent, and a mar-ried woman. He procured a divorce for her. He strongly enlisted the sympathy of the claimant in her behalf. The jealousy of the claimant towards this woman, was the origin of all the subsequent disagreements and quarrels with the Doctor. After this, the decedent occasionally spoke of the claimant to some of his lady relatives and female acquaint-ances in terms of harshness. Mrs. Williams details some conversations with her upon the subject, of rather an ex-traordinary character, and she gives the first account of the charge which the Doctor made against the claimant of having stolen from him a note. The account she gives suffi-ciently demonstrates the falsity of the charge, and shows that it was trumped up for ulterior purposes. She says it was in June or July, that the first conversation with the Doctor occurred, and in which he stated, that the claimant had stolen from him a note, which she gave him for rent.

No rent was due at this time, as will appear by the lease, which has been produced before the Surrogate. In this same conversation she states, that the Doctor told her, that he wished the claimant would not be punctual in the payment of her rent, so that he might eject her. Aside from this, it fully appears from contradictory statements of the decedent, as well as his own admissions, that he never believed this charge. In this connection, I will call your attention to the testimony of James Murray, Police Clerk of the Second District Court, to whom the decedent applied and stated his grievances, and from whom he obtained a paper called a subpœnae, which he took for the avowed purpose of serving upon the claimant, but of which he made no use whatever. He stated to this witness, months after the alleged occurrence, that the claimant had taken from his safe a note and jewelry, which would be found upon the persons of her and her daughters. This is an entirely different account of the matter from that given by him to other witnesses.

Here it will be well to bear in mind, that the note in which he predicated the charge of theft was a mere nullity. The decedent purchased of Mr. Edwards Pierrepont, a judgment against his brother William Burdell. He did not wish to take it in his own name; he therefore caused it to be assigned to the claimant by Mr. Pierrepont, and received from her a note for the face of the judgment, for the purpose of prosecuting it to payment in her name; he, in point of fact, owning the judgment, and the note from her to him having been given as a mere matter of form. Mrs. Wilson states, that while visiting her sister, Mrs. Williams, in Brooklyn, in the summer of 1856, she occasionally heard the decedent speak unfavorably of the claimant. These two witnesses were cousins of Demist Hubbard, as well as the decedent; they recognized and harbored her after she left Bond street. It was but natural, therefore, they should listen with favor to whatever of evil Dr. Burdell felt disposed to say of the claimant.

Hannah Conlan, the cook at 31 Bond street, testifies, that "sharp words" passed between the Doctor and the claimant,

on account of her jealousy in reference to Demist Hubbard, and other women. Allen T. Smith, the police officer, and Hugh Crombie, Deputy Sheriff, who arrested him, in the two actions commenced against him by the claimant, testify in regard to the charge which the decedent made against the claimant, of purloining the note in question. This is the substance of the testimony, showing that Dr. Burdell spoke unfavorably of the claimant prior to the marriage, on the 28th of October. There was no trouble between them, which did not have its origin in jealousy. Was there anything during this period, which did not indicate that she was his betrothed? The relations between them can be explained on no other theory.

It was proved by direct testimony, as well as by circumstances, that the decedent promised to marry the claimant. First: Catherine Lamb states, that when she called at 31 Bond street, in the latter part of September, or first of October last, for the purpose of having some dental work performed by the decedent, that the claimant, in his presence, requested the witness to come and live with her soon, as she was about to be married to the decedent; he replied " yes," and joined in the request that she should come into their employ as a servant. Second: Miss Hester Van Ness testified, that both the decedent and the claimant had several times asked her to act as bridesmaid. Third : After the claimant had brought a suit for breach of promise against the decedent, he in a conversation with Dr. Walter B. Roberts on the subject, admitted in substance that he had held her out to the world as his intended, that the circumstances were such, that she would have no difficulty in succeeding in the suit, and if it proceeded to trial, would recover a heavy verdict against him.

Fourth : It was generally understood by the relatives and acquaintances of both claimant and decedent, that they were engaged to be married.

Fifth : All the facts and circumstances proven in this case, prior to the marriage, on the 28th of October last, are not

only consistent with the theory of a matrimonial engagement between the parties, but are wholly inconsistent with any other rational hypothesis.

Here it would be well to consider the extraordinary character of the decedent. He was unlike any other man. He was emphatically *sui generis.* He was parsimonious; he had lived to the age of forty-six a bachelor; he had no faith in the chastity of any of womankind. He spoke well or ill of persons, as suited his purposes (see particularly the testimony of Mr. Sanxay on this point). With all these characteristics, he entertained for the claimant an attachment almost amounting to infatuation. He was never known to speak in such terms of admiration and respect of any other woman (see particularly the testimony of Mr. Sanxay, Mr. Frazer, Dr. Roberts, Dr. Uhl, and others). With all his strange and inexplicable peculiarities, nothing disturbed his affection for the claimant, until she stood in the way of his intrigues. He then fluctuated between a desire to continue his relations with her and a disposition to terminate them. In an evil moment, he fabricated a charge of theft against her, and called in police officers with a view to intimidate her, and thus induce her to leave his house, which she had rented from him. Stung with the injustice of the charges he had made against her, she invoked the strong arm of the law in her defence. She not only instituted against him a suit for slander, but one for breach of promise of marriage; so flagrantly was he shown to be in the wrong, that he was held to bail in the two actions in the large sum of $12,000. He saw that his iniquity had overreached itself; that exposure was at hand, and, what he feared most, pecuniary disaster was impending over him. He chafed under a sense of his own depravity, and sought to extricate himself from the dilemma in which he was placed. He represented to the deputy sheriff, and Mr. Frazer, his friend, that the object of these suits was to extort money! He sent Mr. Frazer to the claimant, with a view to effect a settlement of the breach of promise case. The claimant scorned his proffer

of money, and, in a true womanly spirit, told Mr. Frazer, she would only settle in an " honorable way." He could effect no settlement with her for money. Soon the suits were settled by the claimant and decedent in person ! A discontinuance was entered by the claimant. What motive induced the claimant to withdraw those suits? The decedent agreed to marry her within a certain number of days. If the claimant be the determined woman she is represented, would she have released her hold upon the decedent for no consideration whatever? All the circumstances of the case, together with the positive testimony, show that the marriage between the parties was solemnized, within the time then agreed upon. The contestants proved that certain papers were found in the desk of Eckel, which were claimed by Mrs. Burdell; among others, a general release in the handwriting of the decedent, purporting to come from the claimant, releasing him from all claims up to the 18th of October. This paper was not executed by her. Before the suits were discontinued (as I contend), this paper was submitted to her by the decedent, and her signature asked, which she refused. This is a significant circumstance, showing that she would accept no settlement, but that of marriage. On the 28th of October, the claimant and decedent were married.

I will now consider their relations between that and the death of decedent on the 30th of January.

After the marriage of the parties, it is evident that some disagreements occurred between them ; these, however, according to the testimony of the servants and others, arose entirely from the real or supposed infidelity of the decedent. After the claimant became the wife of the decedent, was it not natural that she should be more sensitive than ever upon this subject? Her conduct in this respect was that of a wife. Had her conduct been different, our opponents (with some show of reason) would have contended, that she had furnished evidence tending to show that she did not occupy that relation toward the decedent.

After the marriage, the decedent generally spoke of the

claimant to his acquaintances in terms of respect. To Mr. Frazer, his confidential friend and negotiator, after the marriage, he invariably spoke of her in terms of commendation and respect. The same remark will apply to Dr. Roberts (the particular, social, and business friend of the decedent), as well as to Dr. Uhl, Mrs. Dennison, his cousin, and a host of others. He did, however, speak unfavorably of the claimant to his cousins, Mrs. Wilson, Mrs. Williams, and Demist Hubbard. To the latter, he spoke of her in his letters in terms of the most gross and coarse vituperation. In this connection, it will be remembered, that where the decedent spoke of this woman to one of his Elizabethport tenants, he called her his "niece;" he said he had procured a divorce for his niece. The decedent was undoubtedly highly incensed at the claimant, because she would not permit this woman again to reside under her roof, and be brought in contact with her innocent daughters. Why should the decedent disclose to Mrs. Stansbury and Mrs. Crane his pretended domestic relations with the claimant? No other man would have talked thus, even had the facts been as he represented, to ladies who had no especial interest in his affairs. It shows that the decedent is not to be judged by the same standard which would apply to any other man. The substance of the testimony on this head is, that the decedent spoke well and ill of the claimant by turns, from his marriage to his death.

An extraordinary and significant feature in the evidence is, that although the decedent rarely alludes to the matter before the 28th of October, yet after that period he takes especial pains to state to a multitude of persons that he is not married, and never intends to marry, when there is nothing in the conversation, or in his relations with such persons, calling for any declaration from him upon the subject. Why was this? The answer is plain; his mind was continually running upon his secret marriage, and he could not help talking upon it. To his acquaintances, his constant declarations that he is not married, is convincing proof against the truth of these declarations.

Another circumstance which speaks loudly in support of this marriage is, that the claimant, before the 28th of October, obtained from him an affidavit that he had made no will. Why should he give her this paper if he did not marry her?

It is, however, contended by the contestants that the paper found in Eckel's desk, purporting to state the terms of the discontinuance of the two suits by the claimant, is inconsistent with the theory of marriage. The conclusive answer to any such suggestion is found in the fact, that this paper is only signed by the decedent. It is not signed by the claimant; nor is there a *scintilla* of evidence in this case even tending to show that the claimant ever in any way acquiesced in any such terms of settlement. This paper is no more binding upon her than the general release (which was found with this paper), purporting to come from her, but which she never executed. The fair inference to be drawn is, that the decedent submitted these papers to her; that she refused to acquiesce in them, and that he never took the trouble to repossess himself of them, as they were but so much waste paper.

It is contended by the contestants that the claimant, subsequent to the marriage, transacted business in the name of Cunningham, signed notes by that name; that she assigned a judgment to the decedent by that name; that he drew checks to her in that name, and that in all respects she held herself to the world as single; that such a state of facts was inconsistent with the idea of a marriage with the decedent. Our opponents seem to forget that this was a secret marriage. Had not just this state of facts existed, the marriage would have been a public, and not a secret one. In regard to the assignment of judgment, checks, &c., it was indispensable, in order to keep the marriage secret, that the name Cunningham, and not Burdell, should be used. Had the claimant used the name of Burdell in the assignment of judgment, or had the decedent used the name of "Emma A. Burdell" in the checks which he gave her, the marriage

would at once have been published to the world, for the reason that these papers would necessarily be seen by third persons. In a word, the contestants ask to disprove a secret marriage, established by positive evidence, by showing that the parties lived and held themselves out to the world as single. Could absurdity go further?

One word in relation to the release, dated 24th January. This is a palpable forgery. It is apparent upon inspection that the signature to it is not in the claimant's handwriting. The conduct of the decedent in the matter shows that he regarded it as a forgery. Why should the decedent show the paper to Allen T. Smith, compare the signature with that of another of the claimant, and ask him whether he thought it a forgery, when not a word had been suggested as to its spuriousness except by the decedent himself? Why should the decedent show the paper to Mr. Frazer, and ask his opinion respecting the spuriousness of the signature under like circumstances? But suppose the signature to be genuine? What then? The only inference deducible from it would be, that the decedent wished to show it to his acquaintances for the purpose of making plausible his assertion that he was not married. Could any act of the claimant, subsequent to marriage, disprove the fact of marriage?

It is contended that the decedent was about letting 31 Bond street to Mrs. Stansbury, from the 1st of May, 1857; that the claimant would be thereby dispossessed of the house; and that the conduct of the decedent, in this particular, was inconsistent with the idea of marriage. This inference is a forced and unnatural one. The claimant and decedent were to leave for Europe in the ensuing June, to be absent for nearly a year. It would, therefore, be a matter of course for the decedent to let his house. In order to rent it at all, he would have to give possession on the first of May, as is usual in such cases. All the conduct and declarations of the parties, when viewed together, establish a secret marriage, and are wholly inconsistent with any other theory, especially when the peculiar character of the decedent is kept in view.

If anything were wanting to establish the marriage beyond all doubt, it is furnished in the admissions of the decedent. Stephen A. Knowlton, a merchant of this city, of high business, social, and moral standing, testified, that a month or two prior to the death of decedent, he called upon the witness for the purpose of selling to him the house and lot 31 Bond street; that, upon being interrogated as to whether he could give a good title, he replied, the only difficulty he feared was, that his wife would not be willing to sign the deed; but that he (decedent) would indemnify the witness against any loss that might occur on that account, if he would make the purchase. It is true that Mr. Rich, the former partner of this witness, stated that he (Knowlton) would sometimes mingle facts and his own conclusions together. Mr. Rich, however, did the witness the justice to state, that during a partnership of fourteen years with him in the wholesale grocery business in this city, he discovered no want of capacity on the part of Mr. Knowlton in conducting that business in all its complicated details. Some four or five other witnesses examined, who had known Mr. Knowlton for periods varying from two to twenty years, or thereabouts, stated that he (Mr. Knowlton) was not at all prone to mingle conclusions and facts together. The idea that Mr. Knowlton did not understand what Dr. Burdell said in respect to his wife is most preposterous. Mr. Knowlton distinctly swore that Dr. Burdell used the word "wife." If Mr. Knowlton does not know what Dr. Burdell said on this point, who does? Here, it will be seen, it was absolutely necessary for the consummation of the business in question that Dr. Burdell should disclose the fact of his marriage.

James Wilson, a tenant of the decedent at Elizabethport, swore, that he met Dr. Burdell in New-York, a few days prior to his death, when he (Wilson) asked him (Dr. Burdell) in regard to the health of " Mrs. Burdell that was to be;" to which Dr. Burdell replied, that she was Mrs. Burdell. The disclosure made to this witness was not inconsistent with the idea of keeping this marriage a secret. The witness lived

out of the city, and was not likely to meet with any of the acquaintances of the decedent or claimant.

Thus it will be seen, that upon the theory of marriage, especially when you consider the peculiar character of decedent, all the testimony in the case may be harmonized without imputing perjury to any of the witnesses on either side. It is the bounden duty of the court to harmonize all the testimony, if possible. A secret marriage never was, and never could be more strongly proven, unless, perchance (which rarely happens), the officiating clergyman be known to the parties.

V. There is not a fact or circumstance proven, which is inconsistent with the theory of the marriage; the whole testimony taken together, establishes it beyond peradventure.

Under this head, I will content myself with recapitulating some of the prominent proofs of this marriage.

1. The decedent paid the claimant such marked attentions, for a long period anterior to the marriage, that a contract of marriage might fairly be inferred.

2. Aside from circumstances pointing to that conclusion, the proof is positive and direct that the decedent promised to marry the claimant.

3. He frequently stated to his acquaintance, he would as soon marry the claimant as any woman he ever knew.

4. He spoke more highly of the claimant than of any other woman.

5. The claimant brought against him a suit for breach of promise of marriage.

6. Although he alleged the object of the suit was to extort money from him, yet he gave no money to settle it, as he frequently admitted.

7. He never would tell the terms on which the suit was settled; had he done so, the fact of the marriage would have been exposed. Had the terms of settlement been those specified in the paper purporting to contain them, the decedent, being very communicative, especially to ladies (see testimony

of Mrs. Stansbury, Mrs. Crane, Mrs. Wilson, Mrs. Williams, &c.), would not have kept the matter a secret.

8. Before and subsequent to the marriage, and after his most serious quarrels with the claimant, he stated he was going to Europe in June, 1857, and in company with the claimant and her eldest daughter.

9. After the marriage, he was very attentive to the domestic affairs of the claimant, saw that her provisions were not exposed to waste, &c.

10. His vacillating conduct, his alterna e praise and abuse of the claimant after the marriage, were all in keeping with the peculiar character of the man.

11. His request that the marriage be kept a secret, was characteristic of the decedent.

12. His taking especial pains after his marriage to say he was single, showed that the fact of his secret marriage was uppermost in his mind.

13. The claimant applied to Miss Van Ness, an old acquaintance, to be a witness to the marriage.

14. She went to Goshen to get Rev. Dr. Snodgrass, her old pastor, to officiate, and was referred by Mrs. Snodgrass to Rev. Mr. Marvin, in consequence of which, the services of the latter were secured.

15. Rev. Mr. Marvin swears positively he has no doubt that he married claimant and decedent.

16. Augusta Cunningham, an eye-witness, swears positively to the fact of the marriage.

17. Rev. Mr. Marvin and Augusta are corroborated by Sarah Manahan, another eye-witness, who in effect (though not in words), expresses her belief that decedent was the person married to the claimant, on the 28th of October.

18. All the facts proven by reliable evidence to have existed since the 28th of October, introduced with a view to disprove the marriage, are such as would be the inevitable concomitants of a secret marriage between two such persons.

19. The decedent admitted his marriage to Mr. Knowlton and Mr. Wilson.

His allegations to others, that he was single, are quite consistent with the fact of his secret marriage, while his admissions that he was married are not consistent with his celibacy.

20. The theory of a secret marriage harmonizes all the evidence in the case, while the opposite theory involves the idea that an epidemic of perjury has broken out in the Surrogate's Court.

MR. TILDEN, *for Contestants.*

The parties resisting the application for administration on the part of the alleged widow of the intestate, are the blood relatives of Harvey Burdell. The petitioner is here as his pretended wife; it is her duty to show that such a relation existed, and she has attempted to do so. Her counsel claim that there was a secret marriage, and they would not deny that the alleged union, consummated in secret, was followed quickly by a murder; and if they had said that those who could fabricate the one, could perpetrate the other, they must not complain if, after the first had been proven, the other should be believed.

Even in the marriage as claimed, they acknowledge to have violated the policy of the law; and, on this ground, the court might meet the application at the threshold. The case presented by the claimant rests on the evidence of the Rev. Mr. Marvin, Augusta and Helen Cunningham, and Dr. Ware.

Mr. Marvin had testified under circumstances which naturally created a strong bias in his mind in favor of the claimant. In the marriage which he supposed was that of Burdell to Mrs. Cunningham, he had not fulfilled the requirements of the law, and although he was not punishable therefor, still the duty to do so was binding upon the conscience. When first called, he had not properly appreciated to the full extent that subsequent circumstances had made him personally responsible; for had he observed the required cautions, the fabrication would, in all probability, have been nipped in the bud, and Burdell would now have been a living man. Here they had the key to the cause of the revolution in the mind of Mr.

Marvin. Mr. Marvin was an impressible man—peculiarly so. He had said himself that, when he went to testify before the Coroner, he was governed by the declarations of the people gathered there and in that vicinity. He was also a man of exaggerations; and would not seem, at times, to be able to give any idea of what he had said a short time before. When he was called for the first time, his first remark was, " The man I married was larger, and had larger whiskers." He mentioned no points of resemblance—not one. And when the daguerreotype was shown him, he said there was some slight resemblance about the mouth, but he should not like to swear to it. Further on, he said the whiskers were the same color; and after he had seen Eckel, he repeated that the man he married was larger, and had larger whiskers than the body. His impression even then was, that he had entirely failed to recognize the body as that of the man he married. If, when he first saw the body, he had any impression that it was that of the man he had married, he would have said so; but he did not. Subsequently, his entire action was peculiar. When before the Surrogate, he would not admit anything of what all the reports said he testified to before the Coroner. And it must not be forgotten that he did not attempt to identify the body until after he had seen Mr. Eckel. He was a talking man; and when at the house, the people gathered around him with eager curiosity to hear what he would say. He could not identify, but he could describe, and his descriptions were so totally inconsistent with the known peculiarities of Burdell that they turned away, saying it could not have been he.

His theory was, that he must have married either Eckel or Burdell. He treats those two persons as if there were not a hundred millions of other human beings in the world—as though, if it were not Eckel he married, it must necessarily be Burdell. If he was convinced at that time it was Burdell he married, why did not he state so? The truth is, that he was not convinced of it at that time. The process that brought him to that conclusion was subsequent in date, and different in its

character. He relates another thing that you may think it was Burdell he married (and that was the one pressed with so much zeal by the counsel who has addressed your Honor), that he did not think, if that had been an attempt to get up a mock marriage, Mrs. Cunningham would have gone to her old pastor. He knew not that she had gone there, except by her own statement. He did not know the exact character of the errand on which she went; that does not appear now. There is no testimony and none can be produced, that she stated she wanted Dr. Snodgrass to marry her to Dr. Burdell, and not even that she wanted Dr. Snodgrass to marry her. The only testimony there is upon that subject is the statement, vague and feeble, by Dr. Snodgrass, based upon the conversation he had with his wife; and I venture to say, that if Mrs. Snodgrass had been well enough to have attended here, it would have been developed that there was no reality in this pretext that Dr. Snodgrass was wanted to marry Mrs. Cunningham. Why! Dr. Snodgrass says, that the whole of the next day—the day of the actual marriage, until the afternoon, he was in the city. This woman goes to Goshen to find Dr. Snodgrass, to get him to marry her—finds he is in New York, just where he should be to make it convenient for him to marry her; and there is no evidence that she ever made any further inquiry for him. Is it not a reasonable supposition, that if she had diligently sought him, on her return, she could have found him? She did not want Dr. Snodgrass. If she ever pretended she did, the pretext was not in good faith. There is no evidence that she ever pretended so, independent of her own statement; and yet this is one of the considerations that have made Rev. Mr. Marvin come to the conclusion that it must have been Dr. Burdell whom he married. If that conclusion was ever so well founded in reason, it would not be admissible as testimony. Speculations of that kind, if permissible to be entertained by your Honor, are not admissible to be proved by witnesses. That is no fact. That is no information; it is a sort of moral reasoning which cannot be admitted as testimony, and which he is no more competent

to make than anybody else, although much more likely to make. But he states on his cross-examination, that he went to visit Rev. Dr. Snodgrass. Up to that time, there is no evidence whatever that his opinions in regard to the identity of the body of Burdell with the man he married had undergone any change.

He tells us of another thing that operated upon his mind. When he gets to that point in his testimony, he says, that a considerable number of persons, who knew Burdell familiarly and long, described his features, appearance, and peculiarities to him; and he adds, that whenever they finished doing so, " I have uniformly said you have described the man I married." It is then for the first time that he manifested any conviction. He was dumb when he saw the body the first time; he was dumb when he saw the body the second time; he was dumb when he testified; he was dumb when he had seen Eckel; it was only when he had this description given to him of the personal peculiarities of Burdell, by those in whom he had confidence, that he, for the first time, exclaimed, " Eureka! Eureka!" Now, sir, looking at the constitution of the human mind, and the nature of its processes, it is not difficult to see what it was that wrought conviction in this man. It is not difficult to say when that conviction took place. This is manifest from the processes of his mind as he has disclosed them to us on his own examination. It is also shown, by his subsequent conversation with Alderman Voorhis on the Monday of the week after that Sunday when he had exchanged pulpits with Rev. Dr. Snodgrass; and to this man, on that occasion, he says, that he had seen nothing new to convince him that it was Burdell he married; and then he assigns what are the true reasons, and they are those about Dr. Snodgrass and the conversations with persons who had described to him the peculiarities of Burdell. Now, I submit to your Honor that we have a complete history here of the processes by which this revolution in Mr. Marvin's opinion has been wrought. We have it by himself in his cross-examination; we have it by those

witnesses whom we have introduced to prove his conversations. It has, through its whole course, until that change had been wrought, been produced by circumstances that disable his conclusion from being admissible as competent testimony. There is nothing in the evidence by which he comes to that conclusion; there is nothing in the process by which that conclusion is wrought out in his mind that would entitle it to be held as testimony in a tribunal like this. If any reasonings of that sort are to be indulged in, it is not upon the witness stand, it is upon the bench of judgment; and when reasoning is going to be resorted to there, I trust it will be more logical than that of the witness, the Rev. Mr. Marvin; I know it will. Indeed it was impossible that the Rev. Mr. Marvin should have had any means of information which could make his conclusion competent. The body, as I have said, was buried on Wednesday, and after that time there was no probability that he could arrive at any conclusion which he had failed previously to arrive at, that would entitle his testimony to any weight. Mr. Marvin is doubtless a competent witness as to one thing, and that is, as to the personal peculiarities of the man whom he married, as to his appearance at that time, and that is all. He may be a poor witness for that. We may think lightly of his powers of observation and of memory, but as he is the only witness the case affords on that point, we must accept him for what he is worth. There are two modes of identification. The one is the recognition by the mind of an image presented to the vision as the same with an image already existing in the memory. That image in the memory may be the result of many successive impressions, as a picture is of a great many touches of the painter; but yet it is a distinct and definite picture; and when there comes to be presented to the senses an object identical with that picture, the recognition that ensues is instinctive and instantaneous. It is not a thing that depends upon analysis, or upon complex processes of reasoning; our faculties are finer than our powers of analysis and description. A man does not know

his wife by the size of her nose or other peculiarities. He knows her by the aggregate features which she presents to his mind. This, doubtless, when it exists, is the highest and best form of identification. It never existed in any degree whatever in the recognition, or rather, the failure to recognize the body of Burdell by the Rev. Mr. Marvin. His conviction never arose until it was impossible for the body (which of itself presented very imperfect evidences of identity) to be presented to his vision. His conclusion only arose when his means of knowledge had ceased. Even when the body was before him, he never attempted any such recognition as that. He talked about points; he went immediately into an analysis and reasoning, and the parts which he mentioned were of divergence and of contrast, and not of resemblance. There was a comparison of personal peculiarities, which is an imperfect and unsatisfactory mode at best. Because persons have blue eyes, it does not follow that they are the same, or because they have long noses; and if you attempt to establish identity by this process, it must be through a very long complex and comprehensive description, or by personal peculiarities so remarkable and rare, that they can scarcely be found existing in two persons. But these features, feeble for the purpose of establishing identity, are powerful, indeed, for the purpose of destroying and overthrowing it. Although it does not follow that two objects which we see—human beings with blue eyes—are identical, it does follow, with an irresistible force, that when we see one with blue eyes and the other with black, that they are not identical. It may take many features, many similarities, to establish identity; it may take but one to destroy it. Now, sir, what is this description which the Rev. Mr. Marvin gives of the man whom he married? I pass over the size, because the size of a man about the ordinary or middle stature of human beings is no distinction. I pass over the voice, because the Rev. Mr. Marvin himself says it is indescribable, and because he never could have heard the voice of Harvey Burdell after the time he saw the body, and any

description that might be attempted to be given by other witnesses of that voice would utterly fail to establish identity with the voice which Rev. Mr. Marvin could not describe. I come next to the position and carriage of Burdell—his erectness or stooping. Mr. Marvin describes the man he married as making a very distinct impression on him that he was not an erect man—that he stooped—and in that conviction he speaks of his being like a man of sixty to sixty-five years of age. Now, sir, upon that subject we have introduced ten witnesses—men of character, who knew Burdell —knew him familiarly; who have seen him under all circumstances; and they testify, that he was an erect man. Mr. Marvin says, he was slow in his walk. We have introduced twelve witnesses, all of whom swear that he was quick in his actions. Now, sir, I come to the whiskers—and I deem this part of his description of a peculiar importance, because it was the whiskers that Dr. Marvin particularly noticed in the man he married. His attention was so strongly attracted to them at the time, that he talked with his wife on the subject, and she advised him to notice the man particularly the next time. And he did notice him on both the subsequent occasions. If his testimony is of any value on any subject, it is upon this point. He states, that the whiskers of the man he married were "black—very black." Now, what is our testimony upon that subject? William Barr, the barber who habitually shaved him, and who had naturally observed his hair and whiskers professionally, and who saw him about the first of October, and also about the first of November, says, that his whiskers were of a streaked brown, intermingled with gray. We have Dr. Hawes, who saw him on the 20th of October, and he states the same thing. He saw him also on the 11th of November, and he states the same thing about the appearance of his whiskers at that time. We have, on the 25th, 26th, and 27th of October, Mrs. Wilson, Samuel Earle, Rufus A. Munson, Ely Taylor, D. S. Payne, and Robert Earle, who saw him. Mr. Payne states that he particularly observed them,

from seeing the Doctor playing with his whiskers. Mr. Robert Earle, Surrogate and County Judge, states that he did not particularly observe them on that occasion, but he observed them on others; and his general observation was, that they were never black, but always brown, intermixed with gray. On the 31st of October, three days after the marriage, as these other days were immediately preceding it, Adam Snyder, an intelligent man, saw him at Saratoga, and he testified to the same thing. Then, sir, we have the fact that, just before his death, he had his whiskers dyed blacker than he had ever worn them before; and another witness swears that he told her so on the 25th of January, when she took his ambrotype. Mrs. Stansbury observed it on the 13th of January, and she says it wrought such a change, that she scarcely knew him. Dr. Parmley observed it after his death, that his whiskers were darker than he had ever seen them before—that, before, they had been brown, mixed with gray. And what is the answer to this immense mass of testimony? They bring Mr. Beekman, who saw them in the week of the murder, and who says that they were then dyed, as, doubtless, they were. They bring Mr. Cipperly, who saw him on the 19th of December, and who thinks they were black. They bring Mr. Douglass, who says, that the time he became acquainted with him, which was about the time of the marriage, his whiskers were dark. They bring Uhl, who thinks that, on the last of October, they were dark. They bring Roberts, who says, that he generally dyed his whiskers; but that, at the time of his death, they were so black that he should scarcely have known him. William Barr did not think the daguerreotype shown him was much like the doctor; and the particular reason which he assigned was, that the black hue of his whiskers was unaccustomed and unnatural. Here we have witnesses who show what his condition was just about the time of the alleged marriage, and others, who testify how different the color of the whiskers was at the time of his death from their condition at a previous period. You will observe that Mr. Marvin, when he saw

the body, said in his testimony, that that was the only point of resemblance he mentioned, except the very slight one about the mouth. The color of the whiskers was the same as of the man he married.

Now, sir, there is one other point, and but one, and that is the size of his whiskers, and upon that subject I take, as the starting-point, these ambrotypes that have been given in evidence. I wish you to observe, first, that upon the sides of the face, the whiskers are extremely thin and short; that upon the chin they could scarcely change the curve of the face, they are so short. Now, sir, I have departed a little from my order, in calling your Honor's attention to that point. I should have stated first, Mr. Marvin's description of the man he married. He said he was a man of full whiskers. He said that he thought he saw daylight under his whiskers. Mr. Clinton's explanation upon that point is, they were gray at the root and black otherwise as they had started out. I submit, that whiskers like those of Dr. Burdell, so extremely short and scattered, and through which you could see his face—his flesh—could not be mistaken as false whiskers. No daylight could be seen under what the eye could take in perfectly and completely whatever it rested upon there.

Now, in taking that daguerreotype as the starting-point, we have given the testimony of William Barr, who gives the history of the growth of those whiskers on the sides, and the general condition of the Doctor's whiskers in form. In the summer there was no hair on the upper lip, nor on the sides of the face. On the 1st of October, they were still so small that they didn't require clipping. Under the chin, they were short on the 1st of November. But to get an opinion by comparison, Mr. Barr says, that they are well represented in that ambrotype, except that that shows them rather longer than the Doctor's were; that the Doctor had little whiskers and plenty of beard.

Now let your Honor compare that picture with any of the standards to which Rev. Mr. Marvin has referred, and say whether anything could be more dissimilar than that feature

of the personal appearance of the man he married, and the personal appearance of Harvey Burdell.

Taking Rev. Mr. Marvin to furnish that portion of his testimony which he derives by means of his powers of observation, taking everything in his testimony that has the character of knowledge, or that can be received as evidence—any court of justice would throw out his conclusions, his inferences, his speculations, and his hearsay statements from outside persons—and what is the result arrived at? That the man he married on that night was not Harvey Burdell, and could not have been Harvey Burdell.

The identification of the man by the clergyman failing, the claimant's case rests entirely on the evidence of her daughter Augusta. This witness has contradicted herself on important points, at her several examinations before this court and the Coroner's jury, and she states conversations with the decedent preliminary to the marriage on the Sunday and Monday previous, when he was at that very time in the village of Herkimer.

It is only by landmarks upon the stream of time that we are enabled to fix the exact locality of objects. Upon that principle I am content to try the Herkimer evidence, and the mass of error and contradiction introduced to subvert it. The Herkimer witnesses were of the highest standing for honor and probity. Eight witnesses swore positively to Dr. Burdell's presence in Herkimer on the 25th, 26th, and 27th of October. He went to his native village on a public occasion, and under circumstances calculated to attract the attention of all his numerous friends and acquaintances. It was on the eve of an election; and two political conventions, and the monthly meeting of a fire-company, were held on the day of his arrival. On the Monday following there was a lawsuit. Other circumstances were detailed, going to show that it was utterly impossible that these witnesses could have been mistaken as to the date of Dr. Burdell's exceptional visit to the place of his nativity. Mr. Eli Taylor's testimony was fully corroborated by the record of the Delavan House in Albany,

and could not be overthrown.   Mrs. Wilson's testimony was in like manner verified by the officers and records of the steamboat *New World*.   If these witnesses did not fix the date of Dr. Burdell's visit to Herkimer, there was no reliance to be placed upon human testimony.   With the establishment of the truth of these Herkimer witnesses, must fall all the earlier parts of Miss Augusta Cunningham's story; if, indeed, it had not already fallen by her own contradictions: and with it must also fall all her claim to veracity.   Those conversations with Dr. Burdell which she relates, must have happened on Sunday, October 26th, or they are sheer fabrications.   As to the important point of the cohabitation after marriage, she was contradicted by every servant-girl in the family, who testified that they never but once made a bed in the little hall bedroom, in which Augusta at first said they slept.   Not one of them can be convinced that more than one person slept in the Doctor's bed, and they are all certain Mrs. Cunningham slept alone.   On this point Augusta's testimony was completely contradicted, as it was on the subject of the relations between her mother and Eckel.   Mary Donahue's testimony as to the key between the rooms, and the condition of Eckel's and Mrs. Cunningham's beds, bears upon its face the marks of truth.   Her statements were confirmed to some extent by the evidence of Dr. Parmley, who often saw a man in Mrs. Cunningham's room, who was not Burdell.   The evidence on this point was sufficient to establish adultery, if Dr. Burdell had really been married to that woman.   In respect to the marriage ceremony, Augusta was contradicted by three witnesses, who fixed Dr. Burdell's presence elsewhere, at times entirely incompatible with his being present at the wedding.   Miss Helen Cunningham was not a very important witness.   She swore she saw the bridal party go out to the wedding; that Eckel remained in his room; and that she saw and heard the party return late in the evening.   But on all these points she was self-contradicted.

Dr. Jonathan Ware swears that he saw Dr. Burdell and his party on their way to the wedding.   He had no means

of fixing the date, except a letter, recalled to mind at the eleventh hour, which he had never before associated with that meeting. It was impossible that that letter should have fixed the date.

From the time of the alleged marriage, Burdell never ate in the house; when anything was sent to him, he invariably declined partaking of it; while Eckel and Snodgrass were in her room frequently, Burdell never was seen there; he never cohabited with her; and he knew she cohabited with Eckel. He declared that he must get her out of the house, even if he had to pay her, because he could not live in the house with her. From that time until his death, such declarations accumulate and increase in intensity. On the day previous to that on which he died, he leased the house to Mrs. Stansbury. In December, Mrs. Cunningham declared that the Doctor would have to behave himself before she left the house; and during the same month she said: "Do you think I would marry a man who loathes me?" Among her acts was that of attempting to renew the suits, which took place about that time. Another declaration was, that he might never live to sign the lease he had drawn for Mrs. Stansbury; and on the following morning he was found murdered in his room. Were these the declarations and acts of man and wife? When he was about to turn her from the house, was it her love of truth that caused her to keep the marriage secret, and not, as she might, by avowing it, claim the right to remain? The record of the evidence of the settlement of the suits, of the manner in which they were settled, and the consideration for which they were settled, signed, sealed, and delivered between these parties, which is testimony of itself, if it stood alone in the case, would overthrow completely and forever any amount of testimony as to the existence of a marriage.

First. Upon the 15th of October, a suit was commenced in the Superior Court by Mrs. Cunningham against Dr. Burdell, for a breach of promise of marriage, and another in the Supreme Court for slander. Upon the same day, he got out

from the Justice's Court, a subpœna, to require her to appear to be examined, I suppose, upon the charge of stealing a note. Upon the 22d of October, these suits are settled. Mr. Clinton, put this cause upon the proposition that a part of the consideration for a settlement of these suits was a stipulation upon the part of Dr. Burdell, that he would marry this woman; that this was the real consideration, and those witnesses who have testified that he said she did not want money, have been introduced, and have directed their testimony to show that it was marriage, and not money, that settled that suit. Upon the 22d or the 23d, there is entered in the Sheriff's office the discontinuance of these two suits. That discontinuance contained also a stipulation that Dr. Burdell would not sue her for having commenced them. That is the first step in the settlement. Now, I propose to call your Honor's attention, first, to two papers. They are both in Dr. Burdell's handwriting. One of them is a general release, dated upon the 18th of October. That paper was found in Mrs. Cunningham's possession. The depository was Eckel; but it was claimed by her upon its being found. It is sufficiently obvious, from its contents and its date, that it was given to her by Dr. Burdell for the purpose of being executed, in order, not merely to secure the discontinuance of the two suits, but to extinguish forever the cause of action, and that was her part of the settlement. The paper is now found in her possession unexecuted.

The other paper that is found is undated: I will presently fix the date. It is an agreement upon his part, that he will be a friend of her family; at least, that he will do nothing to injure them; and secondly, that he will continue to rent the house to her after the lease expired. That paper is found in her possession also, where this paper given for execution is found unexecuted.

Now look at that settlement. A part of the agreement for settlement, as held upon the other side, is that these two persons shall marry. The other part is, that the husband gives to the wife a stipulation that he will be a friend to the

family, and that she may continue to live in his house, under rent, six months after this marriage shall take place? The consideration to him is, that she not only discontinues the two suits, but extinguishes the cause of action for slander and for breach of promise of marriage; these are the conditions of a settlement received by him from the woman he is to marry in five days afterwards! The two suits would be extinguished of themselves; at least the causes of action would be extinguished by this very marriage. That would be the state of the case if this paper was executed. It remained unexecuted, and I will trace it hereafter.

Now your Honor will observe that both of these papers are totally incompatible with the idea of a contemplated marriage, before the term of a single week should expire, between these parties. Why did she want a stipulation that she should remain in the house, and that he would be a friend to the family? Why did he want a general release from these causes of action?

Your Honor will observe in one of these papers a remarkable erasure. There was a condition, here, that he would continue to rent the house to her if he continued to remain in the house as he now did. That is stricken out. She was too sharp to leave in that instrument any condition, so that in his desperate and eager determination to get rid of her, if he would go out of his house, that agreement would be cancelled. It probably was stricken out before she would consent to the settlement. At all events, it appears now stricken out.

That is the first stage of this settlement. Here I will speak for a single moment of the affidavit they were so anxious to introduce upon the other side. It is not an affidavit; it is a statement; it is of the same date; it is in his handwriting and bears his signature. He states that he has, up to that date, made no will, and if any is found it is a forgery. How this came into her possession we know not. It may have been taken from his safe upon one of those occasions in which she is proved to have examined that depository, or after his death,

when she had an opportunity to do it; or it may be that it was given by him to her, because she exacted it in this settlement. Harmless as the paper was in his esteem, and as it really is, it may have been left among his papers to show he had made no will. By possibility it may have been delivered to her. She may have demanded it as a part of the plan of this fictitious and fraudulent marriage, as it was unknown to him, and he may have given it in order to get a settlement peacefully, knowing it was of no value to her or harm to him, and not knowing the view or the purposes for which she demanded it.

The next step in this settlement is in the fore part of November. This is a settlement in regard to the note. The note was given in consideration of the assignment of a judgment against William Burdell, which was assigned to Mrs. Cunningham. They settled that; they cancelled the transaction. Three weeks after the alleged marriage, she reässigns that judgment to him, and the paper is found among his papers after his death; and an affidavit from him that he had not negotiated this note, and that it should be void if ever found, is contained among his papers, bearing about the same date.

Still the release is unexecuted, still the cause of action for breach of promise, and the cause of action for slander remain. She goes to her lawyer to talk about renewing it. She then reports that she has done so. About the time of the party of the sixteenth of January, he requires that she shall sign some paper, before he will let her have his parlors. He tells Frazer about some paper he wants signed. Upon the twenty-fourth of January, six days before his death, there is a row in the house. Augusta gives an account of it. Her mother was in his room, Augusta comes down; as she stated before the Coroner, the Doctor sent up her little brother to ask her mother to come down. Augusta comes, knocks, and finds the door locked. Then she opened it and pushed right in. He pushed her out against the banister. Her mother comes out, thinking she is hurt; but she is not hurt. The two servant-girls, without any knowledge of the existence of

the paper I am about to present to your Honor, testified also to that occurrence upon that day, so short a time before his death. Mary was in the hall, scrubbing. She heard the row, and was very much alarmed. She gives her own account of it. Hannah heard about it, too. The Doctor ran down stairs, and said, " What shall I do with these devils? How shall I get them out of the house?"—that is the substance of it, I cannot give the words—" they will take my life." Mrs. Cunningham, that evening, tells Hannah that it began about signing a paper. Mary Donahue says, that while she was in the hall, the Doctor had sent out as if for a policeman, and a man came to the door. Helen came down stairs crying, and went into the parlor. Augusta comes down and speaks to her, and Helen then says to the Doctor, in the words of Mary Donahue: " I will get my mother to give you them papers," meaning this paper.

Why was the Doctor thus urgent? Mr. Frazer explains it. Upon that very day, a few hours before, Mr. Frazer had met Thayer ; Mr. Thayer told him that these suits were merely discontinued, not settled ; Frazer was surprised. He meets Burdell and tells him of this—Burdell turns away silently. He goes home to his house, resolved to have that paper executed before he leaves it. Among his papers is found, dated upon that day—what? Another general release, filled in his own hand-writing, containing an addition, by which Mrs. Cunningham agrees also to quit the house upon the first of May. He cancels that stipulation, which he had been obliged to give upon the previous occasion, that she might remain there after the year expired.

The next morning, he shows that paper to Frazer, who identifies it. That same Sunday he shows it to Demist Hubbard, and he tells her with what difficulty he got it, as he told her before that Mrs. Cunningham had promised to give it to him. He shows it also to Dr. Smith, his partner, who identifies it also. When showing it to Dr. Smith, he seems puzzled about the genuineness of the signatures. He compares it with the very reassignment of the judgment of Wil-

liam Burdell with which I compared it, through an expert, before your Honor, in order to prove its execution by the same hand. "Can it be a forgery?" he says. If your Honor will compare that signature with the signature of Mrs. Cunningham, you will find, as the expert says, that there is no resemblance; and yet it is the same signature that she had affixed to the reassignment of the judgment of William Burdell, acknowledged before a Commissioner, and delivered to Dr. Burdell. He had a right to rely upon it as her signature under the rules of law. It is not material to the case; but, in my judgment, that signature was written by Augusta; and if your Honor will read her testimony, although she denies it, and the testimony of her sister, who says it resembles Augusta's handwriting, I think your Honor will come to that conclusion.

They thought they had cheated him at last; that whenever he should set up this paper they would be able to deny its authenticity, just as the counsel yesterday denied it. They had no idea that I would be able to prove it in this case. They knew that if I called upon anybody who knew Mrs. Cunningham's signature, he would swear that was not it. That would be the ordinary way, under the rules of law. It was only by this nice exception, whereby, in respect to a paper already in the case for purposes independent of comparison of handwriting, the Court is authorized to determine the question in that way, with or without the aid of experts, that I was able to prove that paper. Your Honor will remember that occurrence and the discussion which took place about it.

After three months of struggle between these parties, a keen, active contest, in which each party had a sharp eye upon his own rights and interests, Harvey Burdell succeeded in wringing from this woman—what? An extinguishment of the slander suit, and the breach of promise suit, so that they could not be renewed — three months after he had married her! Then he felt safe from a renewal of those suits; then, sir, he went steadily on to let his house. The

night in which this paper was delivered to him—and the contest of that day was almost a contest of physical force— that night, for the first time, the servant girls were sent to bed at an unusual hour, their work undone. What intervened, I know not. Harvey Burdell lingered among the living six days longer. He went steadily on to let his house. Friday he consummated the agreement; Saturday numbered him with the dead.

Now, sir, I say, that here is a perfect documentary history under hand and seal of the settlement of these suits, each paper found in the possession of the proper party. They form a complete settlement. There never was any one of the settlements in which you can insert either a promise to marry or a marriage. They are all of them in direct inconsistency, and perfectly incompatible with any such promise, or any such performance. Under the rules of law, if an action were brought in reference to this settlement, it would not be competent to give oral evidence to add such an important element as a promise to marry. There is no principle by which that rule should not be applied here. The parties have settled their differences, and written down the terms of the settlement; it is signed, sealed, and delivered to the proper parties. They are concluded by what they have done; and these papers present the complete and true history of their settlements. The idea that it was a part of this settlement, contemporaneous with the two first papers, that these persons should marry, is repugnant to everything done by both these parties. The documentary testimony thus harmonizes with, and corroborates the oral evidence, and entirely overthrows the pretence of marriage, to establish which the claimant has come before this tribunal.

CHARLES EDWARDS, *for Infant next of kin.*

THE case now before your Honor is connected with fearful and most extraordinary circumstances.

Harvey Burdell, well known in this city, for good or for

evil, is found murdered in his room—that room forming part of a house hired and occupied by Emma Augusta Cunningham—that woman, known by no other name than Emma Augusta Cunningham, until the man is murdered, a whole city aroused, a Coroner's jury convened, the body laid out, not only for the surgeon, but for the grave; and then, and not till then, we have this widow sprung out of a coffin.

The question for your Honor is this: Was Emma Augusta Cunningham married to Harvey Burdell in the evening of the twenty-eighth day of October, one thousand eight hundred and fifty-six?

The needle of truth must point and remain there, without a vibration or a variance. Let it deviate one point upon the card, and this seeming widow must sail away with a blacker dye upon her than that which now makes up the trappings and the suit of woe.

I. It will be unnecessary to labor the points and principles which I now lay down; for, while the facts and evidence in the case cling naturally to them, their force must have all proper effect with an experienced lawyer.

1. So solemn an act as marriage, on account of its train of consequences, must be made out by certain and conclusive proof, and by unimpeachable witnesses.

2. A contract of marriage, in the presence of a priest, gives no more binding force to it than if it took place in the presence of a layman; and the certificate of the former has no legal value, unless the particular provisions of the statute are complied with. (2 *Revised Statutes*, 139, §§ 7, 9, 10, 12, 14.)

3. If the certificate of marriage, made out by Mr. Marvin, had been found in the possession of Dr. Burdell, and by him endorsed (as it is proved he carefully endorsed all his important papers), then it might have amounted to valuable evidence—under the ruling in the case of the *Barony of Say & Sele* (see *Hubback*, 258). But the facts of the want of endorsement, and a possession in Mrs. Cunningham, destroy

its effect as against the next of kin, while, by parity of reasoning, it helps their position.

4. Mr. Marvin's incomplete private register of marriages, has no force as evidence. In England, a parish register may be evidence for some purposes by statute law. Thus it may be evidence of the time of a marriage, and of its celebration *de facto*, for these are, necessarily, within the knowledge of the party making the entry. (*Doe* v. *Barnes*, 1 *M. & Rob.*, 286, 289.) But even a regular register in England is no proof of the identity of the parties there named, with the parties in controversy; but the fact of identity must be established by other evidence. (*Birt* v. *Barlow*, 1 *Dow*, 170; *Bain* v. *Mason*, 1 *C. & P.*, 202, *and note; Wedgwood's Case*, 8 *Greene*, 75; and as to Mr. Marvin's Register, 2 *R. S.*, 139, § 9; 1 *Greenleaf on Evidence*, 541, § 493, and cases there.)

5. Even though the statute has, perhaps unfortunately, laid open the door very widely to looseness of form in marriage cases, yet sufficient must be legally proved to show a contract of marriage in every instance, *i. e.*, the mutual words of the parties which form and make up the contract. (*Wigmore's Case*, 1 *Salk*, 428; *Weld* v. *Chamberlayne*, 2 *Show*, 300; *Rex* v. *Fielding*, 12 *Howell's St. Tr.*, 1327; *Lyon's Case*, 1 *East's P. C.*, 469; *Latour* v. *Teesdale*, 8 *Taunt*, 830; *Jackson, ex dem., Dies* v. *Winne; 7 Wend.*, 47.)

6. While the rule of evidence in Surrogates' Courts still keeps out parties in interest from being witnesses, and admits the testimony of the daughters of Mrs. Cunningham, such testimony should be weighed with great caution and doubt, arising from its having been given when their mother was laboring under a charge of having murdered the man whom she claims to have been her husband; and especially as any benefit, which she might expect to get from his estate, would naturally be shared by them, probably in the present, and almost certainly in the future.

7. All marriages attempted to be kept secret, carry with them presumption of wrong or sinister motive.

8. Where a marriage is kept secret, and even the chance

of ever marrying has been disavowed by one party, up to the time of death, and never openly claimed by the other, the absence of all reasonable motive for concealment will greatly influence a decision against any such claim of marriage. It mainly did so in the well known Berkley case. (*Hubback's Evidence of Succession*, 256.)

9. Cohabitation, before an alleged marriage, takes away the legal point of consummation of a marriage by cohabitation. (*Rose* v. *Clark*, 8 *Paige*, 574.)

10. A contract of marriage, when not consummated, by what may be called marital cohabitation, must be clearly made out.

11. Even if observations, attributed to Burdell, are to be believed, they do not supersede the necessity of proving a contract of marriage; while evidence of the remarks of a party (of Burdell) should always be scrutinized and received with caution, as it is the most dangerous evidence that can be admitted in a Court of Justice, and the most liable to abuse—especially where such party is dead. (See the case of *Macneil* v. *Macgregor*, 2 *Bli. N. S.*, 470; 1 *Dow*, 208; 3 *Wils. & Shaw*, 75; *Maclaughlan* v. *Dobson*, cited in 2 *Bligh*, *N. S.*, 479; and see *Shelford*, 105.)

12. The mother's claim, and the daughter's explanation, are inconsistent with truths scattered throughout the case. The daughter, Augusta Cunningham, has borne sufficient testimony of the character of the mother's claim; so far (to use the words of Bentham) from grudging the trouble of true answers, she has bestowed upon it the greater trouble of lies.

13. Where the person, claiming as a party to the alleged contract, is living, and the transaction is recent, defects in the proof, or in the explanation of suspicious circumstances, are taken more adversely than when the events involved are remote, and both of the parties are deceased. (*Hill* v. *Burger*, 3 *Bradf.*, 432.)

14. Where evidence, in the nature of *alibi* evidence, is brought to bear, the character of the witness is a great remedy to see whether there has been abuse. And to this

is to be added, the manner and the seeming motive of witnesses. (3 *Benth. Jud. Evid.*, 376–9.)

15. An alleged recent marriage should be susceptible of the clearest proof. Where, in such a case, there is nothing but mystery, concealment, and doubt, the court will not lend itself to sustain a claim founded upon them. (*Turpin* v. *Public Administrator*, 2 *Brad.*, 426.)

16. None of the concomitants of marriage followed the one now alleged.

17. Aside from all the duties, rights, and liabilities attaching to a married life, proof of marriage is more important than proof of crime, however high the grade. Crime may be the act of a moment, and its punishment be perfected in a swift space of time, and there's an end. But, jump rashly to the conclusion of marriage, and crime may succeed; rightful heirs be cast into the street; wantonness be rampant and triumphant for a generation; and future strangers enjoy, through law, what was obtained by the wickedness of their immediate connections.

18. The party holding the affirmative, must prove his case by exhausting it at the outset; and, afterwards, can only get in merely that which qualifies and points to—in fact, simply "rebuts" the case, as made on the other side. Cumulative testimony, which creeps in after the other side has rested, and which has sprung up at the closing of the whole matter, and after a space of time when it might have been manufactured by collusion to fit the whole, is looked at with suspicion. (*Hastings* v. *Palmer*, 20 *Wend.*, 225; *Ford* v. *Niles*, 1 *Hill*, 300; *Hollister* v. *Bender, Ib.*, 150.)

19. Where evidence, on a question of marriage or no marriage, is contradictory, the collateral circumstances, in which there can be no error, ought to have controlling force. (*Cunningham* v. *Cunningham*, 2 Dow., 511.)

II. Let us now look at the relative position of Harvey Burdell and Mrs. Cunningham. As to Dr. Harvey Burdell, we find him the owner of the house No. 31 Bond street, New

York, and occupying important parts of it for his professional business. A man between forty and fifty years of age, with habits formed, and showing all those peculiarities which attach to a city person leading the life of a confirmed bachelor; thought to be rich, and proud to be considered so. He lets part of his house to Mrs. Jones for boarders, and Mrs. Cunningham goes there and takes the place of Mrs. Jones; enters into usual agreement as tenant with Harvey Burdell himself, at a full rent; and the position of landlord and tenant takes place, which continues, and is subsisting at the time of Burdell's death. As to Mrs. Cunningham, we have a widow old enough to have had a large family, with two of the children grown into womanhood. Here are these two persons; and, according to the observation of all within and without the house, Mrs. Cunningham remains the widow of her first husband, and Dr. Burdell continues leading his zig-zag bachelor life. The one is then murdered, and the other thereupon claims to be his widow.

III. Now to the testimony.

(A.) I will draw out for your Honor a chain of evidence, wrought from true metal, that cannot be broken; and which shall show, whatever masquerading did take place between others, that this alleged marriage never happened. The other side have woven a thread leading towards a mysterious ceremony. It will be found I am right in calling ours a chain, and that I am not wrong in speaking of a thread—a thread spun by a cunning spider.

While it is, of course, all-important to bear Tuesday, the twenty-eighth day of October, in mind, and to settle upon its hours, and mark the figure of Harvey Burdell passing over them, and especially the morning and the evening portions, it is exceedingly necessary that his whereabouts the twenty-fifth, twenty-sixth, and twenty-seventh days of the same October should be made certain.

I will now show the court that Harvey Burdell was in the village of Herkimer, two hundred and twenty-three miles north of the city of New-York, on the days I have last

referred to; I will show to your Honor, by the testimony on the other side, that Harvey Burdell was elsewhere than at the Rev. Mr. Marvin's on the morning of the twenty-eighth of October; and I will prove, by unhurt evidence, that Harvey Burdell was on the other side of the East River, in the city of Brooklyn, at the time when the clergyman performed the alleged marriage ceremony at his own house, situated on the very verge of the North River, in New-York, a distance of four miles.

David M. Grant proves that he had an engagement with him in New-York on the week before the twenty-seventh of October, and that thereafter (on Thursday) he excused his keeping it, saying that he had to go up the river; and that he did go up the river, and arrive in Herkimer on Saturday, the twenty-fifth of October, is proved.

Edward J. Munson, a Justice of the Peace, testifies, that he had known Harvey Burdell for years; and that he saw him in Herkimer on the afternoon of Saturday the twenty-fifth, Sunday the twenty-sixth, and on Monday the twenty-seventh of October.

Samuel Earle, a member of the bar, had been on familiar terms with, and saw him at Herkimer on Monday, the twenty-seventh of October, in the witness's office, at a hotel, and also in a Justice's court; "I am certain I saw him on that day at Herkimer, for I then tried a lawsuit in a Justice's court, wherein Ely Taylor was plaintiff." The witness fixes the time of the trial; states that Burdell occupied a seat at the court table; he remembers the fact, that the Justice asked him who that gentleman was, and that witness told him. The witness was, on that day, applied to by Burdell, to aid in getting notes discounted, and Mr. Earle was conferred with by him in relation to a mortgage. After the trial, Burdell walked to the witness's office with him. He saw Burdell as late as the afternoon of the twenty-seventh; he said he was going down that afternoon. The steamboat express train passed between four and five P. M.

D. S. Payne, another respectable member of the bar,
VOL. IV.—26.

knew Harvey Burdell; had seen him in Herkimer in August, and saw him next on Sunday, the twenty-sixth day of October, during tea-hour, at Taylor's hotel, in Herkimer; he fixed the time in connection with a political meeting; he gives us the particular conversation which occurred at the tea-table; he saw Burdell also the next day, Monday, at Taylor's hotel; and there was conversation between them. This witness states, he sat opposite to him in the dining-room of the hotel.

We then have the County Judge and Surrogate of Herkimer County, Robert Earle, Esq. He has been well acquainted with Harvey Burdell for eleven years; Burdell had been in the habit of going to Herkimer: "I am positive I saw him in Herkimer on the twenty-seventh of October." This witness took professional part in the Taylor action, and showed how the time referred to was the morning following the Democratic Political Convention, which had been held on the last Saturday but one prior to the election.

Ely Taylor testified, that he knew Burdell well; had been in the habit of stopping at his hotel, and that Dr. Burdell had arrived there on the afternoon of the twenty-fifth, and remained there the twenty-sixth, and up to the afternoon of the twenty-seventh; and he coupled all with the fact of the before-referred to trial, in which he was the plaintiff.

We then produced the Justice who tried the action, Cephas Johnson. "On that day I saw a gentleman speak to Mr. Earle, who, he said, was Dr. Harvey Burdell."

Christopher Wetherstein saw Dr. Burdell at Herkimer on the evening of the twenty-fifth of October, and had a conversation with him relative to a fire company, and well remembers Burdell's handling and talking about a trumpet which Wetherstein wore.

Thus far, we make use of witnesses who are strangers to the matter before the court, having no interest, and who reside away from the influential atmosphere of New York.

Mrs. Mary Wilson, the wife of Dr. Alfred Wilson, of Herkimer: She was a cousin of Harvey Burdell's; but this lady

has no pecuniary interest in the matter now before the Court. "I saw," she says, "the Doctor in October last, on Saturday, Sunday, and Monday, the twenty-fifth, twenty-sixth, and twenty-seventh; I saw him those several days at my house in Herkimer; I saw him a little after twelve; he was there again on Sunday; he accompanied some friends and my husband to church; I saw him at ten o'clock on Sunday evening; on Monday I saw him at our house; we dined on Monday after three o'clock, and he was there; he told me he had dined, and took some dessert and tea. I fix these dates by reason of my leaving Herkimer for New-York the following Wednesday; I came to Albany in the cars, and in the boat "New World" to New York (confirmed by Perry C. Smith, a clerk of the People's Line of Steamboats). I arrived here on Thursday at three; I went to my sister, Mrs. Williams, in Brooklyn; I wrote to my sister that I would be here on Tuesday morning. I sent a message by him (Burdell) to my sister, that I would be here on Wednesday or Thursday morning."

Here, then, we have Burdell away from New-York on the twenty-fifth, twenty-sixth, and twenty-seventh days of October, up to the afternoon of the latter day. The distance between Herkimer and New-York is such, that he could not have been in both places about the same time. In the present case, there can be no collusion, no interest of witnesses; nor chance of bribery or subornation. They are not mistaken, because they lay down cardinal facts in corroboration. The thing is legally perfected: 1. The person is known and marked. 2. The time of presence clearly defined. 3. The place is as clearly shown.

The time-table tells us that he would arrive in New-York a little after nine o'clock in the morning of the twenty-eighth. Where was he from the moment he arrived in New-York to the rest of the time which exhausted the morning part of the eventful day? According to the theory of the other side, Burdell was with the clergyman as far up as Perry street, near the North River; while, according to their own testi-

mony, he was at the meeting of the Directors of the Artizan's Bank in Nassau street. This is proved by Messrs. Benton, Picton, and Gilmore (officers of the bank), who show that the meeting was protracted, lasting until after noon time, and we gather that he could hardly have got away from the lower part of the city until the afternoon had well progressed.

The other side produced a ledger, showing a professional charge. This helps us in filling up the afternoon. And where, thereafter and at dinner hour, was Harvey Burdell? Our opponent's witnesses, Alexander Fraser and his son Clarence, tell us, that Burdell dined at the Metropolitan at five o'clock. Allow Burdell about half an hour for his dinner; and then, where was he? Their witness, John Smith, informs us. This man had sold to John J. Eckel, a remarkable wardrobe bedstead. This bedstead John Smith personally superintended the putting up, between five and six o'clock. Smith testified that Burdell was there until he was paid, and had departed.

Thus, we come to about seven o'clock in the evening. It would take him about half an hour to get to Brooklyn. At half-past seven, we shall find him with his relative Mrs. Williams, at Brooklyn.

The Surrogate must have been struck with the intelligence and artless truthfulness of two of the Brooklyn witnesses, Phœbe Lipper and Hannah Dennison. Children only in years. Words out of such lips come like arrows from the hand of truth. They must make their mark.

Phœbe Lipper (aged 14). She lived with Mrs. Lucy Ann Williams, in Brooklyn, last fall (in October), she had often let Dr. Burdell in at Mrs. Williams' house. They had expected Mrs. Wilson there, from Herkimer, on Tuesday morning, but she did not come until Thursday. Witness did not remember any one being at Mrs. Williams' on the evening that Mrs. Wilson was expected, until Dr. Burdell came to the door in the evening; witness let him in about seven and a half o'clock, and he went into the parlor.

Hannah Dennison (aged 14), testified, that she lived with

Mrs. Lucy Ann Williams, last fall; remembers Mrs. Wilson being expected there from Herkimer last fall; she was expected to arrive there on Tuesday morning (28th of October); on the Tuesday evening when she was expected, witness was in the basement. " Dr. Burdell came there that evening, and Phœbe (Lipper) let him in; witness saw him in the parlor; he stayed about three quarters of an hour; he came after supper."

Mrs. Lucy Ann Williams, widow, a cousin of the deceased, and residing in Carroll Place, Brooklyn, confirms all this. She refers to the fact that her sister, Mrs. Wilson, was to have come to her from Herkimer, the week before. " Tuesday" (28th October), " being when I expected her, Dr. Burdell coming, told me he had been to Herkimer, and my sister could not be here until Thursday morning; he came about half past seven o'clock in the evening; we had got through tea; he said he had just returned from Herkimer that morning, and had gone there on Friday or Saturday previous. He stayed about three quarters of an hour to an hour."

Harvey Burdell was then in the city of Brooklyn (four miles from Mr. Marvin's house, with a river between), certainly as late as twenty minutes after eight o'clock in the evening of the twenty-eighth day of October; and it would have taken him a fair half hour afterwards to have reached any ferry and landed himself at any point in our city. During the time he was thus in King's county, Mr. Marvin was marrying a man, under a name false as his whiskers, to Mrs. Cunningham, on the extreme western side of New-York city.

Thus have we link fashioned fittingly to link, a chain leading through four consecutive days of Harvey Burdell's life—the twenty-fifth, twenty-sixth, twenty-seventh, and twenty-eighth days of October. And if we, with Harvey Burdell dead, are able thus to present facts, how much more emphatically would have appeared the fallacy of the present claim, if, when this woman was insisting upon a marriage, Harvey Burdell had been alive! The court ought not to forget how much of difficulty we naturally labor under, groping for proofs, and circum-

stances, and conduct, he being " done to death." And yet, grasping for a moment the mass of testimony covering the whole of this proceeding, where, I ask, where will there, where can there be found a case, ancient or modern, in which —in the dead absence of the alleged bridegroom—so much rises up to cry out against this lying outrage on the pure rites of holy matrimony? Where is the remaining friend and partner in the serious and struggling pursuits of manhood? where the comforter for expectant future old age? Your Honor has got to answer it by saying: I find this friend and partner, I declare this comforter to be in Emma Augusta Cunningham; she who sued the man and pursued the man; she whom—by her own confession—that man " loathed;" or your Honor will decide for those who, by right of blood, have a legal claim, and who, under all difficulties, and standing upon a grave, have been able to expose disguise, and untruthful action.

(B.) Inasmuch as we have fairly shown how far, by locality, by distance, Harvey Burdell was from the chance of marriage, we may very well here lay hold of the testimony adduced on the other side.

In taking hold of the evidence offered by Mrs. Cunningham, we find the Rev. Uriah Marvin. Mr. Marvin did not report the marriage to the City Inspector, which the law required him to do (thus aiding in the extraordinary secrecy), nor did he, as will be seen, conform to provisions of law in regard to the contract of marriage, nor as to its registry, nor in relation to the after certificate of it.

The uncertainty of Mr. Marvin in regard to any sufficient and satisfactory identity of Harvey Burdell with the man he married, and our facts, which take and keep him far away from this gentleman's house, make it unnecessary to examine his testimony. He is asked whether he married any person on the twenty-eighth of October last. He answers: " I married two persons on the evening of that day;" but this is not followed up by showing any form or contract of marriage. It may well be assumed that Mr. Marvin took little notice

of the persons he married; for, on being asked whether Mrs. Cunningham was one of them, he answered: "At the time I saw her on the Sabbath after the murder, I did not recognize her as the woman I married." He describes Harvey Burdell as slow of speech and stooping. We positively prove that he was remarkably rapid of speech and erect. He marries a stranger man wearing, even then, as he, Marvin, believes, false whiskers. His servant, Mary McManahan, and Henry L. Bogardus prove this. Question to Mary McManahan: "Did you observe that the whiskers were pretty long down on his bosom?"—*Ans.* "Well, no sir, but I heard Mr. Marvin say, at least tell his lady, that they were full whiskers, and that he thought they were false." Bogardus: "He said the man he married to Mrs. Cunningham had large heavy whiskers, which he thought were false." Mr. Marvin refers to the circumstance of the man's coming the next morning. "I gave him the certificate; he sat down in a chair and read it to himself; when he got through reading it, he nodded his head and said: 'All right, or words to that effect.'" We produced a witness, Daniel Olney, who had rendered Burdell a small bill with his name wrongly spelt; spelt precisely as was his name spelt in the certificate, Berdell, and he instantly observed the error. Again, we have shown by our witness, Mr. Butler, a clerk under the Public Administrator, that all Burdell's documents of importance were carefully tied up and endorsed; yet this certificate is without mark or endorsement. Further, Mr. Marvin says, he gave it to the man; and yet, it is found by the Coroner in the possession of Mrs. Cunningham. Mr. Marvin states that all the parties were utter strangers to him. It will be admitted that Harvey Burdell was a large square-built man; that he was in mid-age; and the mass of evidence clearly shows that he had scarcely any whiskers, and that his beard was always clipt short; and yet, we shall find that the statements made by Mr. Marvin to others are in conflict with all these facts.

And here let me observe, that a marriage should not be adjudged from mere similarity between a dead man and a

person who may have crossed our path during a few minutes of life. When Mr. Marvin saw the dead body, he shook his head; he would not, could not, give it sufficient life appearance to mark the man he married: " I was under the impression, at that time, I had married Mr. Eckel in place of Dr. Burdell." " ——" the theory was not obliterated from my mind then, and I still thought that, when I saw Mr. Eckel, I might possibly see the man I married." *Q.*—"If you found Eckel more like the man you married than the body of Dr. Burdell, what then would have been your opinion?" *A.*—" If there were more points of resemblance, most assuredly I would have fixed upon him; I should have believed that it was Eckel I married and not Dr. Burdell; I would have returned to the old theory again." So that this witness shuts out all the world, except Eckel and Burdell, and is inclined to decide, not from what he knew, but what might turn up, in any point of appearance of another stranger, Eckel. It is hardly fair to put Mr. Marvin to decide positively from observation of a dead body. It will be unjust to decide this case through it. Indeed, all such test is out of the question, when we remember that Dr. Uhl stated, that, from the fearful depletion, the countenance had wonderfully changed. Now, let me show, from the mouths of others, what Mr. Marvin really said, and how completely he drifts past the characteristics of Harvey Burdell, first premising, that before the Coroner he gave no positive opinion. " I gave no positive opinion as to identity." Mr. Marvin told Dr. Samuel W. Parmley, " he was not good at remembering persons;" that " he did not even know that he could have recognized the corpse, even if it had been the man he did marry." " He (Marvin) expressed no suspicion even that it was Burdell he married." (This was before he had seen Eckel.) And he also observed to Dr. Parmley that " he did not particularly notice the person he married at the time he came to make the appointment." This clergyman, in his register, had put down—and as gathered from the man with false whiskers— the age of Burdell at 44; and yet he described to Dr.

Parmley the person he married as being "seventy years of age!"

All who knew Harvey Burdell are aware he was a broad, full-sized man. Mr. Marvin told Dr. Benjamin F. McGuire, that "the man he married was a thin, spare man!" This was on the Sunday immediately after the murder, and before he had been examined by the Coroner; and yet, on seeing the body, he observed to our witness, Robert Johnstone, that "the man he married appeared to be heavier than the corpse;" and yet again, to Henry L. Bogardus, "that, judging of the size of the corpse, he did not think the man he married was as large." Mr. Marvin's own servant testified (as to Burdell) "He was a nice, stout man on his foot."

Mr. Marvin had two conversations with Peter P. Voorhis. In the first interview, Voorhis observed that he (Marvin) did not seem to identify Dr. Burdell as the party he married? "No," said Mr. Marvin; "all I could perceive that looked like him was a slight resemblance about the mouth; that the man acted queer." At the second meeting, "he said he had been up to preach, and saw Mrs. Snodgrass, &c.;" "and then," he added, "he began to think it was Burdell he had married after all." *Witness* (Voorhis): "You don't then, bring anything to your recollection to identify the man more than before?" asking, also, if it was that circumstance, or from any identification or recollection of any identification of his own, that he believed it was Burdell he married? He answered, it was from this circumstance and "a certain lady's" description of what kind of man he (Burdell) was, what kind of speech he had, and how he stood and stooped, and "that was the reason he began to believe it was Burdell he had married." To Robert Johnstone, in the room where the body lay, and after having scrutinized it, Mr. Marvin declared, "I have not recognized the body as that of the person I married to Mrs. Cunningham;" and also observed, that it seemed to him the Coroner wished him to swear that it was the man he married. Henry L. Bogardus was also present, and he testifies that Mr. Marvin declared "he could

not identify the body of Dr. Burdell as the man he married;" and "that the man he married to Mrs. Cunningham had large, heavy whiskers, which he thought were false." And yet Dr. Stephen A. Main heard Mr. Marvin testify before the Coroner "that he could tell the man he married as soon as he could see him;" and spoke of the man's beard as being long, down upon his breast, about two inches below the cravat. This witness asked Mr. Marvin, after he had seen the body, if he recognized the body? He made no other reply than shaking his head; and so says Police Captain Dilkes. "Mr. Marvin did not say, in my hearing, that there were strong points of resemblance; did not make use of the word points; I was directly behind him." Two portraits of Harvey Burdell were handed to him; still, no recognition. And to Mr. McGuire, who knew Burdell thoroughly, Marvin showed that the "whiskers of the latter extended down here"—making a line with his hand upon his breast, from four to six inches below the chin, and he also said that the man's whiskers were very full.

It is very clear, that when Mr. Marvin was face to face with the deceased, he did not exclaim, or even murmur, anything like "this is the man I married;" but that he turned away with such doubts as will not allow this court to build up any certainty out of his testimony.

Even aside from the question of identity, here was not sufficient to satisfy the ceremonial marriage of the law. The form of contract does not appear: "When solemnized by a minister or priest, the ceremony of the marriage shall be according to the forms and customs of the Church or Society to which he belongs." (2 *R. S.*, 139, § 8.) Mr. Marvin merely says, "I married two persons on the evening of that day," but he does not give a word of the ceremony of the marriage. There never yet was a trial in a court involving the issue of marriage or no marriage, but what the words, mutual words amounting to mutual contract, appeared, had to appear. In all the cases referred to at the foot of our Fifth Point, the words of contract were proved; and we ask the court to remark the observation of Chief Justice Holt in Wig-

more's Case. They are the very legal approach towards the question before the court. An implied contract will not do. If the other side have slurred over their case, by not proving a contract *per verba de præsenti*, the risk is upon them. Our own statute, touching marriage, starts with the requirement here claimed: " Marriage, so far as its validity in law is concerned, shall continue in this State a civil contract, to which the consent of parties capable in law of contracting shall be essential." (2 *R. S.*, 138, § 1.)

Mr. Marvin's register, which was put in subject to objection, must be ruled out. Its legal validity depends upon its conformity to the statute. " If either of the parties, between whom the marriage is to be solemnized, shall not be personally known to him, the minister or magistrate shall ascertain, to his satisfaction, the identity of the respective parties." (2 *R. S.*, 138, § 10.) Neither of the parties here were known to Mr. Marvin. Again, the law requires the minister not only to ascertain " the Christian and surname of the parties," but also " their respective places of residence" (*Ib.*, § 9, *Subd.* 1); and this must be put into the register (*Ib.*). Now, look at this register; the residence of the man, the alleged bridegroom, is left a blank! Nor is this all: although the man who had gone to make arrangements, or the minister under dictation did write down the surname, and although the latter admitted in evidence that he owned a City Directory, wherein will be found (in large letters too) " Burdell Harvey, Dentist, 31 Bond street" (as also a totally different branch of people named Berdell), yet he, with the requirements of the statute before him, makes what is here—perfecting, by the by, the whole, by crowding in, in pencil, the name of the sole witness, the other Augusta. He happens, months after this, to take the air of Bond street, and seeing the name of Dr. Harvey Burdell, he, without approval, without recognition, goes to his register and alters the surname, by scratching out the first *e*, and putting *u* in its place. This will not help the entry. Such an act, done upon a perfect instrument, would not in law alter it; while such a course,

pursued upon an imperfect instrument, should raise, if not strengthen, suspicion.

I now call the attention of the court to another remarkable document emanating from Mr. Marvin—the marriage certificate. It has the false name Berdell, and lacks the requirements of the statute.

We have shown that the ceremonial marriage was not solemnized pursuant to the Revised Statutes; and if this be so, no certificate based upon it will have any legal value. The act says: "Whenever a marriage shall have been solemnized within this State, pursuant to this title, the minister or magistrate by whom the marriage was solemnized shall furnish, on request, a certificate thereof." (*Ib.*, § 12.) And even supposing it had been sufficiently a marriage under the law, the certificate must specify: "1. The names" (of course correctly) "and places of residence of the parties married, and that they were known to such minister or magistrate, or were satisfactorily proved by the oath of a person known to him to be the persons described in such certificate." "The certificate shall also state that, after due inquiry made, there appeared no lawful impediment to such marriage." (*Ib.*) A certificate containing all the proper matter is allowed to be filed, entered, and recorded in the office of the County Clerk (*Ib.* 12, *et seq.*); and when it so contains all the proper matter, such certificate, as well as such entry, "shall be received in all courts and places as presumptive evidence of the fact of such marriage." (*Ib.*, § 16.) But, as we have shown, there is here no such statute certificate; there was no sufficient legal register. Again, neither register nor certificate are ever of evidence when the person granting them is a witness.

No harm will be done to the Rev. Mr. Marvin by our saying, in charity—by your Honor declaring, that he was mistaken; while two things are apparent: first, he has said enough to show he is not able to identify; and, second, he is contradicted in what he said were the characteristics

of the man he married, supposing for an instant that that man was Harvey Burdell.

Augusta Cunningham, although really the principal witness for Emma Augusta Cunningham—near in name, nearer in blood, close together in combination—may be put aside with less of minute scrutiny than might at first be supposed. I shall be able to give the court a running contradiction. Placed on the witness stand, it is true, she, *instanter*, makes her mother and Dr. Burdell man and wife. Truth and boldness are not synonymous. She was examined before the Coroner; and, finding how "this and that" would not dovetail, she here advertises how she was there in such a dreadful state of excitement, she hardly knew what she did say. Is this true? Recorder Smith, who then examined her, says: "She testified with great deliberation. I did not observe in her manner anything like excitement." *Q.*—"Did you observe her, at any time, to smile or laugh?" *A.*—"I remember her doing so upon one occasion." *Q.*—"How was it when she was interrogated—did she answer slowly or rapidly?" *A.*—"She answered with great deliberation, at times, there was such an interval elapsed, after the question was put, before she would answer, that I repeated the question."

When examined before your Honor, she gives the idle, trifling reason for keeping the marriage secret, that Burdell had promised Mrs. Demist Hubbard he would not get married till she was married; while, before the Coroner, this witness was asked: "I want you to tell me why the marriage of your mother and the Doctor was kept secret?" *A.*—"He said that people would laugh at him if he told them he was married."

The witness says that Burdell, "on the Sunday morning next preceding the marriage," first asked her to witness the ceremony. Aside from the improbability of his having ever asked her, he was in Herkimer, at church with Mrs. Wilson's family, on that Sunday morning.

She comes to Monday morning, and says, that then the

Doctor, in his office, told her that her mother was gone all the way to Goshen after a parson. But how could Burdell, "in his office," tell her about Goshen and Rev. Mr. Snodgrass, when he was at the court table in Herkimer listening to the trial in which the witness Ely Taylor was plaintiff? The going at all to Mr. Marvin's is not accounted for; while Augusta Cunningham says: "I asked the Doctor if it was to be at the house (in Bond street); he said it was to take place at the house."

The witness states the time of starting for the marriage to be "between seven and eight," whereas Phœbe Lipper, Hannah Dennison, and Mrs. Williams show, that Harvey Burdell was at the house of the latter, in Brooklyn, at that very time.

When prepared to go, this witness says, they all together went down stairs: "we were going to pass out; my mother met my sister Helen in the hall, and told her she wished her to remember this night;" "we then passed out." Now, her sister Helen gives a totally different version, and shows how her mother and the Doctor went into the parlor, and she defines their positions. *Helen:* "My mother came down into the parlor; she and the Doctor both came in together; mother came to about the centre of the room, and the Doctor leaned against one of the pillars by the folding doors."

As Dr. Burdell was in Brooklyn, and there really was a bridegroom, it may be deemed necessary to supply his place. We do it through the testimony of Dr. Parmley. Between five and six, "and near night—I then observed a man in that room (Mrs. Cunningham's room), just before I left to go out of the city; it was not Dr. Burdell. He was dressing himself; I closed the window and left the house; as I was leaving the front steps, I looked up again, and saw the gentleman; his appearance was changed, and the change gave me the impression that he was connected with the theatre, and dressing for the stage." "It was the change in the appearance of the man's face and beard that attracted my attention particularly." "I could not describe the size of

that person's beard, whiskers, or hair, when first seen; and I can only say that his beard, whiskers, and hair, as seen on the second view, were considerably enlarged as compared with the appearance at the first view."

Let us, through Augusta Cunningham's testimony, follow the wedding party. "After we got out a short distance, mother said she had left her gloves (the idea of a widow forgetting gloves on a second marriage!); the Doctor said he had not any either; he said he would stop and buy them a pair." Now, there are glove-shops in Broadway, opposite Bond street, and four others before reaching Bleecker street, and down which the party should have gone direct to Mr. Marvin's, with many stores all along Bleecker street, and also some four or five other glove-stores further down Broadway, before reaching Mrs. Sallenbach's; and yet the bridal party tramps past Bleecker street, past Houston street, down to almost the corner of Prince street, opposite the Metropolitan Hotel, to wait for the bridegroom and two pair of kid gloves. If this woman had really got hold of Harvey Burdell for the purpose of marriage that night, does the court believe that she would have allowed this man liberty enough in the night time to flit between Bond and Prince streets, in order to purchase gloves?

This witness tells the court that she and her mother stayed at Mrs. Sallenbach's about half an hour, when the Doctor brought the gloves; handed a pair to Mrs. Cunningham; had a pair himself. It seems that while they were there, the witness got to Miss Sallenbach's piano.

Miss Emily Sallenbach remembers the night and the circumstance; and we shall find there was no Harvey Burdell—was there a John J. Eckel? Miss Salenbach says she knows Mrs. Cunningham and her daughter Augusta. "I saw them on the 28th of October, when they came to our place to wait for a gentleman; this was about seven o'clock; they asked me to play on the piano, which I did; but when the gentleman came, Augusta took my place; she seemed as if she wished to occupy my attention." The gentleman comes.

"They welcomed him," says Miss Sallenbach, "and said, 'Good evening, sir, how do you do?' He said, 'Good evening, madam, how do you do?' Augusta remained at the piano. Mrs. Cunningham then showed some papers to the gentleman, which were about the size of foolscap; they were open; there were two or three of them; I think papers were lying on the sofa. The gentleman talked to her, but I don't know what it was about. They were very much interested in examining the papers; I saw nothing else in their hands besides these papers; neither she nor the gentleman had anything but the papers in their hands."

But the papers: Here we have a clue to those papers, which we shall hereafter refer to, stolen out of Burdell's safe, and found in Eckel's own wardrobe bedstead after the murder, inclosed in a yellow envelope, in his handwriting, and endorsed by him.

John P. Eckel,  ·  *Private papers.*
171 Stanton street.
Also, Miss Augusta Cunningham,
31 Bond street.

Was this gentleman, with his "good evening," Mr. Eckel? "I saw the gentleman after that," continued Miss Sallenbach, "at the inquest. I saw him there in the front room; he was alive; Captain Dilkes took me up stairs, and I picked him out; the captain did not tell me his name until after I picked him out; the captain then told me it was Mr. Eckel. From the peculiarity about his eyes, I recognized him as the person who came to our house. I saw no difficulty in recognizing Eckel as the man." This witness is unimpeached and disinterested: Augusta Cunningham is impeached and interested. And where is John J. Eckel? He has been in and about the court; all who saw him remember and felt the truthfulness of Miss Sallenbach's remark, "the peculiarity about his eyes." Augusta testifies, that the man who met them there went with them to Mr. Marvin's, and was married to her mother. Now, the person who met them at Sallenbach's

was Eckel. No matter to us whether he parted with them afterwards, and they took up with another personage, a disguised one; and we have shown there was one ready, disguised in the mother's room, at the time they started.

There is one small matter which may as well go with the gloves; the remarkable wedding-ring, which, unconnected with any idea of marriage, Burdell had given to Mrs. Cunningham, as far back as July. Augusta says: " In coming from Mr. Marvin's, mother asked him why he did not give Mr. Marvin the ring; he said, he did not ask for it: he said, if he should put it on her finger and say a few words, it would do just as well." *Q.*—" Did he do anything at that time about the ring?—did he put a ring on her finger?" *A.*—" He did." *Q.*—" In the street?" *A.*—" Yes, sir." The thing is too idle to pause upon.

Helen Cunningham may soon be dismissed. She tells you that Burdell was at Saratoga on the 30th of October, while Dr. Daniel D. Smith says he was with him on that day at the Lafarge House, in New-York. She is called on to dwell upon her mother's desire, that she should remember the 28th of October; and it turns out that all she is to remember in connection with it is—not that the party was going out to any marriage—not that anything was yet to be done—but that " the difficulty was settled on that 28th day of October, before they went out."

An examination of her testimony will show, that she has no correct mind as to dates, not even as to months; and what really occurred, very likely took place on the 23d, when all suits were settled, peace restored, the Doctor declaring he extended his friendship to mother and daughters; and then the trio might have gone out for an hour or two.

She would have us believe that she saw her mother, sister, and Harvey Burdell, and knew of their coming home on the eventful evening of the 28th of October; while before the Coroner she states, point blank, that she did not know when they came home, and saw them not.

As to Stephen Knowlton, he had a property in Brooklyn

for sale ; but would only sell for country property. He makes out that Burdell went .to him to try to effect an exchange. " I told him," says Knowlton, " it was useless to go and see my property, as I wanted country property." This would have blocked off a business, intelligent man like Burdell, even if he had been hawking his house about. " He said he did not want my property for himself." Then, whom did he want it for ? and if not for himself, why dispose of his own property for it ? " He said, it was clear of incumbrances, but he had some little trouble in his family" (he had no family),. " and he did not know if he sold it" (not exchange it), " whether his wife would be willing to sign the deed, but that if we made an exchange he could give me ample security that I should have a clear title." How a clear title, if there was a wife who would not sign ? " The Doctor said he did not want it in his own name, or for himself, or something of that kind !" " I cannot tell at what stage of the conversation it was he spoke about his wife, except that it was when I feared there was something wrong about his title." Now his first " fear" was, that " he was involved ;" here we have a " fear" and a questioning about a title, which Knowlton repudiated at the outset. With all these incongruities, we perfect Knowlton's character as a witness through the testimony of Mr. Josiah Rich, his late partner, called by our opponents : " He does sometimes get confused in his ideas ; his recollection of words is quite indistinct and confused at times, and he will associate ideas in confusion."

As to James Wilson, he says, that on Tuesday or Wednesday before the murder, he met the Doctor in Broadway, at a time when he was on his way to him on business. " How do you do, Doctor ?" and " How do you do, Wilson ?" And " How is Mrs. Burdell ? *or* Mrs. Burdell that is to be ?" " He says, it is Mrs. Burdell, I am sorry to say, *or* am sorry to say." Why to such a man would he express it at all ; why tell him he was sorry for it ? Why tell anybody, if it were to be and was a secret ? Marriages resting in doubt are never decreed on such testimony as this. He then varies his observ-

ation: "I might have said, how is Mrs. Cunningham?" Now, this never could have brought the response he has referred to. It appears that he never mentioned the matter until last week.

E. H. Stone, Dr. Uhl, Clarence Frazer, Walter B. Roberts, Nelson Barlow, and George W. Douglass, are brought forward in a hope to counteract the positive testimony on our side that Harvey Burdell was in Herkimer on the three days immediately preceding the twenty-eighth day of October. E. H. Stone, book-keeper at a hotel, merely shows payments of board-bills at sundry times, and so a negative is attempted to be presumed of non-absence. There is no proof by this witness that Burdell was in New York on the days covered by the charges in the bills; while positive evidence that he was away kills presumption. Dr. Uhl refers to his seeing Burdell on a Monday in the latter part of October, 1856. He only "thinks" the date: "I think the time was the twenty-seventh of October by reference to my book." He finds on that day he attended a patient in Brooklyn. It is only from a debit in his book (made more than half a year ago) that he so "thinks."

Clarence Frazer, a youth, having no particular reason whereby to make a distant date a certainty, is under the impression that on Sunday, the 26th of October, the Doctor walked into dinner at the Lafarge House with the witness and his father. In this he is certainly mistaken. With regard to Walter B. Roberts, he says: "The Doctor was not absent from the city between the twenty-fourth and twenty-eighth days of October to the best of my knowledge." He is impressed with Dr. Burdell's being in New-York on Sunday, the twenty-sixth of October, from a mere entry in his books; and as to entries, he says: "I generally make entries in my book on the day work is done; sometimes I do not till after a day or two; I can't tell anything about my work except by the book." This witness, like others, appears to remember the whereabouts of Burdell, not through a direct transaction with him, but through some gone-by date in connection with some stranger matter and stranger person.

The rest of this witness's testimony is in our favor. He appears to have been very intimate with the deceased. " In talking over the suits, Burdell told me, she (Mrs. Cunningham) wanted to extort money from him."

As to Wilson Barlow, he merely says, he was introduced by Walter Roberts to a person he called Burdell, on a Sunday, in the latter part of October, 1856, at Roberts' office, where witness went to have a tooth fixed. This is all that bears towards the 28th of October. Then we have George W. Douglass, who says he went on Sunday evening, the 26th of October, to 31 Bond street: " on that occasion I saw Dr. Burdell in the house." Burdell was in Herkimer. He then goes on to show how he and Eckel were together on the evening of the 28th of October, from between seven and eight o'clock.

Then appear three female acquaintances of Mrs. Cunningham, Catherine Dennison, Hester Van Ness, the dressmaker of Mrs. Cunningham, and Catharine Lamb, who had been a servant of Mrs. Cunningham. Catherine Dennison testifies in one breath as to Dr. Burdell speaking favorably of Mrs. Cunningham, and in another, to her listening to everything he said, and watching him. She was at the party on the 14th of January; and she makes out that Burdell paid for some flowers used at it. The witness is allowed to say, that Mrs. Cunningham told her she was engaged to be married to him, but wanted witness to keep it secret. Now Mrs. Cunningham took no chance of harm in saying this, because Mrs. Dennison was to say nothing about it. But I ask the court to look at this testimony ; and in doing so, it will be satisfied that the time when Mrs. Cunningham told witness she was engaged to be married, was a short time prior to his death ; in other words, was certainly after (October) when she says she was married. " Mrs. Cunningham told me, before his death, she was engaged to be married to him." Much stress has been laid on a declaration of Burdell's, that he was going to Europe, going with ladies, going with " Mrs. Cunningham" (not with his wife), but see how her friend takes the wind out of the sails of the vessel which was to waft her a bride

acrᵥss the Atlantic: " He spoke to me about going to Europe the present summer; it was between the first of January and last of February. I asked him if he would take me with him; he said he would, if I would leave my children."

As to the witness, Hester Van Ness, she is Mrs. Cunningham's dressmaker, and an intimate of her's of twelve years' standing; and she starts with Burdell's open certificate of character upon her. A witness produced on the other side, Clarence Frazer, tells us, "Burdell said, Mrs. Cunningham had a dressmaker, a Miss Van Ness, who would swear to anything." The witness would have us believe that Burdell spoke very plainly before her, for she was regarded as the friend of both, and goes on to say, that she was " at this time, " making and altering dresses for her intended marriage!" How improbable! when, had it happened at any time, it was to have been a secret marriage. And if this milliner was really, then, upon something like marriage-finery, was not this a part of Mrs. Cunningham's game to be able, in her action for breach of promise of marriage, to show that things had gone so far that even her wedding-dresses were making? She told her friend that they were going to be married, and that Burdell proposed, as his friends had made so much trouble about it, that she should be married privately. And yet none of his friends ever knew of his determination to marry her, while the reasons private marriage heretofore put forth were, his promise of not marrying till Demist Hubbard was married, and that, if it were known, his friends would laugh at him. Here is a third reason, more extraordinary; because his friends never had made trouble.

We come to Catherine Lamb : she tells us, that in October last—fixing no week or day—she saw Dr. Burdell in the house; Mrs. Cunningham was present. " I told Mrs. Cunningham I heard she was going to break up housekeeping." " She said, no, she was going to be married; I asked who with? she said, ' with Dr. Burdell;' I said, are you, Doctor? and he added, ' Yes, and you can come and live with us.' " She says she came down the next day to have her teeth

finished; "He said, wouldn't I come back. I said I would see about it, and that was all." Now, let us see what this "all" amounts to. First, she cannot tell in what part of October it was; and we have seen that Burdell and his tenant were suing each other up to the 23d of the month; it was to be secret whenever it did take place; and this conversation occurred while Catharine Lamb had the toothache, and her mouth was wide open in the dental chair, and the Doctor was working inside of it: "the conversation took place while he was fixing my teeth;" and it must have been a work of some extent, for the Doctor to have charged this servant five dollars and fifty cents. Dr. Burdell's ledger is in evidence; he was in the habit of carefully inserting all sums he received, and there is no charge of this $5.50.

Jonathan S. Ware is the last of the witnesses on the other side whom I shall particularly notice. The remainder are either very secondary, or they will be found to strike in and aid in making up our stock of circumstantial proof. This gentleman is worked into fixing a date, by the finding of a note (handwriting not proved), which he declares he received from Mr. Snow. The note (its envelope destroyed) seems to be dated the 27th of October, but the time when really written is not shown. It relates to no business, requires no appointment to be kept on the 28th, or any other day. He says, he met Burdell and two ladies, and that they passed and went down Bleecker street, on the other side. He did not speak, but merely bowed to the Doctor, and he could not tell the dress of the women, nor whether any of them wore gloves. Now, the man thus with the women—if they were the same persons who came from Miss Sallenbach's—were coming up Broadway on the west side, and would naturally, in going down Bleecker street, and even in reference to reaching Mr. Marvin's house, go down its south side, the very side on which this witness was moving up; but, strange to say, the party cross right over, and take the north side! Again, putting the parties thus, Ware had only, in his line of sight, the edge of the lady nearest to him; and it is impos-

sible there could have been recognition and bowing.  Mr. Ware commences his testimony by loosely saying, that this occurred " in or near the end of October," and only gets to the 28th through the note from Snow before referred to.  It may be well, too, to remember, that it is said to have been in the dark month of October, at night, by the dark southwest corner of Bleecker street.  He added: " I cannot say now that I recognized any other human being that evening;" and to the question, "Are you an observing man, do you ordinarily know men you meet in the street? his answer is: " Not very often."  He added, that he had not told anybody about having seen Burdell until months after the murder; nor did he fix the date until months after; did not even look for the letter until recently.

(C.) Having laid bare the testimony on the other side, I desire to present facts and circumstances, which must destroy all probability of a marriage.

1. *Matter unconnected with the words of parties.*—The chambermaid, Mary Donohue, with a view to confirm the single life which Burdell lived, states, that the Doctor's bed had but one pillow.  " I never knew of any lady sleeping in his room; from the appearance of the bed, I think but one person slept in it; I always made her" (Mrs. Cunningham's) " bed; she slept there" (up stairs, above Burdell's floor), "for I always knocked to call her down."

Mary Murphy was chambermaid during the month of October, and up to the 10th of November.  She shows that Mrs. Cunningham and Burdell slept apart; that the Doctor's bed, on the second floor, was used only by him, and that Mrs. Cunningham slept on the floor above.

2. Mrs. Cunningham's own acts and words, before and after the 28th day of October, 1856, the time of the alleged marriage.

(*a.*) *Before the 28th of October.*—One of her acts before the time of the alleged marriage, was her striking Dr. Burdell, in the presence of police officers.

We have her conduct last summer, in packing the bath-

room with witnesses, while she tried to get testimony out of the enraged Doctor.

(*b.*) *Her acts and words after the 28th of October.*—She sends for Dr. Edward L. Roberts as late as the last of November, or the first of December. " I said, I considered she thought a good deal of the Doctor, and wanted to marry him; she said, 'she would not marry him.' Still further, 'she said, she did not want to marry him; she would not marry a man who loathed her!'"

" I had been informed," says this witness, "that it was a breach of promise case" (the action she had brought), "and I asked her why she did not renew the breach of promise suit again? She said, she had been to her counsel to do so, and he would not have anything to do with it, because she had dropped the first one."

Observe her remark to Hannah Conlan: "I heard them say, and I heard the Doctor say to Mrs. Stansbury, that he would sign the paper in the morning; I told this to Mrs. Cunningham. The answer she gave was, that he might not live to let the house or sign the paper!" If she were, at this time, his wife, why not openly claim her position and her rights?

On the very Wednesday before the Saturday of Burdell's death, Mrs. Cunningham said to Mary Donohue, "'Mary, I want you to come here, and be a witness as to what I am going to give the Doctor.' She told me it was for some money she was going to pay him, and that he was such a cheat he might deny it." (This is the wife!) " She then knocked at the Doctor's office-door, and he came out, and she handed him a paper, which she said was a twenty-dollar bill, and he said, 'Very well;' and he shut the door."

This witness proves how Mrs. Cunningham had a secret key to Burdell's room, and how, when he was out, she opened the door, and had Augusta sent for, and they together rummaged the papers. Mary Donahue goes on to say: "After being about a week there" (this was after the time of the alleged marriage), "I was in the Doctor's bed-room, and

heard her call him 'a vagabond of a man,' and heard, 'you infamous, bad woman;' heard a scuffle, and he turned her out of the door. Mrs. Cunningham came into the bed-room, much flushed. I said to her, 'Perhaps if he was married, and had a wife to guide him, he would not behave so.' She replied, 'She would pity the woman who got him, as he was so cross.' This was about a month before I left."

About the 3d of December, Erastus Wilson heard her say : " Dr. Burdell will learn to behave himself before I vacate the house." We ask again, why did not this woman declare she was his wife, and assume and claim her position and rights ?

We find she had stolen the key of his iron chest. In confirmation of her still being Widow Cunningham, we have in evidence a check drawn by Harvey Burdell on the Artizans' Bank, dated the 14th of November, 1856, for $115, in favor of E. A. Cunningham, and endorsed by her. Then, we show an assignment of a judgment, assigned to Mrs. Cunningham, and by her, " E. A. Cunningham," assigned (by endorsement) on the 14th of November, and acknowledged by her, " Emma A. Cunningham," before a Commissioner of Deeds, on the 19th day of the same November.

Next, we have a controlling, conclusive document; a general release, dated as late as the 24th day of January, 1857, made out in the name of, and signed by, Emma A. Cunningham; not only releasing him from every claim, but likewise declaring this : " I also agree to quit claim and surrender the premises I now occupy, No. 31 Bond street, on the first of May next, and to pay the rent to said Burdell up to that day."

Here, we say, should be an end of all marital claim ; here, we insist, is a virtual estoppel.

3. Harvey Burdell's words and actions prior to and after the 28th day of October.

(*a.*) *Prior to the 28th of October.*—Adam T. Smith was told by Burdell of Mrs. Cunningham's having taken a key from his pocket while he slept; and of her opening his safe, and taking a note therefrom.

(*b.*) *After the* 28*th of October.*—As late as the Tuesday or Wednesday immediately preceding his death, Burdell called Dr. Edward L. Roberts into his room, and showed him a general release, and an agreement of hers to leave the house.

Then we have his reply to Hannah Conlan, just before last New-years: "I heard you were going to get married, Doctor." "I am not going to get married at all, Hannah." Hannah Conlan gives us his expressions at the time of a fearful rencontre between them; and it occurred as late as the Saturday immediately prior to Burdell's death. "They had trouble up stairs, halloed murder, there was a hubbub among them; and when the Doctor came down into the kitchen, I said to him, 'For God's sake, Doctor, do not go up stairs to raise a row, for the neighbors hear it, and it is disgraceful,' and he said, 'How can I get rid of these devils! I must get them out of the house some way.'" This occurrence was also referred to by Mary Donahue.

Mrs. Catharine Stansbury hired Dr. Burdell's house, No. 31 Bond street, for one year, from May 1, 1857; the agreement was made on the Friday before his death. "I called about the middle of December; went through the second story rooms; he said the woman in the house was a very bad woman, and he wished to get her out; that she had the house until the first of May, and would have to remain until then; and if she did not leave by fair means, he would put her out by force, and 'if it cost him damages he would pay them—for, out of the house she should go.' I called again, January the 12th; saw Mrs. Cunningham in the back parlor; the Doctor told me who she was, and asked me if she had been to see me; he said he had told her I was to have the house; that she told him he had no right to let it until the first of February, but he told her he would let it when he pleased." He said: "She has said everything she could against me; she has written anonymous letters about me; she says I am an old bachelor, worth about $100,000, and don't know what I want; she is determined I shall marry her, and I am determined I will not." "He said he was continually watched by the

inmates, and did not feel safe; and he said when I went out I should find her at the door or on the stairs. She was on the stairs when I went out; she could have heard every word the Doctor said; he spoke loud and clear; was active; very quick in his step."

About a fortnight previous to Burdell's death, he told Dr. Cox, with a great deal of emphasis, " that he had never been married, and meant never to be married." " His mode genrally of referring to her was, *this woman.*" (When the witness left, she was leaning over the bannisters.)

We then have Hugh Crombie, the sheriff's officer, who arrested Burdell in the actions brought by Mrs. Cunningham; " he told me when I arrested him, that he had never promised to marry her, and spoke derogatory of her. From the commencement of the suits down to their discontinuance, he often told me that he would never marry any one." " On the 22d (of October), the last day, he denied ever intending to marry Mrs. Cunningham."

James M. Murray, clerk in the Police Court: " On the 15th of October, 1856, Dr. Burdell came, and stated, that parties living in his house had taken from his safe a note; I handed him an informal subpœna directed to Mrs. Cunningham."

We, then, have the telling and emphatic letters of Harvey Burdell to his cousin, Mrs. Demist Hubbard—all after the time of his alleged marriage. A man may hastily say some untruthful things; but, unless he has a sinister object at the time, he will write truthfully. I am not here to defend the coarse language in them—" Plain truth requires few flowers of speech."

Clarence Frazer refers to a conversation which Burdell had with his mother in the latter part of October : " He held up his hands and said, that he hoped they would be withered before he ever married Mrs. Cunningham, or any old woman with children." He said, he would set fire to the house, if she stayed there after the first of May, for the sake of getting her out. He said, she was a bad woman in nearly every respect.

And we have a paper which will be found important. It is wholly in Burdell's handwriting, and it was written when the actions brought by Mrs. Cunningham were going on, "now pending." It either carries with it the exact and full terms on which the suits were ended, or contains the basis of Burdell's proposition, or ultimatum of settlement; and in either aspect, is devoid of all offer, proposition, or hint of marriage. It will speak for itself.

IV. I started this case with saying, that it was connected with awful and most extraordinary circumstances; let me remark upon, let me exhibit, some of them.

Here is said to have been a ceremonial marriage; and yet it is uncorroborated by anything that follows such nuptials. And it occurs before a clergyman, in a large city; only ninety days elapse, and still most minds hesitate to believe it. If such a matter had occurred, without being connected with what was vicious and criminal, there would have been no difficulty, and a marriage might have clearly appeared. We are obliged to lay hold of vice, and cling to it, with a view to get at such an alleged marriage.

It is remarkable that, with the concomitants usual about marriages, not one of them is to be found here: 1. In the place of matrimonial cohabitation, we have prior illicit intercourse, through the admission of Mrs. Cunningham. 2. Secret marriage, without a sufficient reason or motive. 3. No holding themselves out to the world as sustaining the honorable position of husband and wife. 4. No recognition among friends. 5. No visiting among or introduction to relatives. 6. Not known as husband and wife by servants, who saw them at all times. Meals in different houses—he continuing to board at the Metropolitan Hotel, and no change whatever after the 28th of October; beds on different floors. 7. No mutual promises. 8. No record or letter turned up among Burdell's papers; no love epistles of his to her, showing, or even leading, to the idea of marriage. 9. No change made even with regard to a single piece of

furniture, nor with the boarders or servants. Eckel and his birds still find a place in Mrs. Cunningham's bedroom. 10. No behavior between the parties as husband and wife. While all the facts and circumstances, which are in contradiction of a marriage, come overwhelmingly in the train of our remarks.

Finally, the circumstances attending the last night of Harvey Burdell's life, coupled with the occurrences of the following morning, tell most powerfully against the allegation of marriage.

Not more than three months had passed. It is claimed that she loved him. He comes in the dark hour—coldness and night without; silence and darkness within—a silence and a darkness soon to be made more palpable—a silence disturbed only by the blow of the dagger—a darkness more lasting than ever settled in a living home—the darkness of the grave. Where was the would-be wife, when the click of his key sounded through the hall? Where was she when he sought his room—their room? Would not a wife have had the gas lighted, and all common appliances ready on the coming home of a husband, instead of leaving it for him to light an assassin to his murder!

Where, then, was she, when—had she been his wife—she would have been with him, or in the bedroom adjoining? The morning comes. The streets are alive with light, with people, and with sound. Bloody death in the room; the key hangs in the door, as though it marshalled the way, and would invite attention; and yet the would-be wife comes in a line with that door, but goes not in or near, flits down stairs to the breakfast table, goes up those stairs again, comes in sight of the door, with its index, the key—flits past, and up to her room.

It is left to a poor boy to discover the awfully mangled humanity—to the old cook to go all the way from the kitchen to the room of this widow sprung out of a coffin, in order to tell of the death, and murmur of the murder.

And what, then, did this wife of ninety days do? Where

would the wife of a day, or of a whole life, have then been? Quicker than the knife had descended, would have been her flight down; and as sudden as the death-fall, would have been her's upon the dead body. No: her own room, and her own bed were best for the performance of the pathetic; and there she was, and there she remained.

### GILBERT DEAN, *for the Claimant.*

GILBERT DEAN, for the claimant, in closing, said, he would confine himself strictly to the record in the case now on trial, and would refuse to wander, in imagination even, into the investigations which had occupied the attention of other courts. Throwing aside the extrinsic and immaterial circumstances that had accumulated in the case, and had been collected to cover up the issue to be tried, he would base his arguments on the undisputed facts, and on these he would contend that the claimant had established the marriage. That although witnesses differed in their statements, contradicted each other and themselves, yet there were certain controlling, undisputed facts, which could be explained on no possible hypothesis but a secret, compulsory marriage between the claimant and the decedent.

That taking this hypothesis, together with the peculiarities of character of Dr. Burdell, all the mystery of the case disappeared. That these admitted facts were:

1. The claimant, Emma A. Cunningham, on the evening of the 28th October, 1856, was married by the Rev. Uriah Marvin to some one.

2. Augusta, the daughter of the claimant, who has been a witness here, was the witness to that marriage.

3. The man who on that occasion was married to the claimant professed to be Harvey Burdell, now deceased.

4. The man who acted as bridegroom went twice in the day-time; once prior, and again, on the morning subsequent

to the marriage, to the house of Mr. Marvin, to see him on the subject of the marriage.

5. That man was either Harvey Burdell, now deceased, or some person who strongly resembled him.

6. Augusta Cunningham, the witness to the marriage, knew Harvey Burdell, knew then whether it was he, or some one personating him, and knows now.

7. The claimant, the day prior to this marriage, travelled to Goshen, a distance of seventy miles, to get Rev. Dr. Snodgrass, a clergyman who knew Dr. Burdell by sight, and who was in the habit of visiting the house No. 31 Bond street, where the parties resided, to officiate in the performance of a marriage ceremony on the next day.

8. The man who was then married, was either Dr. Harvey Burdell, or both mother and daughter are guilty of three crimes—conspiracy, false personation, and perjury; and the man who personated Burdell on that occasion has, without any apparent motive, been guilty of two crimes—conspiracy and false personation. As the law will not presume crime in any case, the court is bound to require the strongest evidence before making a decree that establishes these felonies.

9. Harvey Burdell, the decedent, and the claimant were both, on the 28th of October, 1856, in New-York, capable of contracting marriage, and under no legal or physical disability.

10. The parties, prior to that time, had been living on such terms of intimacy, and occupied such a position as rendered marriage proper and probable.

11. The claimant and Dr. Burdell were, at the time, living in the same house, sleeping under the same roof, so as to render secret cohabitation possible and probable, and they continued so to live, until the period of his death.

12. The claimant, on the first occasion when called upon in a judicial investigation, announced her relationship to the decedent, asserted her rights as widow, even at the risk of an indictment for murder; stated the reasons why the marriage

had been in secret, and why that secrecy had been observed by her, and the time when the marriage was to have been made public, together with the intended departure for Europe, the following June.

13. Augusta, when called upon separate from her mother, and without any opportunity for consultation, subsequent to the death of Dr. Burdell, made the same statements as the claimant in reference to the marriage, the reasons for secrecy, the time when the announcement was to be made, and the contemplated voyage to Europe.

14. The person married at that time was either Dr. Harvey Burdell, or mother and daughter, with some man to the public unknown, as early as October 28, 1856, formed a conspiracy to enact a fictitious marriage, and murder the personated bridegroom to secure his property, which conspiracy was carried out in the marriage on the 28th October, the murder on the 30th January; and, as a part of that conspiracy, Augusta has testified on this investigation.

15. As all legal presumptions are in favor, not only of marriage and legitimacy, but also of innocence, these undisputed facts and their fair deductions establish the marriage beyond peradventure and doubt, unless they are overthrown by testimony of a higher character, or of greater weight.

Having elaborated these points, and referred to the evidence in the case, showing that they are uncontroverted, I repeat, that these undisputed facts, with those legitimate deductions which the law makes from such facts, establish a valid, though secret and compulsory marriage, between the claimant and decedent.

The contestants, to destroy this evidence, have introduced a mass of testimony, which may be grouped under three general divisions. 1. Declarations of the parties inconsistent with the theory of the existence of the marriage relation. 2. The acts of the parties equally inconsistent. 3. Contradictions of the direct testimony establishing the identity of Dr. Burdell as the bridegroom in the ceremonial marriage.

As, on the theory of the claimant, the marriage was secret,

and the time when the secrecy was to be removed had not passed, all evidence showing that the parties held themselves out to the world as single—the claimant using her name of Cunningham, &c.—is entirely inconsistent with the hypothesis of the claimant, and must be dismissed.

Acts or declarations of hostility prior or subsequent to the marriage can be of little weight, from the fact that the claimant insists that the marriage was compulsory on the part of the decedent, and only adopted by him to avoid exposure, loss of reputation, business, and property. No expressions of love, therefore, but an intenser hatred, might be expected; for marriage, even when public, between parties who are not congenial, or, in the stronger language of Scripture, " agreed," is always the source of bickerings, disaffection, and often violence. " Can two walk together unless they be agreed?"

Dismissing this view of the case, I answer the evidence of the contestants grouped by me under the first and second divisions, viz., inconsistent acts and declarations, in this manner. So far as the acts and declarations of the claimant are concerned, they are equally inconsistent with a fictitious marriage, and it is clear that one or the other existed. If fictitious, it must have been with the intention to assert it in future; and, in that case, her declarations and conduct would have been more guarded than they would have been if the marriage had been actual.

So far as the acts and declarations of the decedent are concerned, which are supposed to be inconsistent with the idea of a marriage between himself and the claimant, I admit their force; and such conduct on the part of any ordinary man would seem almost conclusive: but in weighing acts or declarations, regard must be had to the character of the person enacting or making them. Fortunately, the character of Dr. Burdell is faithfully daguerreotyped by the evidence before this court.

Every man furnishes the standard by which his own acts and conduct are to be judged. When the question of sanity

is raised, courts do not ask if the man differs in his conduct from his neighbors; but the inquiry is directed to a comparison with his former self. Measure each one, not by another, but by himself. Apply this rule in judging of the strange conduct of Harvey Burdell. The proof shows him not only peculiar, but without a parallel. Of him it might, indeed, be said:

"Only thyself can be thy parallel."

He had never been married, and was constantly at variance with his brothers and other relatives. The records of our courts exhibit his history in this respect. Insincere in his professions, fickle and irresolute, or both false and fickle, devoid of all religious principles, acknowledging neither integrity in man nor virtue in woman, denying the sanctity of the marriage vow, and making a business of aiding in obtaining divorces. The last week, and the last hours of his life, the evidence shows him volunteering to aid in two such actions; and the testimony of Dr. McGuire, his cousin, is, that in the celebrated divorce case of John Burdell, "Harvey was at one time on one side, and at another upon the other—depending upon his interest." Physically and morally a coward he must have been, as is demonstrated by his attempts to rid himself of the claimant—publishing to police officers, deputy sheriffs, and others his own infamy, and then as publicly associating with one whom he had represented as a thief, a liar, and a prostitute. Socially, he had no position to prevent him from saying or doing all that he did after the alleged marriage; for, in June, he charges the claimant, in the presence of Mrs. Williams and Mrs. Wilson, two of his cousins, ladies of respectability, with stealing, and crimes that should send her to the Penitentiary; while, the following August, in violation of every dictate of decency and rule of propriety, he takes this " criminal" to Saratoga, introduces her to his friends and acquaintances, and provides a place for her daughters at one of the first schools in the State. Of virtue he had no more idea than a blind man has of the beauty of colors, or one

deaf from his birth of the harmony of sounds. Such is the man whose conduct is to be judged. The whole argument of the contestants on this branch of the case is, that it is not likely that he was married to one to whom he behaved, or of whom he talked as he did of the claimant. I can prove, by the same argument, that he was not a brother of either William or John Burdell, or related to any of those who claim with him a common lineage; for his hand was against them all, and his language anything but fraternal. The answer to this argument, however, is, that Harvey Burdell was unlike other men; and that, therefore, reasoning from analogy, when applied to him, leads to error. But his character is shown in this, that his conduct and declarations in reference to the claimant are not uniform. At times he was kind, attentive, and apparently affectionate, and to her friends extravagant in her praise—calling her all that woman should be; while to others he was unbounded in his denunciations. This conduct on his part continued up to the time of his death. I notice only two other characteristics of this peculiar man. One, his love of money and niggardly parsimony; the other, his passion for engaging in family feuds and domestic difficulties. All the evidence reveals these as striking traits in his character. His conduct shows, that he was regardless not only of the sacred relation of husband and wife, but also of the ties of affinity and consanguinity. Such was the character of Harvey Burdell, and this is the man whom they ask your Honor to compare with those whose acts an declarations form the ordinary subjects of judicial inquiry. To judge him by others, is a libel upon our common humanity. We were willing to let the grave cover his follies and his faults; but they have chosen to bring his frailties here: having done it, we have the right to comment upon them, and to say, that you are not warranted in concluding that the marriage relation could not have existed, because ordinary men do not talk and act as he did, under like circumstances.

The conduct of the claimant, it is said, is not consistent with the existence of the marital relation. It must be remem-

bered that it is not claimed that this marriage was the off-spring of " Love's young dream." The parties were of mature years. When the claimant found that, after succeeding in his designs, he sought to cast her off, seeing the ruin that awaited her and her children, she demanded justice for her-self and them, at the same time saying: " I am your wife, by every tie that can be." In saying this, she spoke not with the power of Emma A. Cunningham alone, but her words were winged with that power that accompanies the right. Burdell quailed and sank before her : she brought her actions, held him to bail; he promised redress, settled with her. But in his cowardice he dare not even do right rightly. He sought and obtained a truce in that miserable compromise— a secret marriage. And with a marriage such as this, the result of legal and physical coercion, the parties agreeing for more than half a year to live a lie, she is to be denied the rights of a widow, because she was not frantic in her affection while the husband lived, and overwhelmed with grief at his death. Had she pretended either, it would have proved the falsity of the claim.

Thus far I have confined myself exclusively to the facts that were admitted, without dealing with controverted or disputed facts. Leaving these, and coming to the testimony of particular witnesses, I add: we have two, one a witness, the other a petitioner, who have been sworn, and who know whether Harvey Burdell was the person married to the claim-ant on the night of the 28th October, 1856. Augusta Cun-ningham must either be impeached, legally impeached, or the decree must be for the claimant. There are only three modes of impeachment: First—By disproving the tes-timony. Second—By general evidence of bad reputation. Third—By proof of self-contradictions. The contestants claim that they have disproved the testimony, and that she has contradicted herself. There is no pretence of an impeach-ment by evidence of bad character or reputation. What is the fact—the material fact she states? The identity of the party who was married to her mother on the 28th October.

Who invited her, or when she was asked to witness that cere-
mony are quite immaterial.   A man dines with some friends
at a particular place; one of them is charged with having
committed an offence at another place at the same time.   A
witness is called to prove an *alibi*.  He swears to the material
fact, the date of the dinner, and the presence of the party.  He
is asked who invited him, and when and where he was invited;
these are immaterial, and he may be mistaken about them,
and yet his testimony remains unshaken.   But this is all the
contestants pretend they have disproved, that Dr. Burdell
was not at No. 31 Bond street, on Sunday and Monday, the
26th and 27th October, when Augusta says the Doctor asked
her to witness this marriage.   Whether she was asked by the
Doctor at that time or a week before, or whether her mother
first spoke to her on the subject, is a matter with reference
to which she might be mistaken, and yet speak the truth in
regard to the material fact, about which there can be no mis-
take—the identity of the parties married.   I make this point
as a caveat, not that we need it, but because the contestants,
to invalidate this marriage, must contradict her in a manner
sufficient to convict, if she were on trial for perjury.

Augusta testified, that Dr. Burdell was here from Friday,
the 24th October, 1856, to the latter part of the week of the
alleged marriage.   In this she is not contradicted, but sus-
tained by the evidence.   The Register of the Marvin House,
Saratoga, proves, that he arrived there on Friday night, the
31st October.   The Book of Minutes of the Artizans' Bank
proves him here on the 24th, 28th, and 31st October.   The
books of the Lafarge Hotel prove, that he paid his board
from the time he went there till the 31st October; and the
bookkeeper testifies, that his habit was to pay only for the
time actually there.   But the contestants claim they have
established his presence at Herkimer from Saturday till
Monday afternoon, the 25th and 27th October.   This case,
extraordinary as it is, is more extraordinary from its omis-
sions on the part of the contestants.   Do they prove that he
had any business at Herkimer?   Why, then, did he go there

at that time? Did he do anything there? He disputes nearly every bill that is presented for payment, and makes the mechanic or tradesman deduct from its amount; and yet they say that he, at this, the only time in his life, wantonly expended his money in travelling to Herkimer, and returning immediately, without an object—doing nothing. Why did he go there? For what did he go there? One month after that, he went on business, and transacted it. His name attests it. The testimony of a witness as to a date, unless the date can be fixed by an act done, can. never be relied on. The trial of *Taylor* vs. *Gray* is mentioned, as fixing the date; that cause was tried on the 27th October. It had been pending three months, and the parties had frequently met before at the same house, when it had been postponed. This present case, I have said, was remarkable for. its omissions. The Justice brings his minutes and the subpœna of the date of the 27th; but omits to bring any papers showing. on what prior days the parties had met at the same house, and postponed the cause. Did it appear by those minutes that one of those occasions was the 14th August, the day on which Dr. Burdell was there, and actually transacted busi·ness? And would that explain how the witnesses, who testify to facts that occurred, were mistaken only in the date? Mr. Ely Taylor, too, goes to Albany to look at the register of the Delavan House, to fix the date when he ate breakfast there, and omits to bring the register of his own hotel to show, whether Dr. Burdell was at Herkimer on the. 27th October; not only omits to bring it, but tells Mr. Butler, the Public Administrator, that he has no register. And Mrs. Williams omits to bring that portion of a letter which would fix the disputed date, though the most minute circumstances tending to. establish his absence at the time, are none of them omitted, but carefully narrated by the same witnesses who make these remarkable omissions. But I claim that he was not in Herkimer, because he did nothing, and had nothing to do there, and because he had business of a double nature here—business in reference to his friend

Frazer, in the Artizans' Bank, and business in the United States Circuit Court, in an action in which he was as really a defendant as though he had been named; a suit that was called on that Monday, and expected to be tried—called on Monday, set down peremptorily for Tuesday, and no excuse made on account of his absence. These are presumptions; but I submit, that when witnesses of equal credibility testify, that a party is in two places at the same time, that it is then imperative to ask, where did his business call him at the disputed date? Besides the improbabilities that exist against the theory of the contestants, the evidence of the claimant shows conclusively that he was here at the time in dispute. We produce a subpoena, dated and sealed on the 27th, returnable the 28th: Mr. Lane testifies to serving it on Dr. Burdell the day of its date; Mr. Taylor, the attorney in the case, testifies, that the subpoena was used to get witnesses in court on the 28th; Dr. Putnam testifies, from a written memorandum, to seeing Dr. Burdell and Lane go over to see Dr. Maine on the 27th; and Dr. Maine testifies to the same interview. The cause is down in Mr. Taylor's diary on the 27th; and upon the Judge's calendar it is marked called on that day, and set down for "to-morrow." That subpoena and calendar are mute witnesses; but yet they are intelligible, and cannot be charged with mistake, alteration, or perjury.

We prove him here on Sunday the 26th, by Clarence Frazer, a young man who has no bias in favor of the claimant. He testifies to his dining with Mr. Frazer; that the subject of conversation was the resignation that had occurred on the 24th. It could not have been the preceding Sunday, for Mr. Frazer had not then resigned, and did not think of doing so. It was not the following Sunday, for on that day Dr. Burdell was in Saratoga; and on the next Sunday after that, Clarence Frazer had returned to college. Mr. Frazer himself also testifies, in the most positive manner, to this circumstance, and to the additional fact, that he saw and consulted him every day from Friday till Tuesday, and that he had business transactions and arrangements with him in

reference to this resignation. Can he possibly be mistaken? Mr. Douglass saw him on Sunday afternoon, and fixes it positively by the date of the delivery of the book-case. Dr. Uhl saw him on Monday morning, the 27th; had a conversation, which he detailed, and fixed the date by an entry in his book, and by the fact, that he was himself about to move on the first of November. Miss Van Ness saw him on Saturday, the 25th. The next evidence on this point is that of Mr. Barlow and Dr. Walter B. Roberts. Mr. Barlow tells the conversation, and the occasion of his being at the office of Dr. Roberts. He was not there after Sunday the 26th. It could not have been early in October, for Mr. Frazer had not then resigned. Dr. Roberts fixes the date by the charge in his book. This witness, we were notified, was to be attacked, because he was "a partisan." They have, however, prudently forgotten to fulfill the promise so openly made. He has, it is true, after being introduced to this family by Dr. Burdell, had the manhood to refuse to desert them in their affliction. Such conduct, instead of destroying, his testimony, adds to its weight in the mind of every honest man. He produced the account-book in court, and exhibited the charge made on the 26th October, in its regular order. There is none against Mr. Barlow after that time, and the conversation related to what had occurred—a past event, and not something that was anticipated. We thus give a history of Dr. Burdell from Friday till Tuesday, and by so doing, corroborate and sustain Augusta.

The contestants attempted to contradict her, or rather disprove the facts to which she testified, by proving that Dr. Burdell was not here on the 28th. To this end, they called Smith, Grant, and Fagg; and these witnesses swore it—but the records of the Artizans' Bank, with other evidence, have disposed of them—so that counsel now admit that he was here on the day of the marriage. Augusta Cunningham is corroborated in other circumstances to which she testified. One is the visit to Goshen the day prior to the marriage. Contestants proved this by Dr. Marvin, on their cross-exam-

ination: another fact, that Dr. Marvin was applied to, because Mrs. Snodgrass had given his name and address to the claimant on that visit on the 27th, and therefore that he was not sought, because he was a stranger to the parties. Another circumstance, which is strongly corroborative of Augusta, and which shows clearly in which direction the tide of truth is setting, is a fact that could not have existed if this were a fictitious marriage—that on the morning of the 28th, as the bridegroom was leaving, Dr. Marvin saw something he thought unnatural about his whiskers, as though daylight were shining through them. He thought them false, and determined to examine. He did examine them on the subsequent visits, and ascertained that they were not false. What caused this appearance? The imperfect dying of the whiskers left the silver lining, the gray, visible as he went away. That would not happen in case of any counterfeit Burdell. If the Doctor had been lame, the simulator would have limped; if he possessed any marked peculiarity of person, the personator would have had the same; but the imperfect dying of the whiskers would not strike any one who sought to imitate. This furnishes strong evidence of identity, and is conclusive, unless Mr. Marvin is mistaken when he says, the whiskers were not false, but genuine; and he had two opportunities for ascertaining this—one by gaslight, and the other by daylight.

All that voluminous and contradictory portion of the evidence as to the length or color of whiskers, and personal appearance of Dr. Burdell, I pass over in silence, because it cannot be raised high enough to be the subject of an argument; it is only by way of courtesy that I call it evidence. Augusta testified particularly to the position of the parties when married—to all the circumstances—in every one of which she is corroborated by Dr. Marvin, who tells you, that the man stooped; that he hesitated, acted awkwardly, and did not enter into it with enthusiasm—no wonder! Would any man, doing what he was ashamed of—marrying, to save exposure and his money, the woman he had slandered,

maligned, and betrayed—act differently? I have a corro-
boration in the handwriting of Harvey Burdell, the force of
which cannot be over-estimated—I refer to that remarkable
affidavit, bearing the same date as the other papers, in which
he declares, he has made no will, and that if any is produced,
bearing .a date prior to that time, he pronounces it " an
unmitigated forgery." Men do not make affidavits, or give
certificates of the title to their property, except when and
to those to whom they are about to convey or mortgage it.
What motive could he have had in drawing up and deliver-
ing this paper to the claimant, if she was to have no interest
in his estate? Take but the theory of the settlement on the
basis of a compulsory marriage, and then you have her motive
in requiring it, and the reason why he would give it. This
paper, too, explains the testimony of Stephen Knowlton, a
gentleman of the highest respectability and character. Bur-
dell was anxious to exchange 31 Bond street for a place of
Mr. Knowlton, but did not want to take the title of the pro-
perty he was to receive in exchange, in his own name—31
Bond street was free of incumbrance, but his wife would not
sign the deed—he would give him a bond, however, of indem-
nity against her. Take, then, the release of the 24th January,
written by himself, in which he makes her " release and quit
claim all her right, &c., to No. 31 Bond street," and you can
understand his whole conduct, he supposing that such a paper
would bar her right to dower. " Quit claim"—what? 'A
tenant asked to quit claim after the tenancy shall expire ! It
is the act of the man, who, with gun in hand, seeks to extort
by force from the woman he has wronged, and been com-
pelled to marry, such a paper as this release. It is the act
of the man, niggardly and penurious, who seeks to cut off the
right of his wife in this property. In the unexecuted release
dated in October, prior to the alleged marriage, there is no
such paragraph or clause as that. At that time he did not
ask her to " quit claim" her right in these premises. But on
the 24th January, 1857, he knew that a widow was entitled
to dower, that if he could get that released, exchange it with

Knowlton, and take the title in the name of another, she could not follow him in his devious windings. Taking the papers all together, instead of furnishing evidence against the claimant, they afford the strongest possible proof in her favor, viewed in connection with the character of Burdell; and admitting, as you must, that there was some right there which he wanted released—and I ask with emphasis, was there any right?—could there be any right but that of a wife? I can conceive of no other possible theory on which that affidavit can be explained.

But I pass hastily to another point: If the claimant had no claims upon him, why these extraordinary declarations of hostility and aversion? Had he at last got his match? Had he been overreached? Did he want to overact with those relatives or acquaintances who were hostile to the claimant? Did he, therefore, talk about her as no man, I will not say gentleman, would talk of a woman, without a motive? To my mind it furnishes the strongest evidence, taking the character of the man in view, that he was married to the claimant, and that by talking thus, he was endeavoring to lull suspicion. I refer also to the fact, that there was a party in that house on the 14th January. Acquaintances and associates of his were there. He purchases flowers for the occasion, fits up his own rooms for the guests, but does not appear himself, skulks away, ashamed to meet his acquaintances, knowing that the relations between himself and the claimant were such as he dare not acknowledge, and different from what they had been on prior occasions, when he had met his friends there.

Another corroboration of Augusta is, that she testified the marriage was to have taken place in June, 1856, and that when it did occur in secret, they were to have gone to Europe in the month of June of this year. It is scarcely possible she could have known of any evidence to corroborate her statements. And yet, we have the testimony of several witnesses to whom Burdell had made these statements. Dr. E. L. Roberts had, in the fall of 1855, entered into a business arrangement with him, based upon his going to Europe, in June,

1856. To some he told that he was to be accompanied by ladies, and to others he named the persons who were to go with him. These facts furnish corroboration that could not exist in a fabricated story.

Augusta tells what he gave as the reason for secrecy. If the atmosphere of this case were not redolent of the relations that existed between Dr. Burdell and Demist Hubbard; the letters have been introduced which explain, in the $10 stipend he sends her, that she is an incumbrance that furnishes at any rate a pretext for secrecy. And it must be remembered that men, in giving excuses for being unmanly, are scarcely expected to adhere to the truth; and in no aspect of the case can we be asked to prove that the reason given was the actual reason; it was his excuse, and we accepted it. A boy absents himself from school, he gives to the teacher as the reason, illness. To prove he was not ill, does not disprove his absence, or contradict the teacher who says that was the excuse given.

Augusta is corroborated by the declarations and conduct of Dr. Burdell in reference to the claimant, as proved by Hester Van Ness. This lady has lived in the city for years, and has earned a character—a character that the contestants dare not attack, though they felt the force of her testimony. She swears positively to the assiduous attentions of the decedent to the claimant—to a marriage engagement between them—that she was to have been the bridesmaid at that marriage—that an "unpleasantness" occurred in the fall—that that had been settled—" the Doctor had come to his senses" —and that she was asked to be a witness to a "secret marriage"—that she refused—that on the afternoon of the 28th October she called at 31 Bond street—decedent and claimant were together. Decedent asked: "What would people think if I should get married?" Would the claimant have asked such a person as Hester Van Ness. A witness who needs no endorsement where she is known, to have aided her in a fictitious marriage? Well acquainted with Dr. Burdell, she could not have been deceived, and yet she was asked to be a

witness *to this secret marriage*. And why did he, on that day, when he saw her, ask that significant question unless the "coming event had cast its shadow before?" "What would people think if I should get married?" A pertinent inquiry! He who had disregarded and violated every marital obligation, and who had professed such a contempt for the sex to which his mother belonged, knowing that the town ought to be surprised, he asked the question—a question which could only be suggested by the position he then occupied. It shows too, that he had some regard for the opinion of others, and furnishes evidence of his real motive for secrecy.

Augusta is strongly corroborated by the testimony of the Rev. Dr. Beecher, a witness of the very highest respectability and intelligence, that Dr. Burdell made the first arrangements for having the claimant's daughters sent to the school at Saratoga, that he endorsed her social position, and introduced her, and associated with her there. And all this occurred the July and August after the decedent had made those hostile declarations to Mrs. Williams and Wilson. If there had been a "*breach*" of the marriage engagement in June, there must have been a reconciliation in July, and the evidence is equally strong, that the "breach" of September was also settled, like other lovers' quarrels, to be renewed and again made up. The claimant's declarations to Dr. Beecher are also important: these were made in October 1846, subsequent to the time the police officers were called in; she was told that she was then engaged to be married to Dr. Burdell, and that the marriage was to take place very soon.

Another corroboration of Augusta is in the fact, that the actions brought by the claimant against the decedent were settled, without the payment of any money; and this, too, before decedent had answered in either case. Frazer, Roberts, and all who talked with him, told him that appearances were against him. Frazer, as his friend, went to her, by Burdell's directions, authorized to settle, by paying her a consideration. She rejected his overtures, and replied, with the spirit of a woman and the dignity of a matron: "I do

not want his money; I will never settle, except upon honorable terms!" What are honorable terms, in a case of breach of a marriage contract? Nothing short of a specific performance. Frazer reported to Dr. Burdell her answer; and added, that the matter ought to be settled; that his position in the bank, and his business relations, required it. Mr. Frazer's intercession is no longer needed. But the action is settled, and without the payment of any money. How was it settled? Dates are now important. The papers, which are dated on the 18th October, three days after the actions were commenced, are undoubtedly the basis on which Burdell sought to settle. But those papers were never executed. It was not until the 23d that the actions were discontinued; but upon what terms, there is no evidence, except the testimony of Augusta Cunningham, and its corroboration in the testimony of Frazer and Roberts—that no money was paid. Weakness, irresolution, or vacillation, are not characteristics of the claimant. And yet, in one week after his arrest, with "appearances all against him," he sending to negotiate a settlement—she refusing upon any basis, except honorable terms—the actions are withdrawn, upon terms which he never discloses to any friend of his. The contestants are driven to the dilemma of charging to her weakness and infirmity of purpose; or, admitting that the terms were satisfactory to her—marriage is what Burdell said she desired—marriage, voluntary or otherwise, is what the contestants say she sought—seeking this, having him in her power—trembling lest he might be exposed—would she—a woman who, in the presence of the officers of the law a month before, had laid her hand upon the decedent—told him of the wrongs he had done her—who, according to their theory, could prepare a plot commencing in false personation, and ending in undetected murder—would she, for nothing, yield up the advantage she had obtained, and allow the object either of her affection or her hate to escape from her grasp? But the contestants answer, that Burdell said she was glad to give up the suits. To whom did he say this? To Frazer,

who, supplicatingly, in the name of Burdell, had sought a settlement on the payment of money? No; but to those to whom he had falsely stated the nature of the actions, and to whom he had so grossly misrepresented what were the relations that existed between him and the claimant. That one great falsehood—the pretence that he and the claimant were not on intimate terms, were, in fact, hostile—was the pregnant mother of a thousand lies; and almost every false statement of his concerning her can be traced directly to that paternity.

I allude to but one other corroboration of the testimony of Augusta Cunningham—a corroboration stronger than by the statement of any witness. It is this, that no fact in the case contradicts her. If this were a simulated marriage, and her's a fabricated story, some indisputable fact would cross the path. But though this and its cognate inquiries have engaged the attention of the courts for five months—though the whole public mind has been occupied, and heightened to intensity—though a million eyes have been bent in one direction—though this young lady has been sworn once, twice, and thrice—examined by lawyers, judges, and laymen, under circumstances of such painful interest as to paralyze her memory—though it is claimed that she has made inconsistent declarations—yet no fact has appeared, or been established, to contradict her. This could not be, unless the marriage itself were a fact. Truth is the harmony of things; and every truth in the universe agrees with every other truth; while every falsehood is at variance with every reality around it. I have a right, therefore, to insist that no fact exists to contradict her; and that this, in itself, is a very strong corroboration.

I had forgotten that the contestants claim, that Augusta is contradicted as to the cohabitation, that she says existed between her mother and the decedent after the marriage. That cohabitation, she says, was secret, consequent upon the secret marriage. And yet Hannah Conlan and Mary Donahue, servants in the house, swear, that they did not know of

it.   Who said they did?   If this were a secret marriage, unknown to them, would the claimant and contestant allow them to know that they were sleeping in the same bed? As to the number of pillows on Burdell's bed, and where Mary Donahue supposed the claimant slept, I answer, by saying, it is quite immaterial; but if it were otherwise, it is proved that Mary does not always speak the truth on the subject of unity and duality ; for when she discovers mother and daughter examining the papers in the safe, she saw the "two doors" open, when it had but a single door.   Its iron portals cannot lie, though Mary can occasionally see double. This witness is also contradicted by the fact, that there was a window, accessible to all, looking into the room where it was pretended the adulterous intercourse between the claimant and Eckel occurred, and by the testimony of the Rev. Dr. Snodgrass, about the places where the family lodged in November and December.   I will not insult Augusta and Ellen Cunningham by balancing their testimony with that of such witnesses as Mary Donahue and Hannah Conlan.   A jury have passed upon that question, and with their verdict I am content.

The contestants, I say, therefore, have not only failed in their attempts to contradict the witness to the marriage, but she is corroborated by admitted, indisputable facts.   The other ground of impeachment, by proof of general bad reputation or character, has not been attempted.   No one has had the hardihood to engage in this hopeless labor.   No witness has been base enough to speak a word against the 'fair fame of this young girl.   She is here, therefore, not only unimpeached, but admitted to be unimpeachable—a witness sworn long ago, with ample opportunity afforded, as to time and detail for contradiction—a witness whose testimony, if true, establishes the marriage, takes from his relatives a portion of the property, and perhaps changes wholly the succession.   Failing, therefore, to contradict her by facts, and not attempting to impeach her character or reputation—having been examined so often, and so long before the close of the

case, I have a right to say, that she stands before this court, untarnished, pure, and unsuspected.

But it is claimed, on the part of the contestants, that this witness has contradicted herself.

I am precluded by want of time, and also by the intimation that it is unnecessary, from making an analysis of the whole evidence of this witness, and showing that it is entirely consistent with itself, and that there are no contradictions on any material point—verbal differences are not contradictions. One thing I beg that your Honor will bear in mind. When she was examined before the Coroner, she only answered the questions put to her; it was the first time she had ever been sworn. She was not asked to go on and relate the whole that occurred on the occasion of the marriage, but to answer specific interrogatories. And before it can be said that a witness is self-contradicted, it must be certain that the party answering understood the question, and that the person reporting accurately comprehended both question and answer. Yet the newspapers, each furnishing a verbatim report, differ essentially and materially as to what was said on that investigation. Every man, who has ever been reported, knows how he has been misunderstood, or has spoken differently from what he intended. Not only charity demands that these presumptions shall be made in favor of this witness, but all the rules of law concur in the demand. She is not to be an insurer of the ears, the skill and the fidelity of all the reporters who attended that memorable inquisition, or of the compositors who brought those various reports before the public. In order to make out a seeming contradiction, counsel were obliged to extract at one time from the report in the *Herald*, at another from the *Times*, and again from the *Tribune*, all professing to report accurately, and yet differing essentially. The injustice of such a system of impeachment will be apparent the instant it is considered. Verbal differences and slight variations, so far from being contradictions, are regarded by all approved works on the subject of evidence, as tests of truth. In the celebrated Gaines' case,

where a secret marriage was sworn to, the fact that the witness, on several examinations, repeated the story in almost the same language, was given by the court as a reason for doubting the truth of the narration, and as evidence that it had been fabricated.

The same method of impeachment was applied to the testimony of Ellen Cunningham. The only fact which might seem a contradiction is, that before the Coroner she testified, that on the night of the 28th October, when she saw her mother, sister, and Dr. Burdell go and return together, she did not know where Mr. Eckel was; while here, she testified that he and Mr. Douglass were at the time in Eckel's room. Subsequent investigations have shown that the bookcase of Mr. Eckel was brought to the house and put up on the afternoon of that day; so that, while before the Coroner, without having her attention called to this fact, she did not remember, yet now she cannot be mistaken on the subject. The human memory is not a machine, to work always alike, but its operations depend upon circumstances, associations, and hidden springs, which are not within the control of mere volition. A witness, therefore, may remember to-morrow what he cannot to-day. And I apply this to the testimony of both these young ladies, who have by the unfortunate complications of their mother, been placed in situations of such painful embarrassment.

I look upon the testimony as a whole, to see in what direction it tends: as the discoverer who stands upon the bank of a river, unknown before, seeks to ascertain its course, not by observing its eddies and counter currents, but intently gazing upon the great stream that flows onward to the ocean. So here, there are eddies and counter currents, that seem to one who confines his observation to them to send the waters of the river back to their native fountains; but the experienced eye looks from the shore to the channel made by the force of the flowing tide. So the great volume of evidence flows on in a single direction, toward a secret, compulsory marriage; not a secret marriage performed be-

tween young lovers, who resort to this as a temporary expedient to avoid the opposition of opposing parents or guardians, but a marriage extorted by a resolute woman, from the fears of a consciously guilty man—extorted from one who was so complicated with other women, that he dare not act boldly and honestly. It is in this direction that the current of testimony flows; and although you may find occasional places where it seems to set in an opposite direction, yet, when followed, you will find that it again turns into the general course of the river, and is swept on with the volume of its waters.

To use another figure—as this case from its inception to its close has been enveloped in such mystery—I add that there is no clue to this labyrinth, but the secret compulsory marriage. Taking that, you thread your way readily and safely through the labyrinth; rejecting this, and you are lost in its inexplicable mazes—no end, no outlet, all is darkness and uncertainty.

But if in the light of all the evidence, your Honor doubts, there is one person who has it in her power, if placed upon the stand as a witness, to explain every thing—and that person is the claimant. We offered her, but were told that we could not call her, but that your Honor might. As the policy of the law now admits parties to testify in their own behalf, I submit that in this court no exception against a claimant should be made. Place her upon the stand, subject her to the most rigid examination; and if the story is fabricated, its consistency cannot be preserved. If, on the other hand, she is able to explain these matters which now seem so strange, it is due to her, it is due to the institution of marriage, that every opportunity should be afforded to enable her to establish a marriage, if one has been entered into and consummated.

Counsel ask us why we have not called Snodgrass; and if we expected he would prove an illicit connection between Eckel and the claimant? They have no right to make the insinuation which that question implies. And if they had believed that he could testify to anything of the kind, they

would have called him, instead of producing witnesses to tell what they imagined they saw when peeping into their neighbors' windows. But we did not need the testimony of young Snodgrass. His father has been upon the stand, he testified to the illness of Mrs. Snodgrass, so that she could not be examined; to the fact that he knew Dr. Burdell prior to October last, to subsequent visits by both himself and wife at this house, and there was no reason therefore why we should call the son.

To the same question in regard to Mr. Eckel, I make the same answer. We did not need him. The suspicious circumstance named by Dr. Parmley, of seeing some one in that third story front room, apparently dressing, about 5 P.M. of the afternoon of the 28th of October, is explained by the book-case brought home at that time, as proved by Smith, Mary Murphy, the receipted bill and the check; besides, if Mr. Eckel were the person disguising himself, as he had a room of his own in the house, he would not have left it and gone for any such purpose into a room at that time occupied by Messrs. Thayer and Bacon. That Miss Sallenbach made a mistake in identity, is proved by Mr. Douglas, who was with Mr. Eckel the whole of that evening. I am sorry that his name has been introduced in the summing up of this cause, when the counsel admit, as one of them has, that he was in no way implicated in the death of Dr. Burdell, and that he was unjustly accused. And yet he is now living with an indictment for murder hanging over him, while rewards to the amount of $12,000 are offered for the conviction of somebody. Under these circumstances, could we ask him to testify—he who on the 15th October last had gone there as a stranger, merely to lodge and board in the house—when, by that testimony, those who seek the rewards, and who are anxious to gratify the public desire for a victim, whether that victim be innocent or guilty, might from that testimony fabricate a story and place him on trial for his life? But my former answer is sufficient. We did not need him. There was no material fact to be proved or disproved by him.

The contestants ask your Honor, in decreeing against the claimant to say, not only that this marriage is a fiction, but also that there was a conspiracy formed in October last, and carried out in January to murder; for without the murder the marriage could yield no fruitage. They ask you to say further, that this mother has, intentionally, wilfully, and with premeditation, polluted and suborned her daughter, involved her in a conspiracy to falsely personate their victim at a marriage, then to aid in taking off the man thus personated, and again suborned her, by placing her on the witness stand, where, in execution of that conspiracy, she must necessarily once, twice, and thrice commit perjury : and this, when all the legal presumptions are in favor of innocence, and when those presumptions, whether in the case of a secret or a public marriage—for the law makes no distinction as to their validity—are in favor of an alleged marriage. Indeed, it is only in case of a *secret* marriage that the benevolence of the law in raising these presumptions can ever be exercised, for when the ceremony has been public, no presumptions are required, proof supplies their place. Apply those presumptions here, apply them, not blindly and arbitrarily, but carefully and liberally, and the result cannot be doubtful.

But a decree for the contestants must be founded upon presumptions violent and unnatural : that this claimant and her daughter formed this conspiracy to enact a personated marriage, while the individual personated was living under the same roof with them, and the minister of the Gospel who officiated at the ceremony resided in the same city, and frequently passed the door that bore the name of Burdell ; that they voluntarily incurred the fearful risk of sleeping in the same house with him a hundred nights, after their crime, liable any moment to discovery and the Penitentiary. And upon what proof are these presumptions raised ? The want of proof only of a public acknowledgment of the marriage, by the conduct of Burdell, when it is admitted that he was not like other men; that in no other respect did he, in his social relations, resemble others; and that on all occasions

he denied the sanctity of marital obligations. I pass over the remark of the counsel who last addressed your Honor, in reference to ·the consequences of your decision, which might pronounce a decree of bastardy upon the child unborn. If it should be true, that within the ordinary period of gestation, a child should be born to Harvey Burdell, all the ties of blood and nature—all the dictates of humanity, and interests of society, as well as the presumptions of law, unite in favor of the claims of that innocent child to a recognition by this court. But with the consequences we have no concern here; they are upon the parties and those connected with them. The daughters of the claimant have been reluctant witnesses; until this occurrence no breath of suspicion had ever affected either. One of them—Augusta—the decree will either weigh down with suspicion of guilt and infamy, or send from the court, as she came into it, with a character pure and unblemished. In conclusion, we rely upon the positive testimony of that witness, who cannot be mistaken—claiming, as we do, that no legal impeachment has been established.

THE SURROGATE.—By the law of this State, marriage is treated merely as a civil contract, not requiring legal forms, religious solemnities, nor any special mode of proof. It is obvious, however, that the security of property, domestic happiness, and the order and well-being of society are deeply involved in the erection of all reasonable barriers against the perpetration of fraud in reference to an institution which lies at the very basis of private and public welfare. The policy of the law is opposed to concealment of the marriage contract. Publicity affords security. Upon this application for letters of administration, there is an effort to establish a secret marriage. There was no open cohabitation or acknowledgment, no mark or token of the relationship; to external appearance the parties lived as single persons; and the alleged contract was first announced when the lips of the decedent

were sealed by death. In such a case there is no presumption in favor of marriage; the presumption is against it. There is no ground for invoking the charities of the law; but the concealment excites suspicion, and calls for rigid scrutiny. If a person will enter into the honorable estate of marriage, in privacy, excluding carefully the usual public, social, and domestic evidences of the nuptial contract, so that the wife is not known until she become a widow, the claim should be viewed with jealousy, and strict proof be demanded.

At the trial, I allowed the widest scope of inquiry the law permits, in order that no means for eliciting the truth might escape. The number of the witnesses examined in this cause, the extent and complication of the testimony, and the great variety of details presented, have rendered a review and analysis of the material facts protracted and laborious; but the grave and solemn duty to which I was called, and the importance of the question at issue in its private and its social bearings, imperatively required that no pains-taking should be spared in exhibiting the grounds of the conviction to which I had arrived.

On the evening of October 28, 1856, the Rev. Uriah Marvin united two persons in the bonds of wedlock at his residence, No. 732 Greenwich street, in this city. One of the parties was Emma Augusta Cunningham; the witness was her daughter, Margaret Augusta; and whether the other party was Dr. Harvey Burdell, is the question submitted for my decision. This must be determined upon the evidence before me, after discarding that which is unworthy of faith and credit.. The point presented for solution is a pure question of fact: Has the claimant established a ceremonial marriage with the decedent

I. I shall first inquire where the decedent was, about the period of time when the transaction was on foot. The claimant has shown to my entire satisfaction that on Friday, the 24th, Tuesday, the 28th, and Friday, the 31st of October, he was in the city of New York, and was present each of those

days at the sessions of the Board of Directors of the Artizans' Bank, probably from 9½ or 10, to 11 or 12 o'clock. He left for Saratoga on Friday, the 31st of October, and returned to his home the evening of Monday, November 3. Mr. Snyder states, that at Saratoga he said he came from the West. If he had been to the West shortly before, the substance of the remark might have been true, but its exact purport misunderstood. The contestants allege that it was substantially true, and that the decedent was at the village of Herkimer on Saturday, Sunday, and Monday, 25th, 26th, and 27th of October. The claimant, on the other hand, adduced proof to show he was then in the city of New-York.

1. It appears from the books of the Lafarge House, that Dr. Burdell paid for his board on two occasions when intending to leave for a few days; no deduction was made for absence, and if he were at Herkimer at the time in question, his bill was running on at the hotel. Nelson Barlow deposed that Dr. W. B. Roberts performed some dentistry for him, Sunday, October 5, and Sunday, October 26; that on the first occasion " another person was present the whole time," whose name he did not recollect, and that on the second occasion he was introduced to Dr. Burdell. These dates are determined by entries in Dr. Roberts' book. Dr. Roberts, as to the 5th of October, says, he does not know who was present then; he thinks Dr. Burdell was in but once when he was attending to Mr. Barlow's teeth, and adds: " the only way I had of determining which of those Sundays it was, was the conversation about Mr. Fraser's resigning, which had taken place two or three days before." Now, Dr. Burdell, according to Mr. Barlow, conversed also generally about the Artizans' Bank, and its officers, and wished him and Roberts to take stock in the institution. So far, the interview might have happened on the 5th of October, nor does he remove it positively to the 26th, when he says, " he also spoke of Mr. Fraser, as well as I recollect, and his resignation as Vice-President." The general conversation about the bank gives no preference to one date over another, and everything turns,

not on the main subject, but upon the certainty or uncertainty of "the resignation" having been mentioned at the time in question—a collateral or incidental which might easily become the subject of mistake.

Dr. Uhl states that he met the decedent in Bond street, in October; he designates the time as Monday, the 27th, and collocates the interview with the circumstance that he was then on his way to attend a patient at Brooklyn; but he produced no memorandum or entry to indicate the date of that visit. The occurrence of two events on the same day proves nothing as to the time, unless the date of one of them be known. Here the date of neither is determinable, except by the memory of the witness, and thus we are reduced to his bare naked declaration in June, 1857, that he saw Dr. Burdell in Bond street, on the 27th of October, 1856, seven months before.

Mr. Douglas testifies that he was sitting in the parlor of the decedent's residence conversing with Mr. Eckel, the afternoon of Sunday, October 26, when Dr. Burdell came in, inquired if some person had called for him, addressed Mrs. Cunningham, who rose, and the two left the room together. The witness marks the date from the circumstance that he called to see Mr. Eckel in respect to a bookcase, for the purchase of which he was negotiating. It is manifest, however, from Mr. Smith's testimony, that the negotiation was pending several weeks; and I should judge, from the intimacy between Mr. Eckel and Mr. Douglas, and from other facts, that the latter was not an infrequent visitor at the house. Still, there is a degree of positiveness in his testimony which cannot be overlooked; and if the bookcase was delivered on the 28th of October, he is to be taken as very definitely affirming the presence of the decedent at 31 Bond street on Sunday, the 26th.

Mr. Fraser expressed the belief that he saw the decedent every day from the 24th to the 28th of October, and even in the evening of the 28th. His language is not very positive, "that is my impression, if my memory serves me

right." Mr. Fraser was impressed with the idea that his resignation was a frequent topic of conversation between . him and the decedent during this period; but it appears that the resignation, for some time after it occurred, and the causes leading to it, for some time before it occurred, were the subject of mutual consideration between himself and the deceased, so that it would be difficult to identify any particular day. He is quite clear, however, that the Doctor was at dinner on Sunday the 26th, from recollecting that Mrs. Fraser was absent from the table that day in consequence of sickness, and the Doctor sat by him and his son, who was then home from school. Clarence Fraser states, that he " saw Dr. Burdell every day," while he was home last fall; but in this he is certainly mistaken, as to the 1st and 2d of November, when the decedent was at Saratoga and the witness was in New-York. He also says: " my impression is, I saw him Sunday after my father's resignation," at dinner; " he filled a tooth for me the week after that Sunday." There is no relation between this piece of dentistry and the dining on Sunday, except such approximation of time as the memory might afford. I think the importance of the testimony of these two gentlemen hinges mainly, if not entirely, on the fact, whether the absence of Mrs. Fraser was limited to that single day. Augustus Prime says, the lady was absent " once or twice on Sunday;" and Clarence Fraser that his mother was unwell and absent from dinner the previous Sunday, October 19, and that she " frequently stayed away when she was not much unwell." In this case, then, we find, as well as in that of Dr. Roberts and Mr. Barlow, a duplication of the most important feature tending to fix the time—a repetition of the collateral or extrinsic circumstance existing in the memory of the witness as connected with the presence of the decedent. This, of course, calls for some other fact to give one date the preference over the other.

An effort was made to show that the decedent was attending as a witness in the United States Circuit Court, Monday, the 27th October, in the case of Warner and Griffin. That case

was called on Monday and Tuesday, and on Wednesday was postponed for another cause, which had precedence. On one of these occasions, Dr. Burdell was introduced to Judge Dean, counsel for the defendant, and complained of the postponement. Mr. Taylor places the event on Monday, Dr. Putnam on Tuesday, while Mr. Parsons says that Judge Dean was not in court on Monday, and Mr. Barnard that he was not there on Tuesday, but attended for the first time on Wednesday. Mr. Lane testifies that he served a subpœna in that cause on the decedent, who at that time accompanied him to see Dr. Main. On this occasion, Dr. Putnam saw the decedent conversing with Dr. Main on the walk. Now what was this date? Dr. Putnam is quite certain it was the day he was notified to attend the trial, and that on the next day he met both Dr. Burdell and Judge Dean in court. That next day was Wednesday, as I judge from the weight of the evidence. It could hardly have been Tuesday, for Mr. Barnard says, Judge Dean was not present then, and the proofs show that the decedent was at the Artizans' Bank until a late hour in the morning; nor Monday, for then the subpœna would have been served on Sunday. The attorney in the cause had died; it was necessary that counsel should be called in, and the day to which the cause would be postponed was entirely uncertain, before the court opened on Monday morning. Yet Mr. Lane says the subpœna was handed to him to serve at 7 or 8 o'clock in the morning. Would a subpœna have been drawn Monday morning, the 27th, at 7 or 8 o'clock, returnable on the 28th? I think not; and am satisfied it was on Tuesday, and not on Monday, Mr. Lane served Dr. Burdell. On a review of this evidence, and bearing in mind that Mr. Fraser and his son, Dr. Roberts and Mr. Barlow, determined their dates by facts which had duplicates in their main features, I think it manifest that Mr. Douglas stands alone, as presenting any positive testimony that the decedent was in New-York at the time in question.

2. Was he at this period in the village of Herkimer? Mrs. Wilson, the decedent's cousin, states that he was at her house,

in Herkimer, on Saturday, Sunday, and Monday, the 25th, 26th, and 27th of October, and accompanied her to church on Sunday; that she expected to visit her sister, Mrs. Wiliams, at Brooklyn, the same week, and requested the Doctor to wait a day longer for her; she had written to her sister she would be with her on Tuesday, but sent word by the decedent she would be down by Wednesday or Thursday; on Wednesday she left Herkimer, her husband remaining on account of the approaching election; and at Albany she took the steamboat "New World," arriving at New-York as late as 3 P. M., on Thursday. The clerk of that steamboat proved that the name Wilson was entered twice in the register of the ladies' cabin on 29th October, and that the boat was detained until 2:20 P. M., the next day. Mrs. Williams testified she had expected her sister, Mrs. Wilson, on Saturday, October 25, her birth-day; received a letter stating she would come the next Tuesday; that on Tuesday evening the Doctor called, stated that he had been to Herkimer, had arrived that morning, and that Mrs. Wilson would come on Thursday. He spoke of the raising of a liberty pole while he was at Herkimer, and mentioned that he had been at church. On Thursday Mrs. Wilson arrived late in the afternoon, and stated that her husband would have accompanied her, but for his wish not to lose his vote. Mrs. Williams did not produce the letter she referred to, but she is corroborated in most of her material statements by two young girls, Phebe Lipper and Hannah Denman. The birth-day of the latter fell on Saturday, October 25, when she had expected a party, if Mrs. Wilson should arrive. This is the only time Mrs. Wilson was in New-York, from August, 1856, until the spring of 1857.

Eli Taylor, proprietor of a hotel at Herkimer, purchased by him of Dr. Burdell, states that a lawsuit, to which he was a party, was tried at his house on Monday, October 27, the last day to which the cause could be adjourned, the summons having been issued three months. He was under the impression he observed the decedent conversing with his

counsel, Mr. Earl, during the progress of the trial. He saw him at church the day previous, and spoke with him about it. He says the decedent arrived late in the afternoon of the 25th, and he told him that he had been to New-York a few days before, and on passing Bond street had thought of giving him a call. This witness further added, that he left home Friday, October 17, registered his name at the Delavan House in Albany, arrived in New-York on Saturday, went to Danbury the same day; returned to New-York on Monday, and reached Herkimer the next day. His brother and sister-in-law, residing in New-York, testified that this visit was three weeks after the decease of their daughter, on the 3d of October; the latter says, " about three weeks after, I think." This is not a very definite contradiction; the difference is between two weeks and three; if three, then Mr. Taylor was not present at the trial of his suit on Monday, October 27. Mr. Taylor is inaccurate, however, in one respect. He says the decedent informed him Mrs. Wilson expected to have made the journey with him from New-York. This circumstance occurred at the end of November, and not in October. Mr. Taylor had a register at his hotel, but at this period it seems not to have been generally used. Cephas Johnson, the Justice who tried the cause of Taylor and Gray, places the trial on the 27th October, the last day to which it could have been adjourned; for which reason he made a special appointment at Herkimer on Monday, his usual court days being Tuesday and Friday. He recollects that, during the trial, a gentleman came into the room and conversed with Mr. Earl. After he left, he inquired of Mr. Earl who he was, and the reply was, " Harvey Burdell." He states also, that there was a political convention at Herkimer on Saturday, October 25. Isaac A. Munson, who has been Justice of the Peace and County Clerk, deposed that he saw the decedent Saturday evening, October 25, at the celebration of a fire company, as the witness was on his way to an unfinished house, into which he moved November 13; that he again observed him on Sunday, going to Mrs. Wilson's, and on Monday, at the hotel

where the trial was in progress.   Christopher S. Witherstein, County Treasurer, testifies, that at the celebration of the fire company of which he was foreman, Dr. Burdell came up to him in the street, and made some commendatory remarks in relation to a silver trumpet won by the company at the Montgomery County Fair in September.   The company were in the habit of turning out only on the last Saturday of each month from April to November.   On this occasion there was a parade and a torchlight procession.   Dolphus S. Payne was absent from Herkimer to make a political speech on Saturday, 25th of October.   He returned on Sunday, and states that he saw Dr. Burdell at tea, who conversed with him in reference to the political meeting to which he had been, and also in regard to his attendance at church that day.   On Monday, at dinner, they spoke together about the suit of Taylor and Gray.   Mr. Earl, who was counsel for Taylor in that trial, says, that the decedent called at his office on Monday morning, and was anxious he should aid him in procuring the discount of some notes.   He came into the room at the trial, and conversed with him.   The Justice inquired who he was. He identifies the time by a hickory pole raising, and a county convention on Saturday.   He was desirous his brother, Judge Earl, should try the cause, in order that he might attend to the Doctor's business, and likewise to a political engagement growing out of the convention.   Samuel Earl, County Judge and Surrogate, corroborates his brother in regard to the suit and the convention, and is positive he saw the decedent at dinner October 27, and conversed with him in reference to the trial.   I have already stated, that when he arrived at Saratoga, October 31, Mr. Snyder testifies that the decedent said, " he came from the West."   This, of course, was not so at that precise instant; and the witness must have mistaken the expression.   At Herkimer, he spoke of going to Saratoga to Mr. Earl and Mr. Taylor; and stated to Mrs. Wilson, on Monday, that he had intended to go there, but had been detained by the court, so that he could not find a connecting train.   Mr. Lafton, who came to New York by

the cars and the steamboat " New World," on the 27th, did not see the decedent, but that oversight might very well have happened without raising a doubt of the decedent's presence. The evidence I have just considered is fortified by the printed notices of the meeting and the convention, and by the minutes of the Justice of the Peace. The docket of the judgment in Gray and Taylor was irregularly entered in the docket-book out of its date; but the original minutes of the trial were produced, dated October 27, a legal entry made by a public officer at the time of the occurrence, and entitled to the highest credit. Is it possible, then, this visit did not take place in October, and that so many witnesses, speaking to so many and various circumstances, all concurrent, should be mistaken? If some of these events could be confounded with like occurrences nearly contiguous, others could not. Mrs. Wilson made but one visit to New-York that fall. The same remark applies to Mr. Taylor. There was but one county convention held at Herkimer, and but one trial of the case of Taylor and Gray. Again, Dr. Burdell was seen in Herkimer but occasionally, and his presence there would naturally attract attention. The events themselves which occurred at the time were especially noteworthy in a quiet country town. On any one single date connected with one single fact witnesses may err; but the chances of error diminish as the coinciding circumstances increase in number, and the evidences accumulating from various independent sources converge upon the same point, fitting harmoniously together, and gathering strength by mutual corroboration. This view impressed my mind when I heard the testimony, and has been confirmed by subsequent examination and reflection. There is nothing I can perceive sufficient to impugn or shake it, and it must stand as my conclusion upon the facts.

II. I now approach the proofs produced to sustain the allegation that Dr. Burdell was a party to the ceremony, the evening of October 28.

1. Miss Helen Cunningham testifies that the decedent

gave her mother a plain gold ring, " put it on her finger," and " told her, if she did not like it, she could get it changed." This circumstance is important, if it occurred about the time of the marriage. Mr. Silverthau, the jeweller, proved, that " some time in 1856," Dr. Burdell purchased of him a plain gold ring, but he could not identify it. As to the date of the gift, Helen said, " I cannot remember the date; I think it was before October last; it was before the 28th of October, I don't know whether it was a week before; I don't think it was the day before." Her sister, Augusta, says, this same ring was put on her mother's hand by the decedent the night of the wedding, in the street; but she also states very distinctly that it was given " in July."

2. In the afternoon of the 28th of October, Miss Helen Cunningham testifies that her mother " was dressing in her room, and she said '.she was going out with the Doctor;'" " I think between seven and eight, very near eight, mother came down in the parlor; she and the Doctor both came in together; mother came to about the centre of the room, and the Doctor leaned against one of the pillars by the folding doors; she then said she was going out with the Doctor, that the suits had all been withdrawn, and everything was to be settled, and that was the 28th day of October; mother went out of the room and the Doctor with her; Augusta was there, too; she was standing near the door in the hall. * * They went out together, the three." Elsewhere she says: " I was a little surprised she was going out with the Doctor, as they had not been out before while they had this difficulty; and I asked her whether she was going out with the Doctor." * * " The only thing I know with regard to my mother coming back that night was, I heard some one in the hall; I went to the bannisters and looked over, and saw my mother, Augusta, and the Doctor. The Doctor said something, and they were both laughing when they came up; by both, I mean Augusta and mother. * * They all went to the Doctor's back room, second story—I then went up stairs to my room and retired. * * It must have been near ten o'clock when they

came in. The Doctor was laughing, I believe." Before the Coroner, Helen stated that she did not see the parties on their return, and had not seen Mr. Eckel since breakfast, while on this trial, she said, that Mr. Eckel, on coming up from tea, spoke with her, and was afterwards two hours in his room with a visitor. There are discrepancies, also, between her account and that of Augusta's; but still I am not inclined to impugn the main features of the narrative just given. The value of the occurrence as a link in the chain of evidence depends entirely upon the time. It might very well have happened on the evening of the 23d of October, the day the suits were settled, and it comports with that date more than with the date of the marriage, the drift of Mrs. Cunningham's remark relating to the settlement of the suits alone. It is manifest, also, that Helen first heard at this time of the settlement of the suits, and it is not likely that information so interesting would have been withheld from her five days.

3. The narrative of Miss Augusta Cunningham, in reference to the marriage, I shall give mainly in her own words:—
" The Doctor first requested me to witness the marriage ceremony on Sunday morning next preceding the marriage; the Doctor first spoke to me about it; he asked me if I would be willing to be a witness to a marriage between mother and himself; he also stated, that he wanted me to keep it a secret until June next; that he then intended going to Europe with mother; he also stated that he would take me with them, if I wished to go; my mother was then present; he asked her if I could keep a secret; and she said, he must ask that question of myself; he also stated to me, that mother was going to Goshen to see if she could get Dr. Snodgrass to come in town to marry them; I asked the Doctor if it was to be at the house; he said it was to be there, to take place at the house; I then asked him why he wished it kept a secret; he said that he had promised Demist Hubbard that he never would marry any one while she was single—that she was the only encumbrance that he had on his hands at that time, and that she was to be married before June next; mother told me I

should not ask any more questions about it; I then left the room, leaving the two there together. * * The next morning the Doctor told me mother had gone to Goshen for Dr. Snodgrass. * * I don't think he spoke about it again until Tuesday morning, before breakfast, between seven and eight; he then asked my mother what her age was; she told him—she said thirty-five. * * He had a paper at that time with him with Mr. Marvin's address, which Mrs. Snodgrass had given mother at Goshen. He stated that he was going to the bank, and that he would see Mr. Marvin before he returned. I did not see him then until six o'clock in the evening—he was in the hall, he merely made the remark, saying, 'I have accomplished it.'" The witness then describes the preparations and the departure from the house, stating, that as they were passing out, they met Helen " in the hall, the front hall;" and her mother told her " to remember this night," but mentioned " no reason." She continues the account by stating that this was between seven and eight; elsewhere she says, " between six and seven, I think, near to seven I think;" that after leaving the house, her mother said she " had left her gloves," and the two stopped at Mrs. Sallenbach's half an hour, while the Doctor went to buy gloves; he bought them, and the party then proceeded to the clergyman's, where the ceremony was performed. On the way home, she made the remark to the Doctor, " What would he say" should she disclose the marriage? and he answered he would " kill" her. Her mother inquired why the decedent had not given Mr. Marvin the ring? He replied, " He did not ask for it; he would put it on her finger, and say a few words, and it would do just as well; he then put a ring on her finger in the street. The party arrived at home about ten o'clock." In regard to cohabitation, she testifies, that the newly married couple slept together that night, and adds: " My mother slept with the Doctor in his bedroom when Mrs. Snodgrass was there; I generally stopped there in the morning to know if she had any word to send down stairs; stopped at the room door, knocked—she would answer; it was the back room she slept

in; I did so almost every morning from the time of the marriage, and she always answered me; that continued until some time in December—until the time of my sister's sickness."

In weighing testimony, and especially in comparing statements made by the same witness at different times, regard should be had to the infirmity of the memory, and the likelihood, even with an honest and ingenuous person, of variance in respect to collateral or circumstantial incidents. I am disposed to make every possible allowance for such accidental discrepancies as might be reasonably expected in testimony given at considerable intervals, under circumstances of painful interest, agitation and excitement; but on comparing the evidence given by this young lady at the inquest, and before me, I am constrained to notice important variations, manifestly occurring to suit present exigencies. Before the Surrogate, she stated that the Doctor was the first one who spoke to her on the subject of the marriage, and he did so first on the morning of the 26th of October. Before the Coroner, she stated her mother was the first who spoke about it; she did so a month or two previously, and the witness immediately after—on the same day—had a conversation with the Doctor, to know if he was willing she should be a witness. Before the Surrogate, she stated the Doctor said her mother was going to Goshen the next day, to invite Dr. Snodgrass to perform the ceremony. Before the Coroner, she stated her mother said the time was not decided. Before the Surrogate, she stated that the Doctor mentioned to her, as the reason for secrecy, a promise to his cousin not to marry whilst she remained single. Before the Coroner, she stated that the Doctor "never said anything to her" about the reason, but her mother had remarked it was from fear of being laughed at, after his professions of celibacy. At the inquest, the Rev. Mr. Marvin is reported to have testified something in relation to making the appointment for the wedding at an hour in the evening after he returned " from a religious meeting." Miss Augusta was examined after this statement, and when asked in regard to the time in the evening the wedding took place,

said, " it was after the minister returned from meeting. *Q.* About how late? *A.* He came there about eight o'clock, I think, and said he had to go to a prayer meeting, and if we would come back in an hour or an hour and a half, he would be in from the meeting. *Q.* Well, did you go back in an hour and a half? *A.* We did. *Q.* That would bring it about half-past nine or ten o'clock? *A.* Yes, sir; somewhere about that time." Before the Surrogate, Mr. Marvin stated that the marriage took place at the time appointed. He had not been occupied or detained by any clerical duties, and remarked, when the parties came in, "You see I am punctual." Augusta, who was examined subsequently, then testified for the first time, that the ceremony took place at eight o'clock, and the clergyman, on coming into the parlor, said, "You see I am punctual." Before the Coroner, nothing was stated by her about the ring, or the visit to Mrs. Sallenbach which appeared in proof after she was examined, and the latter circumstance was first introduced by her before the Surrogate. There are other contradictions between the statements made by the witness at the inquest and at this trial, in reference to Mr. Eckel, the cohabitation of the decedent and her mother, and the lease of the premises 31 Bond street; but the variations I have noted are so adapted to suit the changes and phases of the case, and the evidence of other witnesses, that it is not important to pursue further this line of comparison.

Thus far we have the positive declaration of one of the claimant's daughters to the identity of the decedent as a party to the ceremony performed by Mr. Marvin. But she stands self-contradicted on important facts: her statements have varied from time to time, and the minute particularity with which she has given conversations with the decedent relative to the marriage on the Sunday and Monday before, brings her in direct collision with the mass of testimony, showing that the decedent was in Herkimer at the very time these preparations for the nuptials were in progress. It is to be observed, also, that the ceremony was appointed for eight o'clock. The parties would naturally leave Bond street in

time properly to meet that engagement—the oversight as to gloves was not noted until after they left—yet they passed down Broadway beyond Bleecker street, some distance, tarried at Mrs. Sallenbach's half an hour, while the Doctor was in quest of gloves, which might readily have been obtained on the way; and after this long delay, proceeding on foot, though stages were at hand, still they arrived at the clergyman's house, in a distant part of the town at eight o'clock. This was all accomplished in the space of an hour at the farthest, while their direct return home, after the ceremony, occupied nearly two. Suppose the proof to stop here: could a secret marriage, carefully kept concealed during the decedent's life time, be established as against him on the proof of a single witness standing on these trials in such an attitude as this? Clearly not. In the face of such discrepancies and contradictions, the court would be compelled to say the allegation had not been proved. It remains to be seen how far this difficulty is remedied by other evidence.

4. The occurrences connected with the marriage are thus stated by the clergyman. The gentleman first called, the morning of the 28th of October, and requested him to officiate at a marriage ceremony. This interview was before twelve o'clock; he would not say it was before eleven; it might have been between nine and twelve. He took a memorandum of the names and other particulars for his register, which were ascertained by interrogation. From his habit on such occasions, he thinks something was said about bringing a witness, but the name of the witness was not communicated until the evening. The party requested him not to publish the marriage, and an appointment was made for eight o'clock that evening. At the designated time, the gentleman called with two ladies, and the marriage was performed. The man was "awkward," as if not knowing "how to act." Mr. Marvin said, he had a "faint impression" that the request not to publish the marriage was renewed in the evening by the gentleman, not by the lady he was "sure." The man paid him a fee of $10; something was said about his calling for a certifi-

cate the next day; " he wanted a certificate;" and there the matter terminated.   The certificate is dated October 29, and was delivered the morning of that day, before twelve o'clock. The man "sat down in a chair and read it to himself;" " appeared to read it with deliberation;" "when he got through reading it, he nodded his head, and said, 'all right,' or something to that effect."    " He made no observations about the spelling of the name Berdell; did not ask me to make any correction.   I don't know of any more conversation—that was the substance of it; he then left."   On the point of recognition, Mr. Marvin said: " Since the murder, I have been very much interested in the matter, and have thought a great deal of it; I have recalled the features and general appearance of the deceased, and compared them with the features and general appearance of the man I married; and the more I have done so, the more I am convinced that the man I married was Harvey Burdell."    On being asked if he had any doubt whatever upon the subject, he replied, " none whatever."

5. In regard to the certificate, there are several circumstances deserving attention.   The place of nativity of the lady is stated at " New-York City," that of the gentleman, " New-York."   Why this difference?    The first is particular, the last general; the first was known; was the last unknown?   Certainly if " New-York" be taken as applying to the city, we then encounter the fact that Dr. Burdell was born at Herkimer.   Again, we find from the testimony of Mr. Olney, who presented a bill to the Doctor, December 27, that he was quite ready on a trivial occasion to observe such a mis-spelling of his name as Berdell.   Now that is the precise error committed by Mr. Marvin in the marriage certificate, and he thought it so material, that when it was accidentally discovered he altered the register.   But the mistake was unheeded by the bridegroom.   The occasion was important, the certificate was " wanted"—wanted as evidence—its accuracy was of consequence—not being ready at night, for it is dated October 29, it was called for the ensuing morning; it was read

with deliberation—the party sitting down in a chair and scanning it—and it was pronounced "all right." Was that uttered by Dr. Burdell? Still further, the marriage was secret, and to be kept secret. Was it probable, in view of such clandestinity, that the decedent would call at the clergyman's house in open daylight, with white gloves on his hands, and yet that fact is distinctly testified to by the domestic, who admitted the person calling for the certificate. At the first interview, as the man was leaving the door, Rev. Mr. Marvin stated, he thought he saw "daylight between his whiskers and his face," at the side, from the middle of the the ear to a point on a line with the mouth. "I thought they were false whiskers, and had sprung out a little;" "I remained so impressed up to the second interview;" "I did notice particularly at both the next times; at those times I did not notice that they were false; it would have probably operated as a bar to my marrying them, if I had discovered any deception." Again: "it was my design not to perform the ceremony if I discovered deception;" "I saw no indication whatever at the two last times that the whiskers were false. The impression made by my first observation was removed." Now, the suspicion in regard to the whiskers being false was not excited at the first meeting while the person was in the parlor, nor till he was leaving the door in full daylight. At the time of the marriage there was only one gas-burner lighted in a chandelier; and on the third occasion it does not appear whether the observation was renewed at the door. If they were false whiskers, and "had sprung out a little," at the first interview, it does not follow that the same accident would be repeated. In any event, the impression made on the mind of the witness was so strong as to be the subject of remark in his family and elsewhere. Dr. Parmley says, he "dwelt on the false whiskers;" and I cannot but regard it still as a suspicious circumstance.

6. At the time of the solemnization of the marriage, there were two domestics in the other parlor, privately in the dark, observing the proceedings. Only one of these was examined

on the trial. Sarah states, that she let the parties in at the door, and showed them to the parlor; "did not take much notice of the man; he was a nice, stout man on his foot; he had some kind of whiskers; heard Mr. Marvin say to his lady that the whiskers were full, that they were false." The lady was dressed in black, the folding doors were open two and a half or three feet, and she "got a peep at them now and then." During the marriage, the parties stood "sideways" to her. She did not hear the gentleman request the marriage should not be published; but says, "I heard the lady say, she did not want the marriage to be known; she said it; Mr. Marvin heard it and made an answer back." The witness also states: "I let the same gentleman in who was married, the next morning, when Mr. Marvin was at breakfast (eight or nine o'clock), I didn't pay much attention to his face; I didn't pay no attention, only he had whiskers, and white gloves on his hands." At the inquest, Sarah recognized the claimant and her daughter as the ladies who were present at the nuptials; she saw the corpse and testified: "I could not say; I thought it looked very like the man that was married; but I couldn't say whether it was him or not;" "I said it looked like him, that is all I said." * * "I told him (the Coroner) I could not say it was the same man, on account of the death; death disfigures people very much; if I saw the man living I could give a better guess; but seeing the man dead, it was pretty difficult to give a guess." * * "I saw the daguerreotype looked like him, and that was all I saw; I didn't say it was the man, and I didn't say it wasn't, nor I can't." * * "I could not see whether it was him or not, only it looked like him." Finally, when interrogated before me as to her belief of the identity, she answered, "I can't say," and refused to speak more definitely.

7. There is a large mass of testimony relative to Dr. Burdell's personal appearance. Rev. Mr. Marvin described the man he married as having a mustache, long and large whiskers about the lower part of the face, not heavy at the side, very black, hair dark, medium in abundance; whether the

face was full or thin, not recollected; complexion not fair nor very dark; height, five feet eight or nine inches; weight, 165 or 170 pounds. He was "slow of speech," voice not musical, "stooped considerably," and "walked something like a man of 60 or 65." He says, "I do not remember to have caught his eye at any time." He was neither "very cheerful" nor "enthusiastic" in the matter. Dr. Uhl said, the decedent had "two different manners;" that in regard to personal business of a delicate nature he spoke slowly, and there would be long intervals between the sentences; and at other times his speech was rapid, quick, and sharp. With this exception, the whole body of evidence in the cause exhibits Dr. Burdell as quick of speech and animated in motion. I am inclined to think that in stature, or in carriage, there was some inclination, or stooping. The natural color of his beard was a light brown, mixed with gray; but, as he dyed his hair, the appearance varied. At the time of his decease, it had been recently dyed. I have no confidence in this mode of identification; it can rarely be satisfactory, and certainly is not in this case. There may be general similarity in many details, and yet great difference in their association, in contour, and in expression. The combination and arrangement of the human features and lineaments are ordinarily so unique in each particular person, and the peculiarities of individual expression, tone of voice, gesture, and carriage, so marked and striking, that to a familiar acquaintance or friend there can be very slight chance of mistaking personal identity. Still, we constantly meet with general, as well as particular resemblances, among the millions of our race, which often deceive the casual observer, and which, where fraud is designed, may easily be made the basis of criminal personation, with the aid of art to help nature. It is obvious that, in an effort to pass a counterfeit partner to a marriage contract, there would be an attempt to come as near the genuine as possible. Certainly all startling discrepancies would be avoided, and the closer the approximation to a similitude, the greater the prospect of success. It is

consistent, therefore, with either side of the issue in this cause, that in the inventory which has been made of the features and characteristics of the person of the decedent, and of the person married on the 28th of October, there should be some general resemblance. For example, as to height, it would have been folly to present a tall man in the place of the decedent. Then, again, it must not be over-looked, that peculiarities of the voice and manner, arrangement of the hair, and carriage of the person, may all be imitated, more or less closely. In these respects, a personal friend, having a fair opportunity for observation, could not, as a general thing, be deceived. Familar intercourse produces that kind of knowledge which acts instantaneously, by an immediate and single process of recognition. We do not, at every meeting with an acquaintance, begin to compare features, and reason on the question of identity, but we recognize the whole object as a living unity. Changes in personal appearance consequent upon sickness, arrangement or color of the hair, do not, unless the departure be great, diminish the power of recognition; and dress has very little influence. Where persons, however, are not familiar, these circumstantials are of consequence. If, therefore, the intercourse has been slight, it is important that the elements for comparison should be as nearly alike as possible, in order to secure recognition. The first difficulty in the present instance is, that Mr. Marvin was called to judge of the identity of a living being with a dead body. The decedent came to his end by a sudden and violent death. Dr. Uhl testifies, that at first the change was so great that, but for the circumstances, he would hardly have recognized the corpse. Dr. W. B. Roberts says, the whiskers were "dyed blacker than ever," and he "should hardly have known him." When the body was examined by Mr. Marvin, on Sunday, the appearance had become more natural, but not so much as on succeeding days. I do not observe, however, that Mr. Marvin pointed out any other marks of resemblance at the second examination than were noted at the first view. At the best,

the difference between life and death, the wound in the face, the change of posture and dress, the closed eyes, the rigid mouth—motion, gesture, and carriage gone—all tended to present different elements of comparison. Some of these differences applied to the daguerreotype likeness; and it is a matter of common observation, that even this mechanical process of portraiture is not uniform in its production of resemblance.

The powers of perception and accurate observation, and the memory of forms, vary largely. Mr. Marvin states, that he possesses no unusual faculty in this respect. Dr. Parmley testifies, he said to him, " he was not good at recognizing persons ;" " that death changed the countenance so much, and he not being ready to recognize a person by sight, he did not know if he could have recognized a corpse, even if it had been the man he married." The opportunities for observation in this case were slight. All that occurred at the three interviews might have taken place within thirty minutes, certainly within an hour. The interviews occurred in the space of twenty-four hours, and presented a proximate succession of visual impressions almost like a single observation, and not such a repetition, at distant intervals, as would call for an act of the memory, and an effort at recognition. There was a lapse of three months between the dates of comparison. Under all these difficulties, it would not have been easy for a person of ordinary observation to have pronounced with positiveness upon the identity of the two objects.

Let us see, however, what Mr. Marvin did and said, when first called to testify. He was taken to view the corpse, and was then requested to state whether that was the body of the man he had married. This was done twice, and under circumstances of such striking responsibility as would naturally arouse the faculties and intensify their action, and lead him to probe his deepest recollection. There are various versions of what he said on these occasions; and a large part of the time of the court was occupied at the trial in the effort to exhibit his statements and conduct. In reports of conversations from different observers, variety is to be expected, the

substance being presented through different minds and memories. Sometimes great and palpable errors occur; but in the evidence on the point now reviewed, there is so much substantial harmony between the witnesses and Mr. Marvin himself, that I prefer to use his own language, especially where the course and operation of his own mind are under examination, and the witness has laid it bare with a frankness and candor deserving respect. On the Sunday succeeding the decedent's death, Mr. Marvin states, he did not recognize Mrs. Cunningham at all. Shortly before he was examined in this court, he visited her at the Prison, and he says: "I went, and at the first look of the woman, it flashed more upon my mind than ever that she was the woman I had married; or, in other words, she then resembled more the woman I married, than she did when I saw her on that Sabbath; I am perfectly satisfied that she is the woman I married on the 28th of October last." At the first interview, there was an utter and absolute failure to recognize; at the second, it flashed more "upon his mind than ever," she was the woman he married; and finally, he is "perfectly satisfied of it." A process somewhat similar, except that at the outset partial resemblance was observed, took place in regard to the man. He says: "I swore before the Coroner's jury that there were strong points of resemblance between the dead man and the man I married; I won't say that I said strong points, but I said points; I think I mentioned more than one point; I mentioned particularly about the mouth, and I may have mentioned, and I think I did, that I married a man about that height and weight; I don't remember whether I stated anything about the mouth more than it bore some resemblance; I don't think I told in what respect the resemblance was; I think there was some similarity about the mouth." * * * "I think I mentioned the beard and hair." * * * "I think the District Attorney, showing me the daguerreotype, asked if I recognized anything there in the man who came to be married, or something like that." *Q.*—"Did you not answer, 'I think I do about the mouth;

but there is so little resemblance, I should not like to swear definitely?' " *A.*—"I think that is my reply to the word 'but;' after that, I do not remember saying the rest of the reply." *Q.*—" When you were previously asked, 'Is the body that of the man you married,' did you answer, 'The man I married had larger whiskers,' and was that all the answer you made in respect to the man?" *A.*—"I presume I did so answer; I think I did, because the man I married did have larger whiskers—not thicker, but longer; I don't remember whether that is all the answer I made to that question, but, so far as I now recollect, I think it was." *Q.*—" You were asked, 'Had he a mustache?' and you answered, 'I cannot say?' *A.*—" It was something like that, a dubious expression; I think it was 'I cannot say.'" *Q.*—" Were you asked, 'Do you recognize either of these parties as the ones who came to your house to be married?' and did you not answer, 'The woman I cannot recognize at all; the man had larger whiskers; the deceased has no whiskers, except a goatee; the color of the hair on the face of the deceased and the man I married is the same?'" *A.*—"I think I did." On his second examination before the Coroner, and after he had seen Mr. Eckel, Mr. Marvin says: "I stated that the body up stairs resembled more the man I married than the man shown to me as Mr. Eckel." Still further: "I did not say I recognized the body, not in those words; do not think I told them I believed that to be the body of the man I married, for they asked me no question to lead to such a remark?" Now, nothing can be plainer than that Rev. Mr. Marvin was called as a witness at the inquest solely for the purpose of identifying the parties he married; and on the general question of recognition, he was morally bound to make as full and free a development as lay in his power. I have no doubt that he did. We must take him as answering according to his knowledge at the time. He justifies having given no positive opinion on that occasion, by saying: "I did not deem myself justified in doing so, inasmuch as I did not hear the man speak, which is one important point

in identifying an individual—the voice and the attitude, the position of the body when standing." This is true; but these points are just as important now, as they were at the time of the inquest. Mr. Marvin also freely admits, that he has been theorizing upon this question of identification. When he first entered the dwelling No. 31 Bond street, the idea was "preached" into him that Mr. Eckel was the man; he "was under that impression" before he saw the corpse, but he adds, "my faith in that theory was mightily shaken when I went up and saw the dead body. That was one of the reasons, after I had seen the dead body, I was not willing to swear positively. I had not at that time got entirely free from that theory, and supposed, when I saw Eckel, I did not know but I might see the man I had married." Again: "I thought it possible I might see a man in whom there were more points of resemblance than in Dr. Burdell." If this was possible in regard to a comparison with Mr. Eckel, is it not still possible in regard to other persons? Who can say whether Mr. Marvin might not yet be confronted with a man "in whom there are more points of resemblance than in Dr. Burdell," and so be justified in taking another theory? On seeing Mr. Eckel, Mr. Marvin continued: "My theory was all gone," and "I took the other theory, that Burdell was the man; I was as confident of it as of my existence." Mr. Marvin states, also, that since the decedent's death he has conversed with a number of persons who have described the personal characteristics, appearance, and manners of the deceased, and the description has invariably tallied with his own recollection. This admission of hearsay, and this theorizing, are very much in the way of a clear and unadulterated act of the memory. If the witness has been applying the facts to different theories, has been listening to descriptions, has allowed his mind to be impressed with the views of others, has been unwilling to give a definite answer about one man until he has seen another, and then expressed a conviction, founded largely upon his comparison between the two—in such a case, the court must be careful to dis-

criminate between the fact and the theory. It appears, then, that at the Coroner's inquest the witness, when asked if he recognized the body or the daguerreotype, did not say that he did, but stated that there was a resemblance about the mouth, the color of the beard and hair was the same, but the whiskers of the man were larger than those of the corpse. And again, after he had seen Mr. Eckel, and declared he was not the man, on the question of recognition being again put, he said, " the body resembled more the man" than Mr. Eckel did,—which was just no resemblance at all. These were Mr. Marvin's statements at the inquest; and I must do him the justice to say that, after a careful examination, I do not find them to vary from his testimony before me. The only difference between his position at that time and at this, lies in conclusions, not in facts. His evidence before me as to identity, is limited " to some resemblance in the mouth," the color of the hair and beard, the size and weight of the body; and, as to dissimilarity, the greater length of the whiskers. In regard to the mustache, at the inquest he could not say, but now he recollected it. I may add, that the resemblance about the mouth, relative to lineament or expression, could not be very distinctive, as the lower part of the face was mostly covered by the beard. In the absence, then, of an act of distinct recognition, after twice being placed on the stand, these are the points of resemblance upon which I am asked to pronounce the identification of a person so to be made out in a case of secret marriage and devolution of property as to declare it a legal conclusion. It is enough, in my judgment, that Mr. Marvin did not recognize the man, affirmatively, when he was invoked to test that very question. That was the whole object of his examination of the corpse ; twice he was there ; the daguerreotype was shown to him ; he saw Mr. Eckel; twice he was placed on the stand, and he never spake to an act of recognition, but only to resemblance, in regard to which he reasoned, theorized, and compared. He did not find the same picture. but some similitude to it, no greater, in my opinion, than

might be expected in an effort to simulate the person of the decedent; and if at this moment a person were produced who presented more points of resemblance to the man he married than Dr. Burdell, we might reasonably anticipate a change of his belief and conclusion.

8. There are several considerations touching the circumstances connected with this marriage, and other proofs adduced by the claimant, which may well be considered here.

(*a.*) The gentleman called on the clergyman three times— twice in the open day: the act was bold, but no bolder than the daring requisite to achieve a simulated marriage demanded. The first visit, if crime were designed, was necessary to make the arrangements and insure secrecy; for it is observable, that the injunction against publication was made and a satisfactory reply received at that time. The last interview grew out of the fact that the certificate was not prepared at the marriage.

(*b.*) It is urged, also, that an application would not have been proposed to Dr. Snodgrass, and that so intimate a friend of his, as Mr. Marvin, would not have been selected to perform the ceremony, had fraud been on foot. But Dr. Burdell at that time was not known to Dr. Snodgrass. Who can tell, had the latter been found home at Goshen by the claimant, whether a word would have been uttered touching a marriage; and, finally, the only witness who could have testified to the particulars of the interview at Goshen, was not examined. There is just enough in the circumstances to give a color of openness, and that is all. Augusta states that Dr. Burdell said, " he should like mother to go to Goshen," and it was understood the wedding should be at the house; and yet the decedent was not acquainted with Dr. Snodgrass, and not an effort was made to have the minister selected in his place perform the ceremony at the house.

(*c.*) Dr. Ware testified that he met Dr. Burdell with two ladies on the west side of Broadway, crossing to the north side of Bleecker street, on the evening of the 28th of October last, about eight o'clock, and the Doctor bowed to him; that

he was returning from No. 80 Macdougal street, the house of a friend, where he had called in consequence of a letter he received from him that day, dated the 27th of October. On cross-examination, it appeared that he had been to the same place, at the same time of the day, on the same business, a great number of times before and after the receipt of the letter, and that he had not connected the letter with the occurrence in the street, until he found the document, a week previous to his examination, after a search made at the instance of a person interested for the claimant.

(*d.*) The claimant stated to Miss Van Ness, in September, when the marriage was spoken of, that the Doctor, herself, and Augusta were going to Europe in the spring. In November, she told Dr. W. B. Roberts that she and Augusta were going. There is no question but that the decedent himself had been talking for several years of making a voyage to Europe, and after his intimacy with the claimant, spoke of taking her and Augusta with him. During the last fall and winter, he intimated to various parties the intention of going the next summer, or in May or June, and inquired particularly concerning the expense and the routes of continental travel. On the 30th of October, he spoke to Mr. Smith of having "ladies" accompanying him, and in January stated to Mrs. Dennison he would "take a lady" with him; a gentleman always fared better "when travelling with a lady." Not a witness, however, has been produced showing any recent declaration of an intention to include the claimant in the expedition, except Dr. Uhl, who testifies to a conversation of that tenor on the 27th of October; but, as I have observed elsewhere, there is nothing sufficient to fix that date definitely. This proposed journey to Europe, therefore, does not tend to establish the marriage. The evidence only shows that a voyage, associated by Mrs. Cunningham and Augusta with the period for disclosing the alleged marriage, was talked of, but the truth of the fact would not prove the truth of the association.

(*e.*) The marriage was secret. The assurance of secrecy

was obtained before the performance of the ceremony was ventured. On Mrs. Cunningham's part, it was certainly preserved with the utmost exactness. Indeed, if it were a fraud, it was necessary that silence should be preserved. Secrecy is a badge of fraud, unless a fair and adequate motive be presented. Marriage is honorable; and where its duties are voluntarily assumed by parties occupying an independent position, there must be some strong and controlling motive to induce a suppression of the truth. The motive presented by the claimant is, that the decedent had promised another party never to wed while she remained single, and was not prepared to disclose the marriage until he went abroad. I see nothing in the case to corroborate that view. If, as the claimant's counsel argued, he was forced into this marriage, and if he was driven into it by reason of the suits by which he had been assailed, he might, perhaps, through fear of ridicule upon that ground, as well as his previously expressed views in regard to the sex, have been desirous that the affair should be kept private. On such a hypothesis, I am not prepared to say there was not a motive. But secrecy and publicity cannot exist together; if the motive was strong enough to induce an entire seclusion of the matter from his family and intimate friends, it is certainly very extraordinary that he should speak of it to mere acquaintances, as if it were a known thing. As a slight turn of the wrist may parry a deadly thrust, so a slight variation of words may give an entirely different direction to the purport and meaning of language. The subject of conversation may be remembered, but where the precise phraseology is material, the lapse of time, the infirmity of human memory, the influence of the imagination, the harmony or the inconsistency of the statement reported with the conduct of the party as otherwise indicated, are all to be weighed by the court in determining the probability of mistake. Mr. Wilson testified that he met Dr. Burdell in Broadway, the second Tuesday or Wednesday before his decease, and on inquiring " How is Mrs. Cunningham, Mrs. Burdell that is to be?" received the reply, " He

was sorry it was Mrs. Burdell." The dislike expressed comports with the other evidence in the case, and the introduction of a small particle in harmony with it, an " if," would change the whole tenor of the phrase. Mr. Knowlton deposed to a conversation with the Doctor in December or January, in reference to an exchange of property, when the decedent spoke of some " little trouble in his family," and said, " he didn't know whether his wife would be willing to sign the deed." There was a difficulty at this time, arising from Mrs. Cunningham's claim of a lease, and no doubt it was mentioned to Mr. Knowlton ; but, with the evidence of Mr. Rich, his partner for years, that " his recollection of words is sometimes indistinct and confused"—" he is very apt to detail his inferences as part of the conversation"—there is fair room for question whether the word " wife" was used, or the witness drew an inference to that effect from the drift of the conversation. Catharine Lamb, who had been in the service of the claimant at a previous period, for three years, testified, that some time in October, when Dr. Burdell was attending to her teeth, the claimant said, " she was going to get married to Dr. Burdell," and, to a question of the witness whether it was so, he answered, " Yes, and you can come and live with me." This witness thus asserts a free and easy disclosure of an intention to consummate a marriage, which was carefully concealed from Miss Helen Cunningham, and made known to Augusta under the threat of killing her if she divulged it. In this connection, I may note the declaration of the claimant, mentioned by Dr. E. A. Roberts, that she " would not marry such a man as Burdell"—" would not marry a man that loathed her." An observation of that character is inconsistent even with a pretended marriage, and is not like to have been made subsequent to the wedding, though it may have occurred before.

(*f.*) Among the documents found in Mr. Eckel's possession, and claimed by Mrs. Cunningham, was a writing in these words :

" I, Harvey Burdell, of the city and county of New-York,

" being duly sworn, deposes and says, that he has not up to
" this present day, October 18, 1856, made or executed any
" will or testament, disposing of his property at his death, or
" any portion of it. In case any will or testament should ever
" appear, previous to this date (October 18, 1856), the same I
" pronounce to be an unmitigated forgery.

" HARVEY BURDELL."

It is supposed that this paper, signed ten days before the
alleged contract of marriage, was designed as an assurance
to the intended wife, against a hostile will. But a will could
not affect dower in real estate, and as to personalty, the wife's
rights could be defeated at any moment by a testamentary
instrument. If a new will was made at this date, a previous
will, whether false or genuine, would be inoperative. I can
see no connection between this paper and a contemplated
marriage, supposing that the parties understood the law on
this subject. If they did not understand the law, it is impos-
sible to reason safely on the design of the paper. It was
found in Mr. Eckel's secretary, but how it came to his posses-
sion is not known. He might have proved that, but he was
not sworn; and, under all the circumstances of this case, I
shall make no presumption of lawful possession because it
was discovered in his custody. One fact stands out in bold
relief on the face of the document; it refers in explicit terms
to the possibility of death, and to the presentation of a forged
will; it seems to originate from an apprehension that on his
decease some fraudulent paper might appear, disposing of his
property. Death and forgery are the two subjects of this
extraordinary writing.

III. Although the evidence thus far in support of the alle-
gation of the claimant is entirely insufficient to identify Dr.
Burdell with this marriage, still, if on a full consideration
of all the circumstances, it is probable he was married, if,
instead of finding reason to question, there should be a con-
currence of facts tending to establish the marriage, then the
defects of the direct evidence might thus be supplied by the

indirect and collateral proofs.    It becomes necessary still further, therefore, to inquire whether the conduct, treatment, and declarations of the parties were concordant with the marital relation, or were repugnant to it, and whether previous intimacy and intercourse rendered a marriage probable.

1. Helen Cunningham states that her father died about three years ago, and that Dr. Burdell visited her mother in 1854, which must have been shortly after the decease of her first husband.    Hannah Conlan testifies to circumstances occurring in November, 1855, and statements in reference thereto, by the claimant, in July 1856, which show an early intimacy.    There is no question that up to some time in the summer of 1856, these harmonious relations had not been disturbed, and that the decedent spoke of the claimant invariably in the highest terms.    He expressed the belief that she was rich, praised her and her family, her capacity and management.    He was with her at Saratoga over two weeks, in August, 1855; he introduced her to his friends, he accompanied her to parties, walked arm in arm in the streets, and finally, not only took her into his house, but on the 1st of May, 1856, leased her the premises.    His whole conduct showed confidence and attention.    Miss Van Ness says, she knew of their engagement, and it was understood by both parties that she should be the bridesmaid.    She describes their intercourse as invariably tender and affectionate, excepting some "unpleasantness" mentioned by Mrs. Cunningham shortly after the 1st of September; and then within two weeks she requested her to witness a secret marriage, "said he had come to his senses, and they were going to be married privately, and were going in the spring to Europe."    Dr. W. B. Roberts, who was a frequent visitor at the house, observed "nothing but kindness" in the mutual deportment of the parties.    The claimant stated to Mrs. Denison in the summer, "that they were "engaged," but asked her "to keep it a secret."    In September, she told officer Moore she was "his wife;" and officer Little, " that she was his wife by every tie—that he had wronged her."    In September or October,

she spoke to the Rev. Dr. Beecher of the engagement, but said, her children were opposed to it. In one count of the complaint for breach of promise, the date of the alleged promise is laid in February, 1855, the agreed time for consummation "the summer of 1856," and the breach "in or about the month of July, 1856." In another count, the time for consummation is, "when he should be thereunto afterwards requested," and a request is averred September 15, 1856. This complaint was verified under oath by the claimant. Whether the differences between her and the decedent arose out of the charge of stealing he preferred against her, or from jealousy on her part, or from both these causes, there can be no doubt at all of the existence of a serious difficulty, and that it occurred in the summer of 1856. Nor is there any reason to suppose the parties were ever restored to their original relations. They went together to Saratoga the 26th of July, and this looks like a renewal of intimacy; but he remained there only three days, and the next we know is, the preparation of the papers in the breach of promise suit, and the violent outbreak in September, in regard to abstracting a note from his safe. Prior to July, their mutual intercourse was in harmony with a project of marriage; in that month the claimant has declared under oath that a breach of promise took place; and thenceforth, up to the time of his decease, the general character of their relations was marked by hostility. He was not free in his denunciations to Mrs. Cunningham's friends, but with his own, there was no measure to his invective. There is no proof of vacillation. During their intimacy, he spoke of her with respect; during their warfare, with every token of resentment. There was a strongly marked general current, first in one direction, and then in the other, with little, if any, fluctuation. I do not mean that they were in constant altercation, or that appearances were not measurably preserved when others were present, or when he was conversing with her friends. The claimant was determined to remain at 31 Bond street, and no doubt she had hopes of conciliating the decedent. He was determined she should not remain, and no doubt

desired to effect his purpose peaceably. Some of her money was in his hands, which he was occasionally called to disburse; by the terms of the lease she had charge of his rooms, and their occupation of the same house brought them frequently in company; so that, altogether, even after a hostile feeling was aroused, it would not be demonstrated, save on a collision of interests or plans. Such collisions took place in September, October, December, and January. At the beginning of December there was a quarrel, and the decedent, seizing a gun, drove her out of the room. About the same time, Dr. Wilson testifies he heard her say, "that Dr. Burdell would learn to behave himself before she vacated his house."

2. The difficulty arising out of the accusation in regard to stealing notes from his safe, Ashton says, originated in June or July. The claimant stated to Callahan, the Doctor "was under promise of marriage, and got up this note to get her out of the house, so the promise would be broken off." That marked her appreciation of his wishes, and the bearing of the accusation upon the prospect of matrimony. The Doctor made the charge in the presence of Mr. Smith in September, he asserted it October 15 to Mr. Crombie, the last of the same month to Mrs. Wilson, and as late as January 26 to Mrs. Crane. Whether true or false, the allegation was made; and I think he believed it to be true. June 28 he had the safe-lock altered, in consequence of having lost one of the keys; and that key was discovered, stuffed away in a bag in the attic, at the time of the inquest. There can be no question that Mrs. Cunningham had given the decedent a note for $612.30 for the Burdell judgment, which was assigned to her name in December, 1855. That note disappeared. On the 20th September, as appears from Mr. Spicer's affidavit annexed to the complaint in the slander suit, matters came to such a pass that the police were called in. The decedent charged Mrs. Cunningham openly with having taken the key of the safe from his pocket while he was asleep on the bed, and abstracted the paper. She denied it. Davis

states she said, " he had ruined her and her family;" " she would have his heart's blood:" and the sworn complaint in the slander suit asserts, that the Doctor assailed her at that time with the vilest abuse and epithets. Subsequently to this, Mary Donahue says, that during the Doctor's absence she saw Mrs. Cunningham and Augusta examining papers at the safe. She states, that there were two doors open, while the safe has but one; and this error counsel urged as detracting from her accuracy. Two keys were furnished for the new lock of the safe put on in June : one was found in the decedent's pocket-book; what has become of the other does not appear.

3. I have been surprised, on coming to examine the papers, to discover that the suit for a breach of promise of marriage was originated in September. The summons is dated September 16, and the complaint was verified the same day. This was before the police were called in, Mr. Spicer's affidavit showing the date of that to have been on the 20th September. Some time must have been occupied in preparing these papers. So it is apparent there was a design to bring the action, before the middle of September. The summons in the slander suit is dated October 10, and the orders of arrest in both cases were granted in October.

II. The decedent was arrested October 15. On the same day he took out a subpœna for Mrs. Cunningham to appear before Justice Flandreau, returnable on the 16th. The unexecuted release found in Mr. Eckel's possession is dated October 18, and the discharges were dated October 22 ; so that the parties probably came almost immediately to a settlement. The decedent said the suits were brought " to extort money," but Mrs. Cunningham told Mr. Frazer she would not settle " unless it was in some honorable manner." No money was paid. The decedent declared to the Deputy Sheriff, in the presence of the claimant's counsel, the day the suits were discharged, " they were glad to let him go;" and in December to Mrs. Williams, that " he was going to take

her up for stealing notes and other things, and she was very glad to make a settlement." The terms of the adjustment are thus stated in writing:

" In consideration of settling the two suits now pending between Mrs. E. A. Cunningham, I agree as follows:

" 1. I agree to extend to Mrs. E. A. Cunningham and family my friendship through life.

" 2. I agree never to do or act in any manner to the disadvantage of Mrs. E. A. Cunningham.

" 3. *In case I remain and occupy the house* 31 *Bond street* as I now do, I will rent to Mrs. Cunningham the suits of rooms she now occupies, *third floor, attic, and basement,* at the rate of $800 a year.                "HARVEY BURDELL."

The parts of the paper underscored have been crossed with a pen.

There are some remarkable stipulations in this agreement. I only notice, at present, that the settlement being in writing, it must be taken as comprising all the terms of compromise, and that the guarantee of friendship, the assurance against hostile acts, and the new letting of the premises, are not conditions looking towards matrimony, but directly away from it.

4. The letters of the decedent to Miss Hubbard contain statements showing the progress of the affair between the parties. On the 10th of October, he writes: " Mrs. Cunningham is about to take some steps to injure me, I think;" on the 15th, "The trouble I expected with Mrs. Cunningham may not take place;" on the 1st of November, four days after the alleged marriage, "I think that I should not have had any trouble with Mrs. Cunningham, if it had not been for Spicer, who joined her in her attempt to injure me; but all trouble is now at an end, I think; she is a designing, scheming, and artful woman; all her designs were to get me to marry her; but * * * [she] has failed." November 13 : " There is no trouble now between me and Mrs. Cunningham ; I think Mrs. C. will not make any more disturb-

ance, and that she will be quiet, and leave 31 Bond street as soon as she can with a good grace." " I shall certainly get rid of Mrs. Cunningham by spring; and I may get rid of her now very soon. * * * I assure you, as soon as I can get her out of the house I shall."

5. After the alleged marriage, the parties did not cohabit together. The only evidence tending to show cohabitation is, that of Augusta and Helen. There is something strange and singular in the statements of these two young ladies in regard to the room occupied by their mother. A fact of that kind is ordinarily one well known in the family. Helen says, that her mother slept in the small bedroom, second story, before October 28, and continued there until early in January; and yet, at another place, her words are, "I did not know that the Doctor and mother occupied the same room, but I supposed so." According to her account, the third story front room was not used, except as a family sitting-room, until she was taken sick in January. Augusta, on the other hand, states that, "most of the time," from the 1st of May till 28th of October, her mother slept in the third story back room, or fourth story front room, with the exception of a few nights before the marriage, when she slept in the small room, second story, and after the marriage occupied the back room, second story, with the Doctor, until the last of December; that she knocked at the door almost every morning, and her mother always answered her. During this entire period, it is to be observed, that Helen supposed her mother cohabited with the decedent, though the marriage had been kept strictly concealed from her; and a portion of the same time the cohabitation was continued while Mrs. Snodgrass was visiting Mrs. Cunningham. Mary Murphy, who was there two months prior to the 10th of November, saw the wardrobe bed in the small room, second story, down only once. She made all the beds; supposed that only one person slept in Dr. Burdell's bed; that Mrs. Cunningham had the front attic, and says, "I never knew of Mrs. Cunningham's sleeping in Dr. Burdell's room." Hannah stated, that

she always supposed that Mrs. Cunningham slept in the third story, front room, after Mr. Thayer left in the fall. She went there at night for orders for breakfast, and saw her there in her night-clothes. Mary Donahue, whose service commenced 26th November, and who made the beds, never observed the wardrobe bed down in the small bedroom but once, and then she carried the feather-bed to the third story, front room, two weeks before Christmas. She says she " always considered Mrs. Cunningham slept in the third story front room ;" knocked there to arouse her for breakfast in the morning, and carried water, and adjusted the fire at night. She judged from appearances that only one person slept in Dr. Burdell's bed, two in Mrs. Cunningham's, and, frequently, no one in Mr. Eckel's. She saw the key in the door communicating between Mr. Eckel's and Mrs. Cunningham's rooms once, and at other times placed between the mattresses on Mrs. Cunningham's bed. The young ladies slept in the attic. She heard them go to their room; knocked at their door in the morning ; Helen was generally the first up in the morning; the witness stopped at Mrs. Cunningham's room at bed-time, and Mr. Eckel was often there in the evening.

6. Emily Sallenbach testified, that Mrs. Cunningham and Augusta called at her mother's rooms, 573 Broadway, she believed the 28th of October, about seven o'clock, stating that they came to wait for a gentleman. The gas was not yet lighted. After fifteen or twenty minutes, a gentleman called, and the parties bid each other good evening. Mrs. Cunningham exhibited some papers to this person, and they examined them together. After he came, Augusta played on the piano, and the witness was sent out of the room for a glass of water. She saw no gloves. This was the only time the ladies were ever there in company with a gentleman. At the Coroner's inquest, she picked out Mr. Eckel from a number of persons, and identified him as the man. This witness is in direct conflict with Miss Augusta Cunningham as to the person present, and some of the circumstances

which occurred at the interview. There is no satisfactory determination of the precise date when the transaction took place, so as to identify it with the evening of the wedding; but the identification of Mr. Eckel, and the examination of the papers, connected with the discovery in Mr. Eckel's secretary of documents belonging to Mrs. Cunningham, and bearing on this case, indicate confidential relations. Mrs. Wilson and Mrs. Williams state, that the decedent told them in December, the claimant "had a lover in the house." Dr. Allen T. Smith testifies, that on the 27th or 28th of January, the decedent spoke to him "about Mrs. Cunningham and · Eckel both occupying one room." Whether he was justified by any facts within his knowledge in making this assertion, or whether it was untrue, it seems probable, from the evidence of Dr. Parmley and Dr. Main as to the appearance of a male person in the third story front room, from the two visits made by the parties in January to Cristadoro's to select a wig, and from other circumstances in the case, that a degree of familiar intimacy existed, much beyond ordinary acquaintance. The presumption thus arising was not removed by Mr. Eckel; for, though present some portion of the trial, he was not called to testify.

7. I have not overlooked the suggestion, that the decedent was personated at the wedding by Mr. Eckel; nor the evidence of Dr. Parmley in reference to the transformation in the appearance of a person he saw in the third story front room, at a date which he thought was the 28th of October; nor the testimony which was adduced to show, that between five and six o'clock of that day, Dr. Burdell was present at the delivery of Mr. Eckel's bookcase; nor the declarations of ill-will, on the part of Mr. Eckel, toward the decedent, stated to have been made on the 26th and 27th of January, in the presence of the claimant; nor the testimony of Mr. Douglas, that he was in company with Mr. Eckel the evening of October 28. It is not necessary to criticize this class of proofs. The fact that there is no satisfactory evidence pointing out the person who simulated the decedent at the

marriage ceremony is not important, provided simulation be proved. If the deed was done, it is not necessary to point out the instrument.

8. The character, uniformity, and continuity of the decedent's declarations, after their harmony was disturbed, and which bear upon the probability of his being the husband of the claimant, may thus be indicated:

(*a.*) He considered himself watched, and stated so to Mrs. Crane, Mrs. Denison, Mrs. Williams, Mrs. Stansbury, and the Rev. Mr. Cox. Callahan, Ashton, and Hannah, show that he was watched, and that they were set to listen.

(*b.*) He frequently spoke of the claimant in terms of contumely and apprehension. Dr. Roberts testified that, when conversing in October about the suits, he denied any intention to injure the claimant, and said he knew of nothing wrong on her part; but that was an exception to his usual course. The articles of agreement settling the suits look friendly, and guarantee friendship; but still their reduction to writing shows there was no confidence. What he thought is apparent from other sources. He said to Hector Moore, September 20 : "he did not know what he was going to do with her—that she acted as if she was determined to ruin him." In the presence of Mr. Crombie, and Mr. Thayer her counsel, October 23, when the suits were discontinued, he charged her with infamous conduct, in terms I need not repeat. To Mrs. Wilson, the last of October, he described her as a very "artful," "dangerous woman," "always planning." She told him "she had never been thwarted in her life; whatever plans she attempted, she generally carried through." To Mrs. Williams, in December, he said she was "a perfect fiend," and "would as soon dirk a man in the street as not;" he was "afraid of her,"—she was "plotting." To Mr. Olney and the Rev. Mr. Cox, in December and January, he spoke of her as "that woman,"—"that woman down stairs;" and on the 26th of January, he characterized her to Mrs. Crane as a "very artful woman, who would outwit the devil."

(*c.*) He was generally uniform in his declarations against marriage.

Dr. Walter B. Roberts states, he told him " he never intended to marry ;" " he was preaching that to every one he met ;" " a regular habit." When arrested in October, he declared to Mr. Frazer, " he never had promised her; did not wish to get married ;" to Clarence Frazer, " he hoped his hands would be withered if he ever married" her; to Crombie, the Deputy Sheriff, October 23, " he never would marry any woman ;" to Mrs. Wilson, in October, " he never would marry her, and he had told her so ;" to Mrs. Williams, in December, " she had given up all idea of getting him ;" to Hannah Conlan, on New-year's day, he disavowed matrimonial intentions, in the very presence of the claimant; to the Rev. Mr. Cox, on the last of January, " he never had been married, and never meant to be married ;" to Mrs. Benjamin, January 25, " he never was married, and never should get married ;" and to Mrs. Crane, January 26, " he never had been married," and " he was further from it than ever."

(*d.*) He was violent and denunciatory in his language, and emphatic in his injunctions, that Mrs. Stansbury, with whom he was negotiating a lease, should never permit her to return to the house. " She is determined," he said, " I shall marry her, and I am determined I won't marry her ;" " he was continually watched by her," " and did not feel safe."

(*e.*) He was determined to compel her to leave the premises.

He said in June to Mrs. Wilson, " he was willing to take the house off her hands; in September, to Hector Moore, " he wanted to get her out ;" in October, to Mr. Frazer, after the suits were settled, " they were going to leave 31 Bond street the 1st of May ;" in the same month to Clarence Frazer, " he would set fire to the house if she did not leave after May ;" the same month, he urged Mrs. Wilson to take the house, " he would get Mrs. Cunningham to leave, even if he had to hire her." He expressed the same wish to Mrs. Williams, adding, that " he wanted to get Mrs. Cunningham

out of the house, and he meant to do so, if he had to pay her for going." He spoke to the Rev. Mr. Cox, within two weeks of his death, of the contemplated change, and the proposed letting to Mrs. Stansbury. Hannah Conlan states, that in the evening of January 24, he said, " How am I to get rid of these devils ? I must get them out of the house some way ;" and Mary Donahue, that he exclaimed, when he came down stairs in the afternoon, " My God ! what am I going to do with these people ?—they will have my life at the last !" To Mrs. Crane, January 26, he said, " Thank Heaven, I will be rid of them all on the 1st of May ;" and to Allen T. Smith, January 27 or 28, " he was determined to have her out of the house the 1st of May."

7. These are his declarations. Did his acts correspond ? Mrs. Stansbury's narrative on this point is clear, distinct, and forcible. She had known the decedent for twenty years, and called on him for professional attention the latter part of November. In the course of conversation, she inquired if he knew of any one who had a house to dispose of as he disposed of his ; and he replied, that he intended to let his house in the spring, as he did not " like the parties altogether." The subject was renewed about the middle of December ; he then was more free ; stated that Mrs. Cunningham was " a very bad woman, and he wished to get her out ; but she had the house until the 1st of May, and therefore she would have to remain in until then ;" " if she did not go out then by fair means, he would put her out by force ;" that " when he was in the house she continually threw herself in his way, and when he was out, he was watched." At this time the parties came to an understanding, that Mrs. Stansbury should have the premises for one year from the ensuing May, at $800 per annum. The 12th of January, Mrs. Stansbury called again ; he told her he had informed Mrs. Cunningham that he had let the premises, and that she " claimed to have a lease of the house for the next year," and would not go out of it. This brings me to the consideration of the lease, dated January 24, found in the

decedent's safe after his decease. The legal effect of that paper is to release all causes of action, and it contains also an agreement to surrender the premises, No. 31 Bond street, the first day of May. The third clause of the agreement, on the settlement of the suits, originally was written in this way: "*In case I remain and occupy the house No. 31 Bond street*, as I now do, I will rent to Mrs. Cunningham the suits of rooms she now occupies *–third floor, attic, and basement* —at the rate of $800 a year." As first drawn, the agreement was conditional on the decedent's continuing to occupy the premises. The words underscored were stricken out by a pen, and then the contract was absolute. On the 12th of January, the Doctor told Mrs. Stansbury, that Mrs. Cunningham had set up this claim. Again, when the suits were settled, no release of the causes of action was signed. A general release, drawn by the decedent, dated October 18, 1856, was found unsigned among Mrs. Cunningham's papers. Thus matters stood when Mr. Frazer appears to have met Mr. Thayer, and learned from him that the suits were not "settled," but "discontinued." This he communicated to the decedent, Saturday, January 24, about 4 P.M., who said "very little," and "turned immediately away."

Dr. E. A. L. Roberts testifies, that about the beginning of December, the claimant told him, "she was foolish for discontinuing the suits;" she had been to her counsel again, but "he would not have anything to do with it." Here, then, were these two outstanding claims brought to the decedent's notice —the lease and the causes of action in the suits. No doubt, as he turned away from Mr. Frazer, he went immediately home. On that day there was a disturbance in the house: Hannah says, a cry of "murder!" The Doctor came down and went out, as was supposed, for the police; but at Helen's intercession, on his return to the door, went up stairs. Mary Donahue testifies that she said, "O Doctor, for God's sake come in, and come up stairs, and I'll get my mother to give you up those papers!" Hannah says, Mrs. Cunningham stated this difficulty to be "about signing a paper, but she

never would." Dr. Burdell showed the release, signed, to Mr. Frazer the next morning, January 25, stating, that he had obtained it from the claimant the night before; and also, the same day to Miss Hubbard, saying that there had been trouble; "Helen told him to go and get his dinner, and her mother would sign it that night." The document was next exhibited to Dr. Allen T. Smith, on Tuesday or Wednesday, January 27 or 28, in connection with the statement that "it was a general release and an agreement to leave the house the 1st of May." Finally, January, 30, about 2½ or 3 o'clock, the decedent told Mrs. Stansbury, "it was all settled with Mrs. Cunningham"—"there would be no trouble." At that time he accompanied Mrs. Stansbury through the house, and when the examination of the premises had been made, read over the agreement to let, and stated that Mr. Stansbury was to call the next morning to sign the document. The morning came, and he was found dead in his room, and Mrs. Cunningham claimed to be his widow.

It becomes my duty to pronounce against this allegation of marriage. The reasons leading to this conclusion may be summarily stated thus:

1. The marriage was clandestine—and there is no presumption in favor of a secret marriage, not preceded nor followed by cohabitation.

2. The clergyman selected was unknown to the parties.

3. The place appointed was distant from the decedent's residence.

4. The only witness chosen to be present was one of the daughters of the claimant.

5. The witness is contradicted by her own statements, made under oath at different times, and by other evidence.

6. There is no sufficient identification of the decedent—no act of recognition on the part of the clergyman—but only resemblance indicated.

7. The certificate of the marriage affords no evidence of identification.

8. The certificate is incorrect as to the name of the deced-

ent, and evinces ignorance or error as to the place of his nativity.

9. There were suspicious circumstances attending the transaction.

10. The marriage was not confided by the claimant to any member of her family, save one.

11. There was no private or public acknowledgment of cohabitation; but the alleged parties lived as single persons.

12. On the part of the claimant there were confidential relations with another person, in respect to whom the decedent charged improper intimacy.

13. The terms of the settlement of the suits alleged to have led to the marriage are in writing, and exclude the assertion of other terms.

14. The marriage took place after the settlement had been concluded and carried out.

15. The claimant executed written instruments to the decedent in her own name after the marriage. She assigned a judgment; he drew a check to her order, she endorsed it; and he swore to an affidavit: in all which she was described by her own name.

16. At the settlement of the suits she stipulated for a new lease of the house.

17. Shortly before the decedent's death she released all causes of action, and abandoned her agreement for a lease.

18. He spoke of her with contumely and reproach, and made repeated declarations against marriage.

19. He was determined to compel her to leave the premises, and a new lease to another party was about to be executed.

20. The marriage was first announced after his death.

This is not a case where the proofs have left the mind of the court in doubt. Not only are they insufficient to affirm the marriage, but in my view they utterly negative and overturn it. There is not a solitary sign of that relation, but at every point facts stand out wholly inconsistent with a matrimonial union, from the 23d of October until the decedent was carried to his grave; speech, writing, and actions which

express more than either, constantly proclaim that the parties were single.  We find the decedent and the claimant at one time upon terms of mutual kindness, attention, and daily intercourse.  This concord was unbroken until, on the one side, jealousy, and on the other suspicions of treachery and improper dealing, gave it a blow from which it never recovered.  From that period until the decease of Dr. Burdell, I can discover nothing but a mutual struggle,—on the part of the man to eject the woman from the house, and relieve himself from her presence and influence,—and on the part of the woman an unceasing and persistent determination not to be driven from the strong position she occupied in the very centre of his house.  He charges her with stealing—she assails him with actions for slander and breach of promise of marriage; and then the combatants draw off, and the suits are discontinued.  At this point the claimant insists that a marriage was consummated—not through affection, for the absence of that is apparent—but through fear, by intimidation —in fact, by coercion, the decedent having presented to him two alternatives—to marry his assailant, or to face her attack and defend the suits.  But it must be remembered, that the suits, if continued, would have been likely to affect the plaintiff's character as well as the defendant's; and the latter might, therefore, well doubt whether they would ever be pressed, even if he remain passive.  The application of the Doctor for a subpœna to Mrs. Cunningham, on a charge of stealing, shows that he had no intention of submitting quietly. Finally, all proceedings are abandoned on both sides, the terms of the compromise are committed to writing, and the settlement was closed the 23d day of October, five days before the alleged nuptials.  Such an important element in the arrangement as a compulsory marriage, would hardly have been left by a suspicious and vigilant party to be executed subsequently.  The stipulations of settlement between antagonists are ordinarily consummated on both sides simultaneously.  Indeed, if a marriage were understood as a part of this adjustment, there would have been no formal adjustment

at all; the marriage itself, *uniting the parties together*, would have instantaneously given the wife a home in her husband's house without a rent charge; would, by its necessary effect, have blotted out all causes of action, and rendered useless and futile all agreements and all releases. The whole process of determining these controversies, then, raises the strongest presumption against even a voluntary marriage intended shortly to be solemnized, and is utterly repugnant to a compulsory marriage, insisted upon as one of the terms of the settlement. Let us look a moment at some of the facts. The decedent had, in the summer, ceased to take his meals in the house. Did he return after the alleged marriage? He had spoken of Mrs. Cunningham as an artful and dangerous woman. Did he desist from such representations to his confidential friends after the alleged marriage? Was it his wife he thus characterized and abused in the most bitter and venomous terms—a woman whom he had taken to his bed, and whom he expected to recognize in a few months before the world, by his name, and as the partner of his station and wealth? Was it a proposed wife who took a new lease of the house in the agreement of October 23? Was it a proposed wife whom he desired to sign the unexecuted release of all causes of action the 18th of October? Was it his wife with whom he was dealing on the 14th of November, when he drew his check to the order of " E. A. Cunningham," and she endorsed it in that name, and when, by the same name, and, on the same day, she assigned to him the Burdell judgment, and on the 19th of November, appeared before a Commissioner and acknowledged the instrument, Mr. Thayer, the counsel, swearing to her identity as " Emma A. Cunningham?" Was it his wife the decedent described in his affidavit, sworn the 24th day of November, and found in Mr. Eckel's possession, as " Mrs. E. A. Cunningham?" Was it his wife who he feared would renew the suits in January, and who signed the release of January 24, in the name " E. A. Cunningham?" Again, he was about letting, for the ensuing year, the portion of No. 31 Bond street, not occupied

by himself, reserving some apartments for his own use. As early as June he had begun the struggle to be free. Step by step may be traced the progress of his efforts to remove the claimant; and finally, when, after a scene of violence on Saturday, January 24, he procured a written agreement to surrender the premises on the first of May, he proceeded to consummate the long pending negotiation with Mrs. Stansbury; and the afternoon of Friday, 30th, announced the papers ready for signature the next day. These facts are not to be mistaken—his purpose was understood by her, declared by him. Were these two persons standing at this point of antagonism, husband and wife? Were they mutually conscious of a lawful marriage? Here was a woman of energy and determination, supposed to be equal to the task of forcing him into compulsory wedlock—alleged to be then holding in her hands the fruits of that bold project, invested with a right of dower in his estate, a title to abide in his house, and receive maintenance and support—able at any moment to proclaim her rights to the public and enforce them before tribunals of justice, and her alleged husband was on the eve of signing an instrument which in a few months would eject her and her family, and introduce others in their stead. That little paper, signed by Mr. Marvin,—the certificate of marriage,—if it certified the truth, was a potent argument against the contemplated deed; but not a sound was heard, and the name of wife never passed her lips, until death arrested the consummation of the act, and she declared herself the widow of the deceased. Under such startling and extraordinary circumstances, it is impossible to believe that these parties thus, for the space of three months, dealing, acting with, and treating each other—both holding themselves out to the world as single, and each toward the other behaving in a manner wholly inconsistent with the marital relation—were man and wife? We must treat such a case, in the conclusions we draw, according to the ordinary course of human nature. Conduct improbable, unreasonable, absurd, and inexplicable, in view of one relation, but natural, reasonable, probable, and expli-

cable, in view of another relation, possesses an overwhelming power in determining the relation, and deciding between truth and falsehood. A series of circumstances, such as in Providence has been developed in this cause, showing at every step and link a connected and harmonious chain of evidence against this pretended marriage, cannot be fabricated; it is the result of a natural process; it strikes the mind with irresistible force, and leads to entire satisfaction and conviction that the decedent was unmarried at the time he came to his unhappy death.

Let an order be entered declaring that Emma Augusta Cunningham is not the widow of the deceased, and directing that letters of administration be issued to the decedent's next of kin, on giving the proper security.